22-2128 & 22-2129

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**PRIMESOURCE BUILDING PRODUCTS, INC., CHENG CH INTERNATIONAL CO., LTD., CHINA STAPLE ENTERPRISE CORP., DE FASTENERS INC., HOYI PLUS CO., LTD., LIANG CHYUAN INDUSTRIAL CO., LTD., TRIM INTERNATIONAL INC., UJL INDUSTRIES CO., LTD., YU CHI HARDWARE CO., LTD., ZON MON CO., LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,**
*Defendants-Appellees*

---

Appeal from the United States Court of International Trade in
case no. 1:20-cv-03911-MAB, 1:20-cv-03934-MAB, Judge Mark A. Barnett

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT PRIMESOURCE BUILDING PRODUCTS, INC.**

December 23, 2022

Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel to PrimeSource Building Products, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-2128 and 22-2129 |
| **Short Case Caption** | PrimeSource Building Products, Inc. v. US |
| **Filing Party/Entity** | PrimeSource Building Products, Inc. |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/23/2022

Signature: /s/ Jeffrey S. Grimson

Name: Jeffrey S. Grimson

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| PrimeSource Building Products, Inc. | N/A | PriSo Acquisition Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Wenhui (Flora) Ji<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K St NW, Washington, DC 20006 | Yixin (Cleo) Li<br>5335 Wisconsin Avenue, NW, Suite 810<br>Washington, DC 20015 | Jacob M. Reiskin<br>5335 Wisconsin Avenue, NW, Suite 810<br>Washington, DC 20015 |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Mid Continent Steel & Wire, Inc. v. United States, No. 15-00213 (Ct. Int'l Trade filed Aug. 6, 2015) | Pro-Team Coil Nail Enterprise Inc. v. United States, No. 22-2241 (Fed. Cir. docketed Sept. 22, 2022) | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ..................................................................... ii

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF ISSUES ................................................................2

STATEMENT OF THE CASE AND FACTS RELEVANT TO THE ISSUES.......3

SUMMARY OF ARGUMENT ................................................................13

ARGUMENT ................................................................14

I. STANDARD OF REVIEW................................................................14

II. COMMERCE HAS THE BURDEN TO FIND THAT LIANG CHYUAN'S RATE REASONABLY REFLECTS ITS POTENTIAL DUMPING MARGIN ................................................................16

A. Expectedness: A Default Methodology Does Not Remove the Duty on Commerce that the Record Must Support its Chosen Methodology as Reasonable................................................................18

B. Representativeness: The Presumption of Representatives of the Mandatory Respondents Can Be Rebutted ................................................................27

C. Conclusion................................................................36

III. THE AFA RATE ASSIGNED TO THE MANDATORY RESPONDENTS WAS NOT RESONABLY REFLECTIVE OF THE POTENTIAL DUMPING MARGIN OF LIANG CHYUAN ................................................................36

IV. COMMERCE SHOULD HAVE CALCULATED A RATE FOR LIANG CHYUAN ................................................................46

CONCLUSION AND RELIEF SOUGHT ................................................................54

# TABLE OF AUTHORITIES

## Cases

Albemarle Corp. v. United States,
821 F.3d 1345 (Fed. Cir. 2016) ........................................................ passim

Arista Networks, Inc. v. Cisco Sys., Inc.,
908 F.3d 792 (Fed. Cir. 2018) ..........................................................20

Baroque Timber Indus. (Zhongshan) Co. v. United States,
971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) ......................................31

Bennett v. Spear,
520 U.S. 154 (1997)..............................................................................22

Bosun Tools Co. v. United States,
463 F. Supp. 3d 1308 (Ct In'tl Trade 2020) .......................... 25, 26, 37

Bosun Tools Co. v. United States,
493 F. Supp. 3d 1351 (Ct Int'l Trade 2021) ........................................26

Bosun Tools Co. v. United States,
No. 2021-1929, 2022 U.S. App. LEXIS 624 (Fed. Cir. Jan. 10, 2022) (unpublished) ........................................................ passim

Changzhou Hawd Flooring Co. v. United States,
324 F. Supp. 3d 1317 (Ct Int'l Trade 2018) ........................................48

Changzhou Hawd Flooring Co. v. United States,
848 F.3d 1006 (Fed. Cir. 2017) ..........................................................11

Changzhou Hawd Flooring Co. v. United States,
947 F.3d 781 (Fed. Cir. 2020) ................................................ 41, 47, 48

Changzhou Trina Solar Energy Co. v. United States,
975 F.3d 1318 (Fed. Cir. 2020) ..........................................................15

Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,
701 F.3d 1367 (Fed. Cir. 2012) ....................20

Consol. Edison Co. v. NLRB,
305 U.S. 197 (1938)....................15

Dongbu Steel Co. v. United States,
635 F.3d 1363 (Fed. Cir. 2011) ....................15

Foshan Shunde Yongjian Housewares & Hardware Co. v. United States,
991 F. Supp. 2d 1322 (Ct. Int'l Trade 2014) ....................32

Gallant Ocean (Thailand) Co., v. United States,
602 F.3d 1319 (Fed. Cir. 2010) .................... 21, 24

Godaco Seafood Joint Stock Co. v. United States,
494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) .................... 52, 53

Godaco Seafood Joint Stock Co. v. United States,
No. 18-00063, 2021 Ct. Intl. Trade LEXIS 130 (Sep. 27, 2021) ....................53

Huayin Foreign Trade Corp. v. United States,
322 F.3d 1369 (Fed. Cir. 2003) .................... 15, 40

Hyatt v. U.S. Patent & Trademark Office,
904 F.3d 1361 (Fed. Cir. 2018) ....................19

King v. Burwell,
570 U.S. 473 (2015)....................20

Mid Continent Steel & Wire, Inc. v. United States,
No. 15-00213 (Ct. Int'l Trade filed Aug. 6, 2015) ....................1

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983)....................15

Nan Ya Plastics Corp. v. United States,
810 F.3d 1333 (Fed. Cir. 2016) ....................................................................14

NMB Sing. Ltd. v. United States,
557 F.3d 1316 (Fed. Cir. 2009) ....................................................................15

PrimeSource Building Products, Inc.,
No. 20-3911, slip op. 22-73 (Ct. Int'l Trade June 16, 2022) ...................... passim

Pro-Team Coil Nail Enter. v. United States,
483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020)....................................................39

Pro-Team Coil Nail Enterprise Inc. v. United States,
No. 22-2241 (Fed. Cir. docketed Sept. 22, 2022)..............................................1

Rhone Poulenc, Inc. v. United States,
899 F.2d 1185 (Fed. Cir. 1990) ....................................................................31

RHP Bearings v. United States,
288 F.3d 1334 (Fed. Cir. 2002) ................................................................ 15, 45

Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States,
268 F.3d 1376 (Fed. Cir. 2001) ....................................................................21

SolarWorld Ams., Inc. v. United States,
910 F.3d 1216 (Fed. Cir. 2018) ....................................................................15

Tung Mung Dev. Co., Ltd. v. United States,
354 F.3d 1371 (Fed. Cir. 2004) ....................................................................14

U.S. Steel Corp. v. United States,
953 F. Supp. 2d 1332 (Ct. Int'l Trade 2013)....................................................15

United States v. Eurodif S.A.,
555 U.S. 305 (2009)........................................................................................22

Warner-Lambert Co. v. Apotex Corp.,
316 F.3d 1348 (Fed. Cir. 2003) ....................................................................22

Yangzhou Bestpak Gifts & Crafts Co. v. United States,
716 F.3d 1370 (Fed. Cir. 2013) .............................................................. passim

**Statutes**

19 U.S.C. § 1516a ............................................................................................14

19 U.S.C. § 1673d................................................................................ 10, 16, 19, 20

19 U.S.C. §1677f-1 ............................................................................................27

28 U.S.C. § 1295 ................................................................................................2

28 U.S.C. § 1581 ................................................................................................1

28 U.S.C. § 2107 ................................................................................................2

**Other Authorities**

Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2016–2017, 84 Fed. Reg. 11,506 (Dep't of Commerce Mar. 27, 2019) ....................4, 39

Certain Steel Nails from Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2015-2016, 82 Fed. Reg. 36,744 (Dep't of Commerce Aug. 7, 2017) ..........................33

Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Determination of No Shipments; 2017-2018, 85 Fed. Reg. 14,635, 14,636 (Dep't of Commerce Mar. 13, 2020) ................................4, 6

Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019, 85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020) ........................................3

Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2015-2016, 83 Fed. Reg. 6,163, 6,164 (Dep't of Commerce Feb. 13, 2018)................4

Certain Steel Nails From Taiwan: Notice of Court Decision Not in Harmony With Final Determination in Less Than Fair Value Investigation and Notice of Amended Final Determination, 82 Fed. Reg. 55,090 (Dep't of Commerce Nov. 11, 2017).4

Certain Steel Nails From Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018-2019, 85 Fed. Reg. 19,138 (Dep't of Commerce Apr. 6, 2020)................... 5, 6, 7

Certain Steel Nails From the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 80 Fed. Reg. 39,994 (Dep't of Commerce July 13, 2015) ................................................3

Drawn Stainless Steel Sinks from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017, 83 Fed. Reg. 658 (Dep't of Commerce Jan. 5, 2018) ..........................................................................50

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 47,242, 47,247 (Dep't of Commerce Sept. 9, 2019)....................................4

Multilayered Wood Flooring From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, 76 Fed. Reg. 30,656, 30,658 (Dep't Commerce May 26, 2011)...................................................................47

Stainless Steel Bar From India: Final Results of Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 47,474, (Dep't of Commerce Aug. 25, 2021) ........................................................................................................51

Stainless Steel Bar from India: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 11,235 (Dep't of Commerce Feb. 24, 2021) ........................................................................................51

Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, and Rescission of New Shipper Review; 2015-2016, 83 Fed. Reg. 1,238 (Dep't of Commerce Jan. 10, 2018) ....................................................50

Uruguay Round Trade Agreements, Texts of Agreements, Implementing Bill, Statement of Administrative Action and Required Supporting Documents, H.R. Doc. No. 103-316, at 873 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4201 ....................................................7, 17

**Rules**

Fed. R. App. P. 4(a)(1)(B) ....................................................2

Federal Circuit Rule 32.1(d) ....................................................24

Federal Circuit Rule 47.5(a) ....................................................1

## STATEMENT OF RELATED CASES

As required by Federal Circuit Rule 47.5(a), Plaintiff-Appellant PrimeSource Building Products, Inc. ("PrimeSource") states that no other appeal in or from the same civil action or proceeding in the lower court or body was previously before the U.S. Court of Appeals for the Federal Circuit or any other appellate court. The only cases known to counsel that could directly affect or be directly affected by this Court's decision in this appeal are:

- Mid Continent Steel & Wire, Inc. v. United States, No. 15-00213 (Ct. Int'l Trade filed Aug. 6, 2015)- challenges the underlying antidumping duty ("ADD") order on certain steel nails from Taiwan, which, depending on the final outcome, could moot the instant appeal.
- Pro-Team Coil Nail Enterprise Inc. v. United States, No. 22-2241 (Fed. Cir. docketed Sept. 22, 2022)- challenges the first administrative review of the ADD order on certain steel nails from Taiwan and has been designated as a companion case to this action.

## JURISDICTIONAL STATEMENT

This action is an appeal from the final judgment of the U.S. Court of International Trade ("CIT") in PrimeSource Building Products, Inc., No. 20-3911, slip op. 22-73 (Ct. Int'l Trade June 16, 2022), Appx0001-0023. The CIT had jurisdiction pursuant to 28 U.S.C. § 1581(c) (2018), which gives that court exclusive

jurisdiction over "any civil action commenced under section 516A of the Tariff Act of 1930." This Court has jurisdiction to review decisions of the lower court pursuant to 28 U.S.C. § 1295(a)(5). This appeal is from a final judgment that disposes of all parties' claims. This appeal by PrimeSource was timely filed pursuant to 28 U.S.C. § 2107(b) and Fed. R. App. P. 4(a)(1)(B) because PrimeSource filed its notice of appeal on August 17, 2022 within 60 days of the CIT's June 16, 2022 final judgment in PrimeSource.

## STATEMENT OF ISSUES

Whether Commerce's use of the expected method, in this case a weighted average of the adverse facts available ("AFA") rates assigned to the mandatory respondents, to calculate the non-selected respondents' rate for Liang Chyuan Industrial Co., Ltd. ("Liang Chyuan") was supported by substantial evidence and otherwise in accordance with law.[1] Commerce's use of the expected method to calculate the ADD rate for Liang Chyuan was not supported by substantial evidence or otherwise in accordance with law because the non-selected respondents' rate did not reasonably reflect the potential dumping margin of Liang Chyuan.

---

[1] At the Court of International Trade, PrimeSource appealed both Commerce's calculation of its non-selected respondents' rate for all of the non-selected respondents as well the specific rate assigned to Liang Chyuan. See Rule 56.2 Mot. for J. Upon the Agency Record of Plaintiff PrimeSource (June 1, 2021), ECF No. 25. PrimeSource limits its appeal before this Court to Commerce's calculation of the rate assigned to Liang Chyuan using the expected method.

## STATEMENT OF THE CASE AND FACTS RELEVANT TO THE ISSUES

PrimeSource challenges certain aspects of the final results of the fourth administrative review of the antidumping duty ("ADD") order on certain steel nails from Taiwan conducted by the U.S. Department of Commerce. See Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019, 85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020) ("Final Results POR4"), Appx0634-0636, and accompanying Issues and Dec. Mem. ("Final I&D Mem."), Appx0612-0633.

On July 13, 2015, Commerce issued an ADD order on certain steel nails from Taiwan following an affirmative ADD determination by Commerce and an affirmative injury determination by the Commission. See Certain Steel Nails From the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 80 Fed. Reg. 39,994 (Dep't of Commerce July 13, 2015). Commerce thereafter conducted the statutorily required annual administrative reviews. In the first three annual administrative reviews of the steel nails ADD order, Commerce calculated ADD rates, as opposed to assigning ADD rates using AFA, for the mandatory respondents ranging from 0 to 27.69 percent. See Certain Steel Nails From Taiwan: Notice of Court Decision Not in Harmony With Final Determination in Less Than Fair Value Investigation and Notice of Amended Final Determination, 82 Fed. Reg. 55,090, 55,091 (Dep't of

Commerce Nov. 11, 2017) ("Amended Final Inv."); Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2015-2016, 83 Fed. Reg. 6,163, 6,164 (Dep't of Commerce Feb. 13, 2018) ("Final Results POR1"); Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2016–2017, 84 Fed. Reg. 11,506, 11,507 (Dep't of Commerce Mar. 27, 2019) ("Final Results POR2"); Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Determination of No Shipments; 2017-2018, 85 Fed. Reg. 14,635, 14,636 (Dep't of Commerce Mar. 13, 2020) ("Final Results POR3").

In July 2019, certain interested parties requested that Commerce conduct an administrative review of the ADD order on certain steel nails from Taiwan. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 47,242, 47,247 (Dep't of Commerce Sept. 9, 2019), Appx47,247. On September 9, 2019, Commerce initiated the fourth administrative review of steel nails from Taiwan covering July 1, 2018 to June 30, 2019. See id. Commerce then selected two mandatory respondents: (1) Bonuts Hardware Logistics Co., LLC ("Bonuts") and (2) Create Trading Co., Ltd. ("Create Trading"). See Certain Steel Nails From Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018-2019, 85 Fed. Reg.

19,138 (Dep't of Commerce Apr. 6, 2020) ("Prelim. Results"), Appx0545-0548, and accompanying Issues and Dec. Mem. at 2 n.8 ("Prelim. I&D Mem."), Appx0536.

Ultimately, neither mandatory respondent responded to Commerce's ADD questionnaire. Mandatory respondent Bonuts failed to respond to the ADD questionnaire. See Prelim. I&D Mem. at 2, Appx0536. Mandatory respondent Create Trading had no reviewable sales during the POR and Commerce therefore excused Create Trading from responding to the ADD questionnaire. See id. at 2 n.10.

After the two selected mandatory respondents failed to respond to Commerce's ADD questionnaire, Commerce selected Pro-Team Coil Nail Enterprise Inc. ("ProTeam") as an additional mandatory respondent and issued it an ADD questionnaire. See id. at 2-3, Appx0536-0537. ProTeam thereafter informed Commerce that it also did not intend to answer Commerce's ADD questionnaire. See id. at 3, Appx0537.

Once it became clear that no mandatory respondent would submit a response to Commerce's ADD questionnaire, Liang Chyuan, a foreign exporter of subject merchandise that was not individually examined by Commerce, filed comments arguing that Commerce should not assign it the preliminary rate calculated for Bonuts and ProTeam, which would be based on their failure to respond to Commerce's ADD questionnaire. See Letter on Behalf of Liang Chyuan to Dep't

of Commerce re: Comments on Sampling Determination at 2-3 (Feb 3. 2020) (Public Document) ("Liang Chyuan Sampling Comments"), Appx0527-0528. Liang Chyuan explained that "it {was} willing and able to submit a response to {Commerce's} ADD questionnaire in this segment of the proceeding." Id. at 2, Appx0527. Liang Chyuan noted that it had responded as a mandatory respondent to Commerce's ADD questionnaire in the previous administrative review, where Commerce assigned it a rate of 2.54 percent. See id. at 2-3, Appx0527-0528; see also Final Results POR3, 85 Fed. Reg. at 14,636. That review covered a one year period ending on the day before the period in the review at issue. Liang Chyuan presented evidence that it would be unreasonable for Commerce to assign it an AFA rate because such a rate is significantly higher than the rate assigned to Liang Chyuan in the previous administrative review. See Liang Chyuan Sampling Comments at 2, Appx0527. Instead, Liang Chyuan argued that Commerce should follow one of three approaches: 1) calculate a rate for Liang Chyuan based on data it would have submitted in the review had Commerce solicited such information, 2) assign Liang Chyuan the rate it received in the prior administrative review, or 3) assign Liang Chyuan the all-others rate from the original ADD investigation of steel nails from Taiwan. See id. at 2-3, Appx0527-0528.

On April 6, 2020, Commerce published the Preliminary Results of the fourth administrative review. See Prelim. Results, 85 Fed. Reg. at 19,138, Appx0545.

Commerce assigned both Bonuts and ProTeam a preliminary dumping rate of 78.17 percent using AFA based on both companies' failure to respond to its ADD questionnaire. See id. at 19,139, Appx0546; see also Prelim. I&D Mem. at 7-8, Appx0541-0542. Using the expected method, Commerce assigned the non-selected respondents, including Liang Chyuan, the same AFA rate of 78.17 percent by weight-averaging the rates that it assigned to both mandatory respondents. See Prelim. Results, 85 Fed. Reg. at 19,139, Appx0546.

Commerce determined that assigning Liang Chyuan, or any other non-selected respondent, the same rate that it calculated in the previous review was "not a feasible or legally sanctioned methodology for assigning review-specific rates to non-individually examined respondents." Prelim I&D Mem. at 4, Appx0538. Specifically, Commerce cited to the Statement of Administrative Action ("SAA") that sets forth that "when 'the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or de minimis . . . {t}he expected method in such cases will be to weight-average the zero and the de minimis margins and margins determined pursuant to the facts available.'" Id. at 10, Appx0544 (citing Uruguay Round Trade Agreements, Texts of Agreements, Implementing Bill, Statement of Administrative Action and Required Supporting Documents, H.R. Doc. No. 103-316, at 873 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4201). Commerce found that the expected

method was the appropriate methodology to calculate the review-specific rate for the non-selected respondents, citing the SAA, and the Federal Circuit's decision in Albemarle Corp. v. United States, 821 F.3d 1345 (Fed. Cir. 2016). See Prelim. I&D Mem. at 10, Appx0544.

Following the Preliminary Results, PrimeSource submitted a letter in lieu of a case brief for Commerce's consideration arguing that the use of AFA rates to calculate the review-specific rate applicable to the non-selected respondents was inappropriate based on the case law and the record of the current review. See Final I&D Mem. at p. 2 n.8, Appx0613. PrimeSource presented evidence that the AFA rate did not reasonably reflect the potential dumping margins of the non-selected respondents, including Liang Chyuan. See Letter on Behalf of PrimeSource to Dep't Commerce re: Letter in Lieu of Case Brief at 4 (June 25, 2020) (Public Document) ("PrimeSource Case Brief"), Appx0562. Specifically, PrimeSource demonstrated that "{t}hroughout the preceding review periods the highest calculated rate was less than half of the rate Commerce proposes applying in this proceeding." Id. PrimeSource maintained that Commerce should have instead assigned the non-selected respondents the rates previously calculated for these respondents in past reviews, or, in the alternative, should have assigned the non-selected respondents the all-others rate calculated in the investigation underlying the ADD order on steel nails

from Taiwan. See id. at 4-5, Appx0562-0563 (incorporating by reference the arguments that were made by other non-selected respondents).

Liang Chyuan also argued that Commerce's application of the expected method to calculate the review-specific rate for Liang Chyuan was unreasonable. See Letter on Behalf of Liang Chyuan to Dep't Commerce re: Steel Nails from Taiwan: Case Brief at 1-2 (June 25, 2020) ("LC Case Brief"), Appx0554-0555. Liang Chyuan maintained that "the rate attributed to Liang Chyuan bears no relationship whatsoever to any actual dumping margin calculated from any reported sales and cost information, and so is questionable as a matter of law." Id. at 4, Appx0557. Liang Chyuan presented evidence that Commerce had calculated a rate of 2.54 percent for "Liang Chyuan in the most recently completed segment in this proceeding," which "reflects Liang Chyuan's actual sales and cost information." Id. at 5, Appx0558. Liang Chyuan reiterated that it had "offered itself as a replacement for the non-cooperative respondents." Id.

On November 27, 2020, Commerce published the Final Results. See Final Results POR4, 85 Fed. Reg. at 76,014, Appx0634. Commerce continued to assign Bonuts, ProTeam, and the non-selected respondents, including Liang Chyuan, a rate of 78.17 percent based on AFA. See id. at 76,015, Appx0635. Commerce also continued to apply the expected method on the basis that "the record evidence does not rebut the presumption that the mandatory respondents are representative" of the

non-selected respondents. Final I&D Mem. at Cmt. 1, p. 9, Appx0620. According to Commerce, the statute dictates that "Commerce may use any reasonable method to calculate the all-others rate" when the rates for all the individually examined respondents are calculated based on AFA. Id. at Cmt. 1, p. 10, Appx0621 (citing 19 U.S.C. § 1673d (c)(5)). Specifically, according to Commerce, the SAA provides that "the expected method in such cases will be to weight average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." Id. (citing SAA, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 at 4201). Commerce stressed that the expected method has been upheld by courts as reasonable. See id. at Cmt. 1, p. 11, Appx0622. Further, Commerce claimed that the cases relied on by respondents to support their arguments that the expected method is unlawful, or that Commerce should have departed from the expected method given the context surrounding the current review, were unpersuasive or otherwise distinguishable from the present action. Id. at Cmt. 1, p. 16-17, Appx0627-0628.

The CIT ultimately sustained Commerce's use of the expected method to calculate an ADD rate for Liang Chyuan as supported by substantial evidence and in accordance with law. See PrimeSource, slip op. at 1, Appx0001. The CIT recognized that the SAA provided that "{i}f {the expected method} is not feasible, or if it results in an average that would not be reasonably reflective of potential

dumping margins for non-{examined} exporters or producers, Commerce may use other reasonable methods." Id. at 15-16, Appx0015-0016 (quoting SAA at 873, reprinted in 1994 U.S.C.C.A.N at 4201). The CIT determined that the primary issue under appeal was "whether the burden lies on Commerce to affirmatively find that the expected method results in a rate reasonably reflective of the potential dumping margins of the non-selected respondents, or on Plaintiffs to demonstrate that Commerce must depart from the expected method." Id. at 4, Appx0004. The CIT concluded that the burden fell on the party seeking for Commerce to depart from the expected method. See id. According to the CIT, two key concepts set forth in Albemarle and Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006 (Fed. Cir. 2017) ("Changzhou Hawd I") confirm Commerce's interpretation of the SAA: 1) expectedness: that "Commerce is expected to use the mandatory respondents' rates to determine the ADD rate to be assigned to the non-selected respondents" and 2) representativeness: that the "largest exporters by volume are assumed to be representative of the non-selected respondents," PrimeSource, slip op. at 14-16, Appx0014-0016. The Court then determined that placing the burden on Commerce to find that its use of the expected method results in a review-specific rate that reasonably reflects the potential dumping margins of the non-selected respondents would be inconsistent "the language of 19 U.S.C. § 1677f-1(c) expressly permitting

Commerce to 'limit{} its examination' to the largest exporters and producers by volume." Id. at 16, Appx0016.

Determining that the burden did not fall on Commerce, the CIT then concluded that Plaintiffs did not provide substantial evidence to "rebut the presumption of representative and thereby justify {Commerce} deviating from the expected method." Id. at 17, Appx0017. The CIT found that Plaintiffs had pointed to no evidence from the period of review ("POR") to support their assertion that Commerce's use of the expected method resulted in a rate that was not reasonably reflective of the potential dumping margins of the non-selected respondents. See id. The CIT acknowledged, as consistent with the Federal Circuit's holding in Bosun Tools Co. v. United States, No. 2021-1929, 2022 U.S. App. LEXIS 624 (Fed. Cir. Jan. 10, 2022) (unpublished) ("Bosun III"), that rates from prior reviews may represent substantial evidence that an AFA rate is not representative of a respondent's potential dumping margin. See id. at 18, Appx0018. The CIT, however, found that Commerce properly examined the past rates and supported with substantial evidence its conclusion that these rates did not "rebut the presumed representativeness of the mandatory respondents' rates from this review." Id. at 19-21, Appx0019-0021. Finally, the CIT concluded that Commerce's decision not to calculate an individual rate for Liang Chyuan was supported by substantial evidence because Liang Chyuan did not submit responses to Commerce's questionnaires

sufficient to qualify as a voluntary respondent and there was no information on the record from the relevant review that its dumping margin remained consistent from the prior review when it had received a calculated rate. See id. at 22., Appx0022.

## SUMMARY OF ARGUMENT

Commerce's determination to calculate the non-selected respondent rate for Liang Chyuan using the expected method was not supported by substantial evidence or otherwise in accordance with law. Contrary to Commerce's finding that 19 U.S.C. § 1673d(c)(5) allows for the inclusion of AFA rates and also presumes that mandatory respondents are representative of all exporters, the statute does not absolve Commerce of its obligation to ensure that the record supports its calculation for the non-selected respondents' rate as reasonably reflective of the potential dumping margins of these respondents. The presumption of representativeness of the mandatory respondents can be rebutted by substantial evidence on the record. Such evidence can include the rates calculated for mandatory respondents in prior administrative reviews. Here, the significantly lower rate of 2.54 percent calculated for Liang Chyuan in the third administrative review, as well as its willingness to participate in the fourth administrative review, rebuts any presumption that the high AFA rate assigned to the mandatory respondents was reasonably reflective of Liang Chyuan's potential dumping margin. Commerce had multiple options to ensure that the record supported its calculation for Liang Chyuan's rate as reasonably reflective

of its potential dumping margin, including soliciting additional information from Liang Chyuan or pulling forward its prior rate from the third administrative review, separated from the instant review period by only one day. Instead, Commerce's use of the expected method was not supported by substantial evidence or in accordance with law because the record does not support that the rate assigned to the mandatory respondents based on AFA was reasonably reflective of Liang Chyuan's potential dumping margin.

## ARGUMENT

### I. STANDARD OF REVIEW

The Court applies the same standard of review as the CIT. See Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1341 (Fed. Cir. 2016). Under that standard, the Court sustains Commerce's administrative determination "unless it is arbitrary and capricious or unsupported by substantial evidence on the record, or otherwise not in accordance with law." Tung Mung Dev. Co., Ltd. v. United States, 354 F.3d 1371, 1378 (Fed. Cir. 2004) (internal citations omitted); see also 19 U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.").

Substantial evidence requires "more than a mere scintilla," see, e.g., Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1326 (Fed. Cir.

2020) (internal citation omitted), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence supporting an agency determination must be based on the whole record, and the Court shall consider not only the information that supports the agency's decision but also whatever in the record that "fairly detracts from the substantiality of the evidence." Changzhou Trina, 975 F.3d at 1326 (quoting SolarWorld Ams., Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir. 2018)). Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable." NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Further, "{t}o be in accordance with law, a decision must not be arbitrary and capricious . . . and must be supported by substantial evidence and reasoned explanations." U.S. Steel Corp. v. United States, 953 F. Supp. 2d 1332, 1336 (Ct Int'l Trade 2013) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41-43 (1983)). Agency action can also be arbitrary when "when the agency offers insufficient reasons for treating similar situations differently." Dongbu Steel Co. v. United States, 635 F.3d 1363, 1371 (Fed. Cir. 2011); see also RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002) ("{a}n agency action is arbitrary when the agency offers insufficient reasons for treating similar

situations differently." (citation omitted)).

## II. COMMERCE HAS THE BURDEN TO FIND THAT LIANG CHYUAN'S RATE REASONABLY REFLECTS ITS POTENTIAL DUMPING MARGIN

In an administrative review, "Commerce looks to 19 U.S.C. § 1673d(c)(5) for guidance, which provides instructions for determining the 'all-others rate' in an investigation." PrimeSource, slip op. at 8, Appx0008.[2] Under 19 U.S.C. § 1673d(c)(5), the general rule is that the non-selected respondents rate "shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under {AFA}." Id. at § 1673d(c)(5)(A). "If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins or determined {pursuant to facts otherwise available or adverse facts available}, {Commerce} may use any reasonable method to establish the estimated all-others rate." Id. at 19 U.S.C. § 1673 d(c)(5)(B) (emphasis added).

---

[2] Commerce uses the same framework to calculate the separate rate in non-market economy case and the "all others" rate (for companies not selected for individual review) in a market economy case. See 19 U.S.C. § 1673d(c)(5); see also PrimeSource, slip op. at 8, n.6, Appx0008 ("Jurisprudence for determining the rate applicable to non-selected, separate rate respondents is relevant to determining non-selected respondents' rates in a market economy proceeding.").

PrimeSource, interchangeably uses the terms "separate rate" and "non-selected respondents' rate" consistent with Commerce's own practice.

In selecting any reasonable method, the SAA[3] directs that "{t}he expected method in such cases will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." H.R. Rep. No. 103-316, at 873. The SAA further instructs that Commerce may use "any other reasonable method" when use of the expected method "would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers." Id.

In the fourth review, Commerce used the expected method and decided that the inclusion of an AFA rate was lawful under the statute and reasonable given that the mandatory respondents are presumed to be representative of all exporters. See Final I&D Mem. at Cmt. 1, pp. 11-13, Appx0622-0624. The CIT sustained Commerce's determination and wrongly concluded that the burden was not on Commerce to support its calculation as a reasonable reflection of the non-selected respondents' dumping margin when Commerce relies on the expected method but instead on the party seeking for Commerce to depart from the expected method. See PrimeSource, slip op. at 15-16, Appx0015-0016. Reframing the findings presented by Commerce, the CIT reasoned that two concepts supported its conclusion that the burden was not on Commerce: 1) expectedness: that "Commerce is expected to use

---

[3] Congress has approved of the SAA as "an authoritative interpretation of the statute." PrimeSource, slip op. at 9, Appx0009.

the mandatory respondents' rates to determine the ADD rate to be assigned to the non-selected respondents" and 2) representativeness: that the "largest exporters by volume are assumed to be representative of the non-selected respondents." Id. at 13-14. Contrary to the CIT's findings, the concepts of expectedness and representativeness to do not absolve Commerce of the obligation that the record must support that its non-selected respondents' rate reasonably reflected the potential dumping margin of Liang Chyuan.

### A. Expectedness: A Default Methodology Does Not Remove the Duty on Commerce that the Record Must Support its Chosen Methodology as Reasonable

Commerce claimed that its calculation of the non-selected respondents' rate was consistent with Congress' mandate in the statute to employ the expected method, noting that the "courts have consistently upheld the use of the expected method, which may include AFA rates, as lawful." Final I&D Mem. at Cmt. 1, pp. 10-11, Appx0621-0622. The CIT agreed with Commerce's interpretation of the statute, concluding that Congress intended for the expected method to be the "default" methodology. PrimeSource, slip op at 11, Appx0011. Based on its interpretation of the SAA as setting an expectation that Commerce will "use the mandatory respondents' rates to determine the ADD rate assigned to the non-selected respondents," id. at 14, the CIT held that the "burden of proof lies with the party seeking to depart from the expected method." Id. at 11, Appx0014. Although

Commerce is statutorily allowed to include AFA rates assigned to the mandatory respondents in its calculation of the non-selected respondents' rate, Commerce and the CIT nonetheless overstate the concept of expectedness to unlawfully infer that the SAA removes the statutory burden on Commerce to select a reasonable methodology. See 19 U.S.C. § 1673d(c)(5)(B). Commerce and the CIT have overlooked another key tenant of the statute, the SAA and court precedent, i.e., that a reasonable methodology requires that the record must "reflect{} {the} economic reality" of the non-selected respondents' dumping margins. See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) ("{A} a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality."). The requirement that the record must support Commerce's calculation inherently places a burden on Commerce to find that its non-selected respondents' rate reasonably reflects the potential dumping margins of these respondents.

The CIT's conclusion that the expected method is the default methodology ignores the plain language of the statute mandating that the expected method is not appropriate in all circumstances. "Statutory interpretation begins with the language of the statute." Hyatt v. U.S. Patent & Trademark Office, 904 F.3d 1361, 1374 (Fed. Cir. 2018) (internal quotation omitted). When "the statutory language is plain, {the court} must enforce it according to its terms." Arista Networks, Inc. v. Cisco Sys.,

Inc., 908 F.3d 792, 803 (Fed. Cir. 2018) (quoting King v. Burwell, 570 U.S. 473, 474 (2015)). Under the statute, 19 U.S.C. § 1673d(c)(5)(B), when all the rates calculated for the mandatory respondents are either zero, de minimis or based on facts available, Commerce is to select "any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B) (emphases added). The plain language of the statute is unequivocal: when the rates assigned to the mandatory respondents are based on AFA, Commerce must select a "reasonable" method to calculate its non-selected respondents' rate. Id. "Reasonable" does not mean that Commerce can justify its conclusion based on any reason. Rather, the reasonableness requirement in the statute inherently "imposes a duty on Commerce to select a method appropriate for the circumstances." Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States, 701 F.3d 1367, 1378-79 (Fed. Cir. 2012); see also Bestpak, 716 F. 3d 1370 (holding that while Commerce's chosen methodology may "meet{} the statute's lenient standard of 'any reasonable method' . . . it is possible for the application methodology to be unreasonable in any given case."). Even though the expected method may be the default, it is not authorized where it results in a rate that is unreasonable as applied based on the facts.

The statute does not establish how to determine whether Commerce's chosen methodology is reasonable. Court precedent provides useful guidance on this issue. When selecting a method to calculate its non-selected respondents' rate that is appropriate for the circumstances, Commerce's "primary objective" must be "{a}ccuracy and fairness." Albemarle, 821 F.3d at 1354; see also Wujin, 701 F.3d at 1378 (holding that "fairness or accuracy, is the 'overriding purpose' of the antidumping statue when calculating a rate for a cooperating party"); Bestpak, 716 F.3d at 1379 ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible"). Calculating an accurate and fair margin requires that Commerce's "rate determinations for non-mandatory, cooperating separate rate respondents must also bear some relationship to their actual dumping margins." Bestpak, 716 F.3d at 1380 (emphasis added); see also Gallant Ocean (Thailand) Co., v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (holding that Commerce must calculate an AFA rate that is a "reasonably accurate estimate of the respondent's actual rate"); Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (holding that any methodology Commerce employs must be "based on the best available information and establish{} antidumping margins as accurately as possible"). "{F}orm should be disregarded for substance and the emphasis should be on economic reality." Bestpak, 716 F.3d at 1378 (quoting United States v. Eurodif

S.A., 555 U.S. 305, 317-18 (2009)). Court precedent, therefore, clearly establishes that a rate is unreasonable when it does not bear some relationship to a respondent's dumping margins as that would not be in the interests of fairness and accuracy.

The CIT's conclusion that Commerce does not have the burden to find that its calculated rate reflects the potential dumping margin of the non-selected respondent Liang Chyuan when using the expected method, see PrimeSource, slip op at 17, Appx0017, conflicts with Commerce's statutory mandate to select a reasonable methodology and to support that determination with substantial evidence. Principles of statutory construction mandate that a particular clause in the statute must be interpreted within the context of the entire statute. See Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1355 (Fed. Cir. 2003) ("When interpreting a statute, the court will not look merely to a particular clause in which general words may be used but will take in connection with it the whole statute . . . and give it such a construction as will carry into execution the will of the Legislature." (internal citations omitted)). Not only must a court interpret a statute in its entirety but it is a "'cardinal principle of statutory construction' . . . {that} it is {a court's} duty 'to give effect, if possible, to every clause and word of a statute' . . . rather than to emasculate an entire section" (internal citation omitted)). Bennett v. Spear, 520 U.S. 154, 173 (1997). By interpreting the relevant language in the SAA in a vacuum separate from the statute, the Court unlawfully ignored the statute's mandate that

Commerce's chosen methodology must be reasonable. See PrimeSource, slip op. at 14-17, Appx0014-0017. There is no reading of the statute that absolves Commerce of the obligation to select a reasonable methodology that bears a relationship to the respondent's margin when the margins assigned to the mandatory respondents are either zero, de minimis or assigned using AFA. See generally Bestpak, 716 F. 3d at 1378. The only reading of the SAA that also gives effect to the statute's mandate that Commerce must select a reasonable methodology, and the requirement set forth in Court precedent that the record support such determination, is that the burden is on Commerce to find that expected method results in a rate that reasonably reflects the potential dumping margins of these respondents.

Interpretating the SAA as placing the burden on Commerce to find that its non-selected respondents' rate reflects the potential dumping margins of these respondents is consistent with the Court's holding in Bestpak. In Bestpak, the Court held that:

> {a}lthough Commerce may be permitted to use a simple average methodology to calculate the separate rate, the circumstances of this case renders a simple average of a de minimis and AFA China-wide rate unreasonable as applied. Similarly, a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality.

716 F.3d at 1378-80. The Court reasoned that even when using "determinations of an AFA-rate, Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin." Id. at 1380. The

requirement that Commerce's determination must be supported with substantial evidence, i.e., that the record must support Commerce's determination as reasonable as applied, places a duty on it to select a methodology that results in a calculated rate that "tie{s} . . . to the respondent's actual dumping margin." Id. (citing Gallant Ocean, 602 F.3d at 1325).

The CIT relegates its discussion of Bestpak to a mere footnote that "{Bosun III)} interprets Bestpak narrowly." See PrimeSource, slip op. at 14, n. 9, Appx0014.[4] Contrary to the CIT's conclusion, the Court in Bosun III, however, did not interpret Bestpak narrowly. Instead, it confirmed that the burden is on Commerce to find that the record supports its non-selected respondents' rate as reasonably reflective of the potential dumping margins of these respondents even when Commerce applies the expected method. See Bosun III, 2022 U.S. App. LEXIS 624, at *9-11. In Bestpak, Commerce did not rely on the expected method, which requires a weighted average of the mandatory respondents' rates, and instead used a simple average of an AFA margin and a de minimis margin. See Bestpak, 716 F.3d at 1350 ("In this case,

---

[4] The Court's opinion in Bosun III is an unpublished opinion. Like the CIT, this Court should find the reasoning in Bosun III persuasive as it "builds on the Federal Circuit's prior reasoning in Albemarle and Changzhou Hawd." PrimeSource, slip op. at 13, n. 7, Appx0013; see also Federal Circuit Rule 32.1(d) ("The court may refer to a nonprecedential or unpublished disposition in an opinion or order and may look to a nonprecedential or unpublished disposition for guidance or persuasive reasoning but will not give one of its own nonprecedential dispositions the effect of binding precedent.").

however, the only two dumping margins on the administrative record were Yama's de minimis rate and Jintian's AFA China-wide rate. Therefore, Commerce applied the exception found in § 1673d(c)(5)(B) and took a simple average of the two rates."). By contrast, Commerce did use the expected method in Bosun III.[5] In initially remand Commerce's determination, the CIT in Bosun Tools Co. v. United States, 463 F. Supp. 3d 1308 (Ct Int'l Trade 2020) ("Bosun I") relied on Bestpak and Albemarle to hold that "Commerce's application of the 'expected method' of weight-averaging the zero and AFA margins is not reasonable, because Commerce failed to consider evidence indicating that the {non-selected respondents' rate} {was} not reasonably reflective of the separate rate respondents' dumping." Id. at

[5] Bosun III similarly involved a simple average of an AFA and zero rate. See Bosun III, 2022 U.S. App. LEXIS 624 at *6-7 ("Specifically, it averaged the two mandatory respondents' rates: (1) Chengdu's 0% rate and (2) Fengtai's AFA China-wide rate of 82.05%."); see also PrimeSource, slip op. at 13, Appx0013 ("By using the simple average, Commerce diverged from the expected method, which calls for using the weighted average of the selected respondents' rates"). Although Commerce took a simple average, it maintained that it used the expected method. See Bosun Tools Co. v. United States, 463 F. Supp. 3d 1308, 1318 (Ct In'tl Trade 2020) ("Here, Commerce's application of the 'expected method' of weight-averaging the zero and AFA margins is not reasonable, because Commerce failed to consider evidence indicating that the 41.025 rate is not reasonably reflective of the separate rate respondents' dumping"); see also Final I&D Mem. at Cmt. 1, 13, Appx0624 ("In {Bosun I}, the Court remanded Commerce's reliance on the expected method . . . ."). The Court subsequently treated Commerce's methodology as the equivalent of the expected method. See Bosun III, 2022 U.S. App. LEXIS 624 at *5 (explaining that the SAA provides additional guidance when Commerce relies on the expected method); see also PrimeSource, slip op. at 13, n.8 ("Regardless, the Federal Circuit did not fault Commerce's use of a simple average").

1318. The CIT found that Commerce failed to address evidence that Bosun received low calculated dumping margins when it was "individually investigated in prior reviews." Id. at 1319. Based on Commerce's examination of the historical trend of the dumping margins assigned to the mandatory respondents upon remand, the Court sustained the CIT's holding in Bosun Tools Co. v. United States, 493 F. Supp. 3d 1351, 1358 (Ct Int'l Trade 2021) that "Commerce confirmed the reasonableness of the separate rate in view of historical dumping trends." Bosun III, 2022 U.S. App. LEXIS 624 at *11; see also id. at *15 (holding that Commerce "reasonably determined that the {rate it assigned Bosun} was reflective of Bosun's historical dumping rates"). In applying the holding in Bestpak that Commerce's use of the expected method can be unreasonable as applied, and then examining past dumping margins to confirm the reasonability of Commerce's use of the expected method, the Court in Bosun III confirmed that Commerce has a duty to find that the record supports its non-selected respondents' rate as reasonably reflective of the potential dumping margins of these respondents. The requirement that the record must support Commerce's determination inherently places a burden on Commerce to find that its non-selected respondents' rate reasonably reflects the potential dumping margins of these respondents.

In sum, the CIT's conclusion here that SAA does not place the burden on Commerce when using the expected method, as the default methodology, to find that

its calculation reflects the potential dumping margins of the non-selected margin was not supported by substantial evidence and contrary to law. The Court's finding that Commerce's use of the expected method absolves Commerce of the burden of finding that its calculated rate reasonably reflects the potential dumping margins of the non-selected respondents is inconsistent with Commerce's obligation to demonstrate that the record supports that its chosen methodology was reasonable as applied based on the record consistent with Bestpak and Bosun III.

**B. Representativeness: The Presumption of Representatives of the Mandatory Respondents Can Be Rebutted**

Commerce's conclusion that that its use of the expected method was reasonable because the mandatory respondents were "reasonably representative" of all respondents incorrectly interpreted the Court's holdings in Albemarle and Changzhou Hawd I. See Final I&D Mem. at Cmt. 1, p. 12, Appx0623; see also id., p. 19, Appx0630. In making this finding, Commerce noted that pursuant to 19 U.S.C. §1677f-1(c)(2) it limited its review to the mandatory respondents that "account for the vast majority of the total volume of subject exports during the POR" and that "{the statute} assumes that, absent such evidence, reviewing only limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." Id. at Cmt. 1, p. 13, Appx0624 (quoting Albemarle, 821 F.3d at 1353). The CIT sustained Commerce's determination, concluding that the Albemarle and Changzhou Hawd I confirm that "Commerce is not otherwise

required to collect information about the non-selected respondents because Commerce expected to treat the mandatory respondents as representative of the non-selected respondents when it determines the non-selected respondents' rate." PrimeSource, slip op. at 15, Appx0015. Neither Albemarle nor Changzhou Hawd I, however, require rote adherence to the "expected method" in every instance. Both cases establish that the presumption of representativeness can be rebutted and do not alter the holding in Bestpak that this presumption is at its lowest when the mandatory respondents are assigned rates based on AFA. The facts at issue here are also distinguishable from both Albemarle and Changzhou Hawd I because both cases concerned an average of a de minimis rate with an AFA rate as opposed to the use of two AFA rates as was the case in this action.

Both Albemarle and Changzhou Hawd I make clear that the presumption of representativeness can be rebutted. In Albemarle, the Court rejected Commerce's decision to depart from the expected method and instead use the separate rate from a previous POR in determining the separate rate. See Albemarle, 821 F.3d at 1359. The Court noted that there are exceptions to the mandatory respondents being representative of all exporters. See id. at 1353 ("The statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." (emphasis added)). The Court, citing to Bestpak, confirmed that "accuracy and fairness must be

Commerce's primary objectives in calculating a separate rate for cooperating exporters." Id. at 1354 (citing Bestpak, 716 F.3d at 1379). Further, in its later opinion in Changzhou Hawd I, the Court concluded that Albemarle expressed a "preference for the expected method . . . reflecting how Commerce selects mandatory respondents," but that "presumption of representativeness may be overcome." Changzhou Hawd I, 848 F.3d at 1012. Specifically, the Court concluded that the presumption can be overcome if Commerce finds "based on substantial evidence that there is a reasonable basis for concluding the separate rate respondents' dumping is different." Id. (quoting Albemarle, 821 F.3d at 1353). Contrary to the finding of Commerce in that its use of the expected method was consistent with the holdings in Albemarle and the Changzhou Hawd I, these two cases, along with Court's holding in Bestpak, confirm that the expected method is not appropriate where the mandatory respondents are not representative of the non-selected respondents and Commerce's selected method must be reasonable as applied. See Bestpak, 716 F.3d at 1380.

Further, the facts underlying Albemarle and Changzhou Hawd I are distinguishable from this case because the separate rates in both cases were the result of calculations flowing from cooperating respondents who received de minimis margins. See Albemarle, 821 F.3d at 1347 (noting that Commerce calculated de minimis margins for both mandatory respondents and "continued to apply the rates

it had assigned {separate rate respondents} in the second, immediately preceding administrative review"); Changzhou Hawd I, 848 F.3d at 1009 (noting that on remand Commerce found all three mandatory respondents dumping margins to be de minimis). In the review at issue here, Commerce in fact acknowledged this factual distinction, noting that "Albemarle and Changzhou Hawd I contemplated de minimis rates, and this review contemplates the inclusion of rates based entirely on facts available." Final I&D Mem. at Cmt. 1, p. 18, Appx0629. Here, it was unreasonable for Commerce to have presumed that the AFA rate assigned to both of the mandatory respondents was representative of the non-selected respondents' rate without further evidence because an AFA rate is merely an estimation of the most adverse scenario of the exporters' or producers' dumping margins.

In contrast to Albemarle and Changzhou Hawd I, the facts here are instead analogous to Bestpak where the Federal Circuit held that Commerce's decision to average the de minimis and AFA China-wide rates when calculating the separate rate was unreasonable as applied. See Bestpak, 716 F.3d at 1378-79. In the fourth review, Commerce misread Bestpak in concluding that the rate was reasonable because Commerce lawfully used "an AFA rate in the average to determine the separate rate." Final I&D Mem. at Cmt. 1, p. 11, Appx0622. The Court in Bestpak found that the inclusion of a rate based on AFA in assigning the separate rate, without further evidence that it was reasonably reflective of the separate rate

respondents dumping margins rendered Commerce's separate rate calculation unsupported by substantial evidence. See Bestpak, 716 F.3d at 1380. There, the Court rejected Commerce's finding that its calculation reasonably reflected the separate rate companies' dumping margins where the record contained only one substantiated and calculated dumping rate. See id. at 1379 (concluding that the "record simply does not supply enough data for Commerce to calculate its separate rate determination based on only one individually investigated respondent"). The Court noted that a respondent's margin is in fact "unknown" when Commerce bases its determination of AFA on a respondent's "lack of participation" and, Commerce "cannot base a determination of economic reality on such slim findings." Bestpak, 716 F.3d at 1379; see also Baroque Timber Indus. (Zhongshan) Co. v. United States, 971 F. Supp. 2d 1333, 1343 (Ct. Int'l Trade 2014) ("Application of the AFA rate to non-cooperating parties is a rebuttable presumption. A rebuttable presumption is not evidence.").[6] The presumption of representativeness of the mandatory respondents

[6] The CIT relies on the Court's holding in Rhone Poulenc, Inc. v. United States, 899 F.2d 1185 (Fed. Cir. 1990) for the proposition that "AFA rates may be representative of actual dumping because, 'if it were not so, the {mandatory respondent}, knowing the rule, would have produced current information showing the margin to be less.'" PrimeSource, slip op. at 15, n. 10, Appx0015 (quoting Rhone, 899 F.2d at 1190). The facts in Rhone, however, are distinguishable from this action. Rhone involved the use of AFA by Commerce based on a mandatory respondent's failure to fully comply with Commerce's investigation. See Rhone, 899 F.2d at 1187-88. The mandatory respondent defended its questionnaire response and argued that the zero percent margins from more recent reviews represented the best information to calculate its current margin as opposed to the AFA rate applied in the initial

is at its lowest, and Commerce's burden to find that its calculated rate is reflective of the non-selected respondents is at its highest, therefore, when the rates assigned to the mandatory respondents are based on AFA because these rates are divorced from a respondents' contemporaneous data on the record. Furthermore, the presumption of representativeness is rebutted here where Commerce's method of selecting respondents based on customs data did not necessarily result in identifying representative respondents because, in this very review, Commerce initially chose a respondent that did not have any sales of subject merchandise at all, calling into question the validity of its respondent selection methodology. See Letter on Behalf of Commerce to Create Trading Co., Ltd. (January 13, 2020) (Public Document), Appx0519 (informing Create that it was no longer required to respond to Commerce's no shipment claim based on its statement of no sales).

Commerce's finding that the record supported a general presumption of representativeness of the mandatory respondents is even more tenuous here than in Bestpak. See Final I&D Mem. at Cmt. 1, p. 12-13, Appx0623-0624. Here, the rate

---

investigation. See id. By contrast, this action involves the non-selected respondents' rate and not the calculation of an AFA rate for a mandatory respondent. Further, as discussed below, Liang Chyuan offered to submit updated information. Rhone was also decided pre-Uruguay Round and the Courts have subsequently decided that the holding in Rhone does not dispense with the requirement that Commerce corroborate an AFA rate. See, e.g., Foshan Shunde Yongjian Housewares & Hardware Co. v. United States, 991 F. Supp. 2d 1322, 1330-1331 (Ct. Int'l Trade 2014).

Commerce assigned to the two mandatory respondents was based entirely on AFA whereas Commerce's all-others rate calculation in Bestpak was at least averaged with an actual, calculated de minimis rate. See id.; Bestpak, 716 F.3d at 1378-79. In fact, the AFA rate assigned to the non-selected respondents here is not even based on information submitted by the mandatory respondents but instead originates from data placed on the record by Petitioner. See Prelim. I&D Mem. at 9 n.41, Appx0543 (citing Certain Steel Nails from Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2015-2016, 82 Fed. Reg. 36,744 (Dep't of Commerce Aug. 7, 2017), and accompanying Prelim. Issues and Dec. Mem. at 12 ("POR1 Prelim. I&D Mem.") (unchanged in final results) (setting forth that the rate of 78.17 percent came from the "petition rate assigned in the {less than fair value} investigation"); see also Final Results POR1, 83 Fed. Reg. at 6,163, and accompanying Issues and Dec, Mem. at Cmt. 2, p. 21 ("POR1 Final I&D Mem.") (to corroborate the AFA rate, Commerce "examined evidence supporting the calculations in the Petition to determine the probative value of the dumping margins alleged in the Petition for use as AFA in this review"). Namely, the U.S. price used to calculate the AFA rate was based on a sale between a U.S. distributor/trading company and its downstream customer dating back to the initial investigation. See POR1 Final I&D Mem. at Cmt. 2 ("The petitioner calculated normal value for the petition based on the experience of a surrogate

producer of nails, adjusted for known differences between the surrogate producer and the industry of Taiwan, during the proposed POI."). A surrogate value sale by itself, as an estimate of a sale, cannot represent substantial evidence that the AFA rate reasonably reflects the dumping margins of the non-selected respondents.

Further, in Bestpak the record at least contained some additional contemporaneous evidence on the record, AUV estimates, showing that the rate calculated using AFA for a mandatory respondent may have been reflective of the separate rate respondents' potential dumping margins during the relevant POR. See Bestpak, 716 F.3d at 1379. Nonetheless, the Federal Circuit determined that the record did not contain substantial evidence that would tie the AFA rate to Bestpak's commercial activity. See id. In the review at issue here, by contrast, Commerce conducted no such AUV comparison between the mandatory respondents and Liang Chyuan and instead relied on the general presumption of the representativeness of the mandatory respondents. See Final I&D Mem. at Cmt. 1, p. 12-13, Appx0623-0624. Although Commerce claimed to have corroborated the AFA rate using Unicatch Industrial Co. Ltd.'s margin program calculated back in the first administrative review, those data were far outdated by the time of the fourth administrative review. See POR1 Prelim. I&D Mem. at 12. As discussed below, contemporaneous evidence on the record demonstrates that Liang Chyuan's potential dumping margin was not reasonably reflected by the mandatory

respondents. The record here, therefore, was "so thin that Commerce could {not} have reached a valid decision," that the AFA rate was representative of Liang Chyuan's dumping margin because the only evidence on the record was an AFA rate that was calculated years earlier in the initial investigation based on a surrogate sale submitted by the Petitioner. Bestpak, 716 F.3d at 1379.

In sum, Commerce and the CIT erred in concluding that its use of the expected method was consistent with the Federal Circuit's holdings in both Albemarle and Changzhou Hawd I. Neither case modified the central holding in Bestpak that the burden is on Commerce to establish that the rate assigned to non-selected respondents reflects the potential dumping margins of these respondents. Further, the Court found that Commerce's determination to depart from expected method was unreasonable in Albemarle and Changzhou Hawd I because both cases involved the use of de minimis margins based on contemporaneous data that are more likely to reasonably reflect the dumping margins of non-selected respondents. By contrast, here the rate assigned to the mandatory respondents was based on AFA and calculated using outdated surrogate value data. Such slim evidence cannot constitute substantial evidence to support the general representativeness of the mandatory respondents as the foundation sufficient to sustain the rate assigned to Liang Chyuan.

### C. Conclusion

Commerce's reliance on the concepts of expectedness and representativeness to support its use of the expected method to calculate Liang Chyuan's rate was not supported by substantial evidence or otherwise in accordance with law. Although the expected method is the default methodology as set forth in the SAA, Commerce's chosen methodology must nonetheless be reasonable given the particular facts on the record. Even when relying on the expected method, Commerce must find that the record supports that the non-selected respondents' rate is reasonably reflective of the potential dumping margins of the non-individually investigated respondents, here Liang Chyuan. Commerce cannot hide behind the general principles of expectedness and representativeness to ignore the facts on the record. Commerce's burden is at its highest when Commerce relies on rates calculated on AFA because these rates are often based on outdated information that cannot be presumed to be representative of all exporters.

## III. THE AFA RATE ASSIGNED TO THE MANDATORY RESPONDENTS WAS NOT RESONABLY REFLECTIVE OF THE POTENTIAL DUMPING MARGIN OF LIANG CHYUAN

Commerce's use of the expected method did not result in a rate that reasonably reflected the potential dumping margin of non-individually investigated respondent Liang Chyuan. Rates assigned to the mandatory respondents in prior review can constitute substantial evidence to establish that Commerce's chosen methodology

was not reasonable. See Bosun III, 2022 U.S. App. LEXIS 624, *12-14 (analyzing how Commerce supported its separate rate calculation as representative of Bosun with substantial evidence based on the rates calculated for Bosun in prior reviews). The CIT acknowledged that Bosun III "offers some considerations for evaluating Commerce's analysis of the rates from prior reviews." PrimeSource, slip op. at 18, Appx0018; see also Albemarle, 821 F.3d at 1358 ("{E}vidence of dumping from previous administrative reviews is relevant and may inform Commerce's methodology."); Bosun I, 463 F.3d at 1318 n.17 (noting that Albemarle directed Commerce "to consider any evidence on the record—in that case, the presence or absence of historical data—to determine whether to apply the expected method . . . . The contemporaneity of the data is then considered when establishing the reasonableness of a rate established by an alternative method"). Here, the presumption of representativeness of the mandatory respondents was sufficiently rebutted because the record contains substantial evidence that the AFA rate assigned to the mandatory respondents in the fourth review did not reasonably reflect the potential dumping margin of Liang Chyuan.

In the fourth review, Commerce concluded that the high AFA rate assigned to the mandatory respondents was representative of all exporters based on two factual findings: 1) there was a pattern in prior reviews that "the mandatory respondents have failed to cooperate and have been assigned a rate based on AFA" and 2) the

rates have been increasing in past reviews when Commerce calculated a dumping margin for the mandatory respondents in line with the higher AFA rate. Final I&D Mem. at Cmt. 1, p. 14, 16, Appx00625, Appx0627; see also PrimeSource, slip op. at 18-21, Appx0018-0021 (relying on these two facts to hold that "Commerce engaged with data from past reviews and considered its relevance to the present review"). Neither of Commerce's factual conclusions are supported by substantial evidence with respect to Liang Chyuan.

As to its first factual finding that there is a trend of non-cooperation in past reviews, Commerce ignored that in the majority of cases, it previously calculated actual rates for the mandatory respondents. Instead, a comparison between the calculated rates assigned to the mandatory respondents (reflected by "*" in the chart below) and the rates assigned to mandatory respondents based on AFA (reflected by "**" in the chart below) in past proceedings demonstrates that Commerce has calculated a rate for mandatory respondents in significantly more instances than it has relied on AFA:

| STEEL NAILS RATE CHART | | | | |
|---|---|---|---|---|
| | **Investigation** | **POR1** | **POR2** | **POR3** |
| **Ko Nails, Inc. ("Kos")/Quick Advance Inc. ("Quick")** | Excluded- de minimis margin* | | | |
| **ProTeam/PT Enterprise Inc. ("PT")** | 2.16%* | 0*[7] | 0%* | 6.72%* |
| **Unicatch Industrial Co. Ltd. ("Unicatch")** | | 78.17%** | 6.16%* | 27.69%* |
| **Bonuts** | | 78.17%** | 78.13%** | |
| **Liang Chyuan** | | | | 2.54%* |

See Amended Final Inv., 82 Fed. Reg. at 55,091; Final Results POR1, 83 Fed. Reg. at 6,164; Final Results POR2, 84 Fed. Reg. at 11,507; Final Results POR3, 85 Fed. Reg. at 14,636; Final Results POR4, 85 Fed. Reg. at 76,015, Appx0635.

In reviewing Commerce's decision, the CIT created a rate chart similar to the above, concluding that the fluctuation in rates supported Commerce's conclusion that "looking to past reviews for evidence current dumping lacks a logical foundation." PrimeSource, slip op. at 20, Appx0020. The CIT's chart, however, is incomplete. See id. The CIT failed to account for the following three facts: 1) of

[7] There have been significant developments in the litigation surrounding the first administrative review since Commerce released the Final Results in this action. In Pro-Team Coil Nail Enter. v. United States, 483 F. Supp. 3d 1242 (Ct Int'l Trade 2020), the CIT sustained Commerce's determination upon remand calculating a company-specific dumping margin of zero percent for ProTeam/PT. See id. at 1252.

the mandatory respondents in the initial investigation, one received a de minimis rate and the other a rate of 2.15 percent, 2) ProTeam was assigned a rate of 0 percent following a court appeal of Commerce's first administrative review and 3) Liang Chyuan received a rate of 2.54 percent in the third review. See infra at STEEL NAILS RATE CHART. The fourth administrative review is in fact the only proceeding related to Commerce's ADD order on steel nails from Taiwan where all of the mandatory respondents were assigned a rate based on AFA. There is only one mandatory respondent, Bonuts, that has received an AFA rate in every review for which it was selected as a mandatory respondent. No reasonable reading of the record supports Commerce's claim (as sustained by the CIT) that rates assigned to the mandatory respondents in past reviews are indicative of a trend of non-cooperation given that only one mandatory respondent has been assigned an AFA rate in every proceeding for which it has been individually reviewed whereas Commerce's past review have yielded numerous de minimis or low calculated rates. See Huayin, 322 F.3d at 1374 (setting forth that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

In particular, the record evidence undermines Commerce's presumption that the mandatory respondents were representative of Liang Chyuan's potential dumping margin. Not only is there no general trend of non-cooperation by the

mandatory respondents, but Liang Chyuan itself has never received a rate based on AFA and was in fact specifically investigated in the immediately preceding period (separated from the instant review by one day). Commerce found that "73 of 75 of the non-examined companies have never been examined in any segment of the proceeding," and "there is no evidence on this record or any other record that the 78.17 percent rate does not reflect their commercial reality." Final I&D Mem. at Cmt. 1, p. 15, Appx0626. Liang Chyuan volunteered to serve as a mandatory respondent in this administrative review. See Liang Chyuan Sampling Comments at 2, Appx0527. Unlike the other 73 companies that were never examined by Commerce in any proceeding, Liang Chyuan was investigated in the prior administrative review and received its own calculated rate. See Final Results POR3, 85 Fed. Reg. at 14,636. The CIT concurred with Commerce's finding that "there is no record evidence substantiating {Liang Chyuan's} claim that it would have received the same result in this review as it did in a previous review." PrimeSource, slip op. at 23, Appx0023 (quoting Final I&D Mem. at Cmt. 1, p. 20, Appx0631). But there is no indication on the record that Liang Chyuan would not have similarly cooperated in the review. To the contrary, a company's willingness to volunteer as a mandatory respondent can serve as evidence that its dumping margins are likely lower than the mandatory respondents. See Changzhou Hawd Flooring Co. v. United States, 947 F.3d 781, 793-794 (Fed. Cir. 2020) ("Changzhou Hawd II")

(rejecting Commerce's decision to keep an ADD order in place with respect to companies that sought to be voluntary respondents and received de minimis separate rate on the grounds that these respondents' willingness to serve as mandatory respondents demonstrated that their dumping margins were likely closer to the de minimis margins of the mandatory respondents than the AFA rate assigned to the China-wide entity). Liang Chyuan's history of cooperation in the third review and its willingness to submit its own data in the review under appeal establishes that its dumping margin was likely lower than the AFA rate. Commerce's conclusion that the there was no record evidence that Liang Chyuan's dumping margin remained consistent between the third and fourth administrative reviews, therefore, was not supported by substantial evidence because there would be no reason for Liang Chyuan to have volunteered to submit its own information if its dumping margin was equivalent to the AFA rate.

Turning to Commerce's second factual finding that there has been a trend of increasing dumping margins in past reviews, Commerce failed to contend with the undisputed fact that the rates it calculated in past reviews were significantly lower than the AFA rate assigned to the mandatory respondents. See infra at STEEL NAILS RATE CHART. The CIT found that Commerce did not ignore these lower rates but instead found fluctuation in the rates assigned to the mandatory respondents in past reviews as evidenced by the fact that there was a 350 percent increase in

Unicatch's rate between the second and third administrative review. See PrimeSource, slip op. at 19, Appx0019 (citing Final I&D Mem. at Cmt. 1, p. 15, Appx0626).

The facts in this case are distinguishable from Bosun III where the Court found that an increase in dumping margins in past reviews and the fact that Bosun receiving a comparable rate in a prior administrative supported Commerce's use of the expected method as reasonable. See 2022 U.S. App. LEXIS 624, *14. Here, Commerce has calculated rates for the mandatory respondents in prior reviews between 0 and 27.69 percent. See infra at STEEL NAILS RATE CHART. While Commerce reasonably concluded in Bosun III that a rate of 39.66 percent assigned to Bosun from two prior reviews is comparable to its current rate of 41.025 percent, there is no similar comparison between a 27.69 percent rate and a 78.17 percent rate. And, concerning Commerce's finding that there has been an increase in the dumping margins in recent reviews, a comparison in a percentage change between reviews is meaningless where the dumping margins are small in the first instance. In other words, the small variations in the early review periods may appear significant in relative terms, but the nominal changes were minimal and not significant. No reasonable reading of the record can support Commerce's conclusion that there is an increasing trend in dumping margins that could justify a rate increase of 2.54 percent for Liang Chyuan on one day to 78.18 percent the next day in the subsequent review.

Most importantly, although there is a slight upward trend for certain respondents, no such trend exists for Liang Chyuan. Here, both PrimeSource and Liang Chyuan demonstrated in their case briefs at Commerce that the AFA rate assigned to Liang Chyuan bears no relationship to its actual dumping margin. See PrimeSource Case Brief at 4, Appx0562; LC Case Brief at 4, Appx0557. Commerce calculated a rate for Liang Chyuan in the third administrative review of 2.54 percent and that rate was significantly lower than the rate that Commerce assigned to the non-selected respondents using AFA in the instant review. See infra at STEEL NAILS RATE CHART. Commerce rejected these arguments, stating that "{Liang Chyuan} is not entitled to a special dumping margin in this review on the basis of having been previously examined" because Commerce's "long-standing process is to treat each administrative review as a separate reviewable segment of the proceeding." Final I&D Mem. at Cmt. 1, p. 19, Appx0630; see also PrimeSource, slip op. at 23. Commerce's finding is illogical given that the AFA rate assigned to the mandatory respondents was based on information provided by the Petitioner in the initial investigation. See infra at Section II.B; see also Prelim. I&D Mem. at 9, Appx0543 ("Therefore, we are assigning to Bonuts and PT a margin of 78.17 percent based on total AFA, which is the highest margin applied in any segment of the proceeding."). Even though Commerce corroborated this information in the first administrative review, the rate calculated for Liang Chyuan is far more

contemporaneous than a rate based on data from the initial investigation and corroborated in the first review. Commerce arbitrarily dismissed the rate assigned to Liang Chyuan in the prior review by claiming that it is treating each review separately while at the same time relying on data from a prior segment to assign its AFA rate. See RHP Bearings, 288 F.3d at 1347. Commerce cannot rely on past company experiences in some instances but not others. There is no reasonable reading of the record that a rate calculated for Liang Chyuan a day before the review on appeal here is less contemporaneous than an AFA rate based on data from the investigation. Commerce's conclusion that the rate of 78.17 percent based on AFA reflected Liang Chyuan's commercial reality, therefore, was not supported by substantial evidence because more contemporaneous, company-specific data from the immediately preceding review established that Liang Chyuan's dumping margin was likely far lower. Commerce has not provided any explanation why it is reasonable to assume that Liang Chyuan's antidumping rate would skyrocket from 2.54 percent to 78.17 percent at the stroke of midnight on the first day of the fourth period of review.

Commerce's factual determinations for supporting its non-selected rate simply do not apply to Liang Chyuan. Liang Chyuan previously cooperated in the prior review. Further, Liang Chyuan's dumping has not increased between prior reviews, nor has it previously received a rate comparable to the AFA rate. Instead,

Liang Chyuan received a significantly lower rate of 2.54 percent after fully cooperating as a mandatory respondent in the prior administrative review. Commerce's rate calculation for Liang Chyuan, therefore, was not supported by substantial evidence and not in accordance with law because there is no reading of the record that a rate of 78.17 percent based on AFA reasonably reflected Liang Chyuan's potential dumping margin.

## IV. COMMERCE SHOULD HAVE CALCULATED A RATE FOR LIANG CHYUAN

Commerce wrongly found that Liang Chyuan did not qualify for its own rate because it failed to meet the requirements for voluntary respondent status by timely responding to all of Commerce's questionnaires. See Final I&D Mem. at Cmt. 1, p. 20, Appx0631 (citing 19 U.S.C. § 1677f-1); see also PrimeSource, slip op. at 23, Appx0023. ("Liang Chyuan was not entitled to an individual rate because Liang Chyuan did not take the necessary steps to qualify for an individual rate or otherwise establish that the non-selected respondent rate should not apply.") There were multiple options available to Commerce to find that its calculated rate for Liang Chyuan reasonably reflected its potential dumping margin. For instance, Commerce could have solicited additional information from Liang Chyuan to calculate its own rate or it could have pulled forward Liang Chyuan's previously calculated rate from the third administrative review. Commerce's failure to do so rendered its decision

unsupported by substantial evidence and contrary to this Court's holding in Changzhou Hawd II.

Liang Chyuan was not required to submit full questionnaire responses to be entitled to its own rate. In Changzhou Hawd II, Commerce calculated zero percent margins for all the mandatory respondents and, following litigation, assigned the separate rate litigants margins of zero. See 947 F.3d at 784. Commerce then refused to rescind the ADD order with respect to separate rate companies that had requested voluntary respondent status. See id. There, four of the separate rate firms requested voluntary respondent status, but only two of these firms submitted full questionnaire responses pursuant to their requests. See Multilayered Wood Flooring From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, 76 Fed. Reg. 30,656, 30,658 (Dep't Commerce May 26, 2011) (noting that Fine Furniture (Shanghai) Limited, Shanghai Lizhong Wood Products Co., Ltd., Dun Hua City Jisen Wood Co., Ltd and Armstrong Wood Products sought voluntary respondent status, but only Fine Furniture and Lizhong "submitted unsolicited responses to section A of the Department's original questionnaire . . . {and} Sections C and D of the Department's original questionnaire."). In holding that Commerce had not justified inclusion of the respondents that requested voluntary-review in the order, the CIT did not distinguish the firms who submitted full questionnaire responses from those that merely requested voluntary respondent status. See

Changzhou Hawd Flooring Co. v. United States, 324 F. Supp. 3d 1317, 1321 (Ct Int'l Trade 2018) (defining the voluntary respondents as including Fine Furniture, Armstrong and Dun Hua City and not listing Lizhong because it was not subject to the appeal). The Court sustained the CIT's judgment and similarly did not distinguish between the two types of voluntary respondents. See Changzhou Hawd II, 947 F.3d at 784 (listing the "voluntary-review firms" as "cross-appellees" Armstrong and Fine Furniture). Neither the Court nor CIT distinguished between voluntary respondents that submitted full questionnaire responses and those respondents, like Liang Chyuan, who instead submitted a request to be treated as a voluntary respondent without further submissions. Nothing in the Court's holding in Changzhou Hawd II suggests that a respondent must submit a full questionnaire response to be considered a voluntary respondent.

Allowing a respondent to qualify for its own rate without submitting full responses to Commerce's questionnaires is consistent with Commerce's underlying obligation to calculate a fair and accurate rate for all respondents. See infra at Section I.A. Further, even if a respondent submits full questionnaire responses, Commerce nonetheless may have declined to "fully investigate the voluntary respondent" if it had determined, as it does in nearly all instances, that "individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation." See Bestpak, 716 F.3d at 1373. Commerce's

conclusion that Liang Chyuan was not entitled to a separate rate for failing to submit full questionnaire responses was not supported by substantial evidence because such a requirement would lead to futility concerns that prevent Commerce from calculating an accurate and fair margin.

Commerce had multiple options available to find that Liang Chyuan's rate was reasonably reflective of its potential dumping margin. First, Commerce could have sought additional information from Liang Chyuan early in the investigation when it became clear that the mandatory respondents would be uncooperative. See Bestpak, 716 F.3d at 1380 ("Commerce was certainly aware of this situation when Jintian was being unresponsive early in the investigation and could have gathered more information."). "While it is clear that 19 U.S.C. § 1677f-1 does not require Commerce to calculate individual margins for every known exporter in all instances, it is equally clear that Commerce has at its disposal broad authority to gather information, see 19 U.S.C. §§ 1677f-1(a), (b); 1675(a), including from separate respondents." Albemarle, 821 F.3d at 1358. Liang Chyuan made itself available to Commerce, stating that "it is willing and able to submit a response to {Commerce}'s antidumping duty questionnaire in this segment of the proceeding." Liang Chyuan Sampling Letter at 2, Appx0527. Notably, Liang Chyuan submitted its comments on February 3, 2020, almost a full two months before Commerce released its preliminary determination. See Prelim. I&D Mem. at 10 (listing the signature date

as March 31, 2020), Appx0544. Commerce, thus, had ample opportunity to use its broad authority to solicit additional information from Liang Chyuan. Commerce cannot now rely on the "absence of evidence" concerning the dumping margin of Liang Chyuan "by invoking procedural difficulties that were at least in part a creature of its own making." Albemarle, 821 F.3d at 1358 (citing Bestpak, 716 F.3d at 1378).

Second, if Commerce determined that it lacked the resources to fully investigate Liang Chyuan, it could have pulled forward the prior rate calculated for Liang Chyuan in the third administrative review. In fact, Commerce has an established practice of carrying forward past rates in other agency proceedings. See, e.g., Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, and Rescission of New Shipper Review; 2015-2016, 83 Fed. Reg. 1,238, 1,239 (Dep't of Commerce Jan. 10, 2018) and Drawn Stainless Steel Sinks from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017, 83 Fed. Reg. 658, 659 (Dep't of Commerce Jan. 5, 2018)). Significantly, in a recent market economy case, Commerce determined that "{c}onsistent with the {Federal Circuit}'s decision in Albemarle, in this review, we preliminarily determine that a reasonable method for determining the rate for the only non-selected

company, Ambica, is to pull forward the dumping margin applied to Ambica in the most recently completed administrative review." Stainless Steel Bar from India: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 11,235 (Dep't of Commerce Feb. 24, 2021), and accompanying Dec. Mem. at 8 ("SSB I&D Mem."), unchanged in Stainless Steel Bar From India: Final Results of Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 47,474, 47,475 (Dep't of Commerce Aug. 25, 2021). Commerce not only has a clearly established practice but has confirmed in implementing this practice that pulling forward rates is consistent with Court precedent.

Contrary to its finding in Stainless Steel Bar, Commerce concluded that pulling forward a rate established in prior review is incongruous with its "long-standing practice . . . to treat each administrative review as a separate review segment." Final I&D Mem. at Cmt. 1, p. 19, Appx0630; see also PrimeSource, slip op. at 23, Appx0023. Contrary to Commerce's conclusion, pulling forward a prior rate does not "contravene{} the Federal Circuit's explicit opinion in Albemarle." Final I&D Mem. at Cmt. 1, p. 19, Appx0630. In rejecting Commerce's determination to pull forward rates from prior reviews instead of relying on the expected method, the Court in Albemarle specifically noted two scenarios where relying on non-contemporaneous data may be appropriate. See Albemarle, 821 F.3d at 1357. One of the two scenarios is directly applicable here. The Court

acknowledged that "use of data from a prior period may be reasonable . . . where there is evidence that the overall market and the dumping margins have not changed from period to period." Albemarle, 821 F.3d at 1357. As detailed above, the rate assigned to Liang Chyuan in the prior administrative review was more contemporaneous than a rate based on outdated data in the initial investigation. See infra at Section III. Further, Liang Chyuan's willingness to cooperate demonstrates that its potential dumping margin was likely far closer to 2.54 percent than the higher AFA rate. See id. The facts here fall directly under the exception identified in Albemarle, where a company's dumping margin has remained constant between reviews, such that it would have been appropriate for Commerce to pull forward Liang Chyuan's rate from the third administrative review.

Applying the holding in Albemarle, the CIT has expressly upheld Commerce's practice of carrying forward rates as a viable method to calculate the non-selected respondents' rate. In Godaco Seafood Joint Stock Co. v. United States, 494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) ("Godaco I"), the CIT remanded "Commerce's assignment of the total AFA rate to fully cooperating Separate Rate Plaintiffs {using the expected method} as unreasonable and not in accordance with law" where "evidence on the record suggests instead that Separate Rate Plaintiffs' rate may be reasonably closer to the . . . rate assigned to separate rate respondents in the prior twelfth administrative review, rather than the total AFA rate . . . from the

thirteenth administrative review." Id. at 1306. The Court then sustained Commerce's remand redetermination calculating the all-others by applying a simple average of the separate rates assigned in the four prior administrative reviews of the ADD order and then assigning that average rate to the separate rate plaintiffs. See Godaco Seafood Joint Stock Co. v. United States, 539 F. Supp. 3d 1286, 1290 (Ct Int'l Trade 2021) ("Godaco II"). In carrying forward rates from prior administrative review, Commerce explained that these past rates "were more contemporaneous than the AFA rate previously assigned to the Separate Rate Plaintiffs." Id. The Plaintiffs voluntarily dismissed their appeal of the CIT's judgment in Godaco. Although Commerce's methodology was under protest, see id. at 1288, that does not change the fact that pulling forward rates from prior review has been upheld as a lawful means of calculating the non-selected respondents' rate. This Court should be guided by the reasoning in Godaco I and Godaco II because the facts in that case are directly analogous to this action. In Godaco I and Godaco II, the Court found that Commerce's separate rate calculation using an AFA rate was not reasonably reflective of the separate respondents potential dumping margins when compared to the rates that had been calculated in prior reviews and then the CIT upheld Commerce's remand redetermination to carry forward past rates. See Godaco I, 494 F. Supp. 3d at 1306; Godaco II, 539 F. Supp. 3d at 1290-91. Here too, Commerce erred by relying on an AFA rate to calculate its non-selected respondents' rate when

the rate calculated for Liang Chyuan in the third administrative review demonstrates that Commerce's calculation was not reflective of Liang Chyuan's potential dumping margin.

Given that that interest of fairness and accuracy support calculating a rate for Liang Chyuan, and nothing in the Court's holding in Changzhou Hawd II suggests that a respondent must submit full questionnaire responses to be considered a voluntary respondent, Commerce had multiple options other than the expected method that would have been reasonable as applied to the facts. For instance, it could have either solicited additional information from Liang Chyuan or pulled forward the rate previously assigned to Liang Chyuan in the third review. Either method would have ensured that Commerce's calculation adequately reflected the potential dumping margin of Liang Chyuan. Commerce's use of the expected method, however, was not supported by substantial evidence because it did not reasonably reflect the potential dumping margin of Liang Chyuan.

## CONCLUSION AND RELIEF SOUGHT

Commerce's determination to calculate the non-selected respondent rate for Liang Chyuan using the expected method was not supported by substantial evidence or otherwise in accordance with law because it failed to reflect the potential dumping margin of Liang Chyuan. Commerce cannot hide behind the concept of expectedness and representativeness when relying on the expected methodology to

absolve it of its duty to support with substantial evidence the reasonability of Liang Chyuan's rate. Here, the rate calculated for Liang Chyuan in the third review, and its willingness to cooperate in the fourth review under appeal, demonstrated that its potential dumping margin was not reasonably reflected by the AFA rate assigned to the mandatory respondents. Commerce had multiple options available to calculate the rate for Liang Chyuan, such as seeking additional information or pulling forward Liang Chyuan's rate from the third review. Commerce, however, instead chose to rely on the expected method – a methodology that was not supported by the facts on the record.

For the foregoing reasons, the Court should reverse the judgment of the CIT in PrimeSource sustaining Commerce's use of the expected method to calculate the non-selected respondent rate for Liang Chyuan. This Court should remand the case with instructions that Commerce should recalculate the non-selected respondents' rate assigned to Liang Chyuan.

Respectfully submitted,

December 23, 2022

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel to PrimeSource Building Products, Inc.*

# ADDENDUM

Slip Op. 22-73

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC.,<br>Plaintiffs,<br><br>and<br><br>CHENG CH INTERNATIONAL CO., LTD., CHINA STAPLE ENTERPRISE CORPORATION, DE FASTENERS INC., HOYI PLUS CO., LTD., LIANG CHYUAN INDUSTRIAL CO., LTD., TRIM INTERNATIONAL INC., UJL INDUSTRIES CO., LTD., YU CHI HARDWARE CO., LTD., AND ZON MON CO., LTD.,<br>Consolidated-Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>Defendant,<br><br>and<br><br>MID CONTINENT STEEL & WIRE INC.,<br>Defendant-Intervenor. | Before: Mark A. Barnett, Chief Judge<br>Consol. Court No. 20-03911 |

**OPINION**

[Sustaining Commerce's use of the expected method in its calculation of the non-selected respondents' rate in this antidumping duty review of certain steel nails from Taiwan.]

Dated: June 16, 2022

Bryan P. Cenko, Mowry & Grimson, PLLC, of Washington, DC, argued for Plaintiff. With him on the brief were Jeffrey S. Grimson, Jill A. Cramer, and Wenhui (Flora) Ji.

Kelly Slater, Appleton Luff Pte Ltd., of Washington, DC, argued for Consolidated Plaintiffs. With her on the brief was Edmund Sim.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Vania Y. Wang, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon, The Bristol Group PLLC, of Washington, DC, argued for Defendant-Intervenor. With him on the brief were Jennifer M. Smith, Ping Gong, and Lauren N. Fraid.

Barnett, Chief Judge: This consolidated action is before the court on two motions for judgment on the agency record pursuant to U.S. Court of International Trade ("CIT") Rule 56.2 challenging certain aspects of the final results issued by the U.S. Department of Commerce ("Commerce" or "the agency") in its review of the antidumping duty ("ADD") order covering certain steel nails from Taiwan. *See Certain Steel Nails From Taiwan*, 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020) (final results of antidumping duty admin. review and final determination of no shipments; 2018-2019) ("*Final Results*"), and accompanying Issues and Decision Mem., A-583-854 (Nov. 20, 2020) ("I&D Mem."), ECF No. 17-5;[1] *see also* Rule 56.2 Mot. for J. Upon the Agency R. on Behalf of Pl. PrimeSource Building Prods., Inc., ECF No. 25, and accompanying Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. on Behalf of Pl.

[1] The administrative record associated with the underlying proceeding is contained in a Public Administrative Record ("PR"), ECF No. 17-2, and a Confidential Administrative Record ("CR"), ECF No. 17-3. PrimeSource submitted joint appendices containing all record documents cited in the Parties' respective Rule 56.2 briefs. *See* Public J.A. ("PJA"), ECF No. 31; Confidential J.A., ECF No. 30 ("CJA").

PrimeSource Building Prods., Inc., ("PrimeSource's MJAR"), ECF No. 25-2; Rule 56.2 Mot. for J. Upon the Agency R. on Behalf of Consol. Pls., and accompanying Mem. of P. & A. in Supp. of Consol. Pls.' Rule 56.2 Mot. for J. Upon the Agency R. ("Consol. Pls.' MJAR"), ECF No. 24.

Specifically, Plaintiff PrimeSource Building Products, Inc. ("PrimeSource") and Consolidated Plaintiffs Cheng Ch International Co., Ltd., China Staple Enterprise Corporation, De Fasteners Inc., Hoyi Plus Co., Ltd., Liang Chyuan Industrial Co., Ltd., Trim International Inc., UJL Industries Co., Ltd., Yu Chi Hardware Co., Ltd., and Zon Mon Co., Ltd., (together with PrimeSource, "Plaintiffs") challenge the review-specific rate received by the companies not selected by Commerce for individual examination in this review (referred to herein as the "non-selected respondents' rate"). *See* PrimeSource's MJAR at 13–42; Consol. Pls.' MJAR at 2–6. Plaintiffs request remand to the agency for the determination of a new rate to be applied to the non-selected respondents. *See* PrimeSource's MJAR at 42–43; Consol. Pls.' MJAR at 6. Defendant United States ("the Government") and Defendant-Intervenor Mid Continent Steel & Wire Inc. ("Mid Continent") urge the court to sustain the *Final Results*. Def.'s Resp. to Pls.' Mots. for J. Upon the Agency R. (Def.'s Resp.") at 23, ECF No. 26; Def.-Int. Mid Continent Steel & Wire, Inc.'s Resp. Br. ("Def.-Int.'s Resp.) at 17, ECF No. 27.

As will be discussed in detail below, while the rates assigned to the mandatory respondents (i.e., the selected respondents) were determined based on adverse facts available ("AFA"), Commerce is not barred from using those rates to determine the non-selected respondents' rate. As such, resolution of this case in part turns on whether the

mandatory respondents may be considered representative of the non-selected respondents. In evaluating this issue, the court considers whether the burden lies on Commerce to affirmatively find that the expected method results in a rate reasonably reflective of the potential dumping margins of the non-selected respondents, or on Plaintiffs to demonstrate that Commerce must depart from the expected method. The court concludes that the burden is on the party seeking a departure from the expected method, in this case, Plaintiffs, and finds that Commerce's reliance on the expected method is otherwise supported by substantial evidence and in accordance with law. Consequently, the court sustains Commerce's use of the expected method in calculating the rate for non-selected respondents.

**BACKGROUND**

On July 25, 2014, Commerce initiated an antidumping duty investigation of certain steel nails from various countries. *See Certain Steel Nails From India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 36,019 (Dep't Commerce June 25, 2014) (initiation of less-than-fair-value investigations). Following affirmative determinations by Commerce and the U.S. International Trade Commission, Commerce issued an antidumping duty order on certain steel nails from Taiwan. *See Certain Steel Nails From the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg. 39,994 (Dep't Commerce July 13, 2015).

On September 9, 2019, Commerce initiated the fourth administrative review of the antidumping duty order covering steel nails from Taiwan. *See Initiation of*

*Antidumping and Countervailing Duty Admin. Review*, 84 Fed. Reg. 47,242, 47,247 (Dep't Commerce Sept. 9, 2019). For this review, Commerce selected two mandatory respondents for individual examination: Bonuts Hardware Logistics Co., LLC ("Bonuts") and Create Trading Co., Ltd. ("Create"), the two respondent companies that accounted for the largest volume of subject merchandise from Taiwan during the period of review.[2] *See* I&D Mem. at 9. Commerce issued questionnaires to Bonuts on October 23, 2019, and to Create on October 28, 2019. *Certain Steel Nails From Taiwan*, 85 Fed. Reg. 19,138, 19,138 (Dep't Commerce April 6, 2020) (prelim. results of antidumping duty admin. review and prelim. determination of no shipments; 2018–2019) ("*Prelim. Results*"), and accompanying decision mem. ("Prelim. Mem.") at 2, PR 55, PJA Tab 12. Bonuts did not respond. *See* Prelim. Mem. at 2. Create submitted a letter indicating that it had no reviewable sales during the relevant period such that it was not required to respond to the questionnaire. *Id.* at 2 n.10. Commerce accordingly "excused" Create from responding to the questionnaire and selected another respondent to individually examine. *Id.* at 2.

To replace Create, Commerce selected Pro-Team Coil Nail Enterprise, Inc. ("Pro-Team"), the next-largest respondent exporter by volume, as a new mandatory respondent. *See id.* at 2–3. Pro-Team submitted a letter indicating that it would not respond to the questionnaire. *See id.* at 3.

[2] 19 U.S.C. § 1677f-1(c)(2) (2018) permits Commerce to select the largest exporters by volume for individual examination when it is "not practicable" for Commerce to determine individual margins for each exporter. These selected exporters are referred to as the "mandatory" respondents. *See* I&D Mem. at 9.

On February 3, 2020, after the statutory deadlines to participate as a voluntary respondent passed, Liang Chyuan, a non-selected respondent exporter of subject merchandise, submitted respondent selection comments to Commerce and indicated that it was "willing and able to submit a response to [Commerce's ADD] questionnaire in this segment of the proceeding." I&D Mem. at 20 & n.109 (citations omitted). Liang Chyuan did not, however, submit questionnaire responses. *See id.* Liang Chyuan requested that Commerce use Liang Chyuan's data from the 2017-2018 administrative review or the non-selected respondents' rate from a prior review to determine Liang Chyuan's rate. *Id.* at 19.

Commerce assigned both mandatory respondents preliminary dumping margins of 78.17 percent using AFA due to their failure to respond to the questionnaires.[3] *Prelim. Results*, 85 Fed. Reg. at 19,139; Prelim. Mem. at 7–9. Commerce also found that Liang Chyuan's asserted willingness to submit questionnaire responses was insufficient for it to be chosen as a mandatory respondent because "it [was] not the next largest exporter of subject merchandise" and because its asserted "willingness is not a consideration" pursuant to the statutory scheme "unless [the] company has . . . fulfilled all the statutory and regulatory criteria for consideration" as a voluntary respondent. Prelim. Mem. at 3–4. Commerce found that Liang Chyuan had not taken the necessary steps to qualify as a voluntary respondent. *Id.* at 4. Commerce further explained that

---

[3] AFA rates, as established in the statute, may be determined based on data from the petition, other information placed on the record, or determinations in a prior segment of the proceeding regarding the subject merchandise. 19 U.S.C. § 1677e(b)(2) (2018).

carrying forward a previous review rate for Liang Chyuan was "not a feasible or legally sanctioned methodology." *Id.*

Commerce used the so-called "expected method" to determine preliminarily the rate applicable to the non-selected respondents: averaging the rates assigned to the mandatory respondents.[4] *See id.* at 10. This method yielded a 78.17 percent rate for the non-selected respondents, including Liang Chyuan. *Prelim. Results*, 85 Fed. Reg. at 19,139. The rates assigned to the mandatory respondents and the non-selected respondents' rate remained the same in the *Final Results*. 85 Fed. Reg. at 76,015.

Before the court, Plaintiffs challenge Commerce's use of the expected method to determine the non-selected respondents' rate. Plaintiffs argue that because the mandatory respondents' rates were based on AFA, the expected method does not yield results reasonably reflective of the potential dumping margins of the non-selected respondents. PrimeSource's MJAR at 13–35; Consol. Pls.' MJAR at 3.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[5] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[4] Commerce refers to its method, throughout the preliminary and final I&D Memoranda, as the "expected method." See I&D Mem. In one instance, Commerce refers to the use of a "simple-average" rather than weighted-average. *Id.* at 10. In this case, the result is the same and this one reference does not affect the court's analysis.

[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless stated otherwise.

## Discussion

At issue first is whether Commerce's use of the expected method based on the mandatory respondents' AFA rates to determine the rate to apply to the non-selected respondents was based on substantial evidence and otherwise in accordance with law. Second, the court examines whether Liang Chyuan was entitled to an individually calculated rate.

### I. Use of the Expected Method for Determining the Non-Selected Respondents' Rate was Lawful

The statute is silent regarding how to determine the rate for companies not selected for individual examination in an administrative review. In such a situation, Commerce looks to 19 U.S.C. § 1673d(c)(5) for guidance, which provides instructions for determining the "all-others rate" in an investigation.[6] *See, e.g.*, *Albemarle Corp. v. United States*, 821 F.3d 1345, 1352 & n.6 (Fed. Cir. 2016); *see also* I&D Mem. at 10 (discussing 19 U.S.C. § 1673d(c)(5)). Section 1673d(c)(5)(A) provides that the all-others rate assigned to non-examined companies is calculated as the "weighted average of the estimated weighted average dumping margins" assigned to individually

---

[6] In nonmarket-economy cases, companies may obtain a "separate rate" by establishing independence from government control. *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373–74 (Fed. Cir. 2013); *Bosun Tools Co. v. United States*, No. 2021-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) (unpublished). When numerous companies seek separate rates, Commerce will likewise select mandatory respondents and determine a non-selected respondents' rate for those respondents that have established their independence from government control. *See Bestpak*, 716 F.3d at 1374. Jurisprudence for determining the rate applicable to non-selected, separate rate respondents is relevant to determining non-selected respondents' rates in a market-economy proceeding. *See id.* at 1373–74 (discussing the market-economy rule alongside the nonmarket-economy rule); *Bosun*, 2022 WL 94172 at *2–3 & n.2 (same).

examined companies, "excluding any zero and *de minimis* margins, and any margins determined entirely under section 1677e of this title [i.e., on the basis of the facts available, including AFA]." 19 U.S.C. § 1673d(c)(5)(A).

When the dumping margins assigned to all individually examined companies are zero, *de minimis*, or based on facts available, the statute further provides that Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." *Id.* § 1673d(c)(5)(B).

The Statement of Administrative Action accompanying the Uruguay Round Agreements Act, which Congress has approved as an authoritative interpretation of the statute, *id.* § 3512(d), provides an "expected method" to determine the all-others rate in these situations, Uruguay Rounds Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 ("SAA"). When the dumping margins for all individually investigated exporters and producers are determined entirely on the basis of facts available or are zero or *de minimis*, "[t]he expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." *Id.* The SAA further provides that "if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods." *Id.*

Prior litigation surrounding these statutory provisions and corresponding portions of the SAA provides the backdrop to the court's consideration of this case. First, case law confirms that when Commerce relies on 19 U.S.C. § 1677f-1(c)(2) to select the largest exporters by volume for individual examination, it does so based on a statutorily supported assumption that the data from the largest exporters may be viewed as representative of all exporters. *See Albemarle*, 821 F.3d at 1353; *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017). This respondent selection exercise occurs early in the administrative proceeding before questionnaires are issued and is based on the respondents' export volumes, not the results of the agency's dumping margin analysis. *See* Respondent Selection Mem. (Oct. 22, 2019) at 4–5, CR 5, PR 29, CJA Tab 2. In other words, the selected respondents are assumed to be representative of the non-selected respondents without regard to whether their final antidumping duty margin is zero, *de minimis*, based entirely on the use of AFA, or calculated based on the questionnaire responses of the selected respondents. *See Albemarle*, 821 F.3d at 1353; *Bosun*, 2022 WL 94172 at *4.

Second, this assumption of representativeness that arises with Commerce's reliance on 19 U.S.C. § 1677f-1(c)(2) carries weight when Commerce determines the rate applicable to non-selected respondents. As mentioned above, Commerce determines the rate for non-selected respondents consistent with 19 U.S.C. § 1673d(c)(5). Thus, in the first instance, Commerce will weight-average the above-*de minimis* calculated rates to determine the non-selected respondent rate. 19 U.S.C. § 1673d(c)(5)(A). If, however, the rates for all selected respondents are zero, *de*

*minimis*, or based on facts available, the SAA provides that the expected method is for Commerce to weight-average such rates to determine the non-selected respondents' rate. SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201. In other words, it is *expected* that zero, *de minimis*, and facts available rates will be used in determining the non-selected respondents' rate. *See id.*; *Bosun*, 2022 WL 94172, at *4 (rejecting the appellants' argument that Commerce unreasonably based the separate rate, in part, on an AFA rate as "expressly foreclosed by statute").

*Albemarle* and *Changzhou Hawd* confirm that the expected method is the default method and that the burden of proof lies with the party seeking to depart from the expected method (or with Commerce as the case may be). For example, in *Albemarle*, Commerce sought to deviate from the expected method when the mandatory respondents were both found to have *de minimis* margins. *See Albemarle*, 821 F.3d at 1353. Instead of weight-averaging those results, Commerce decided to "carry[] forward" the results of prior administrative reviews to determine the rate for non-selected respondents. *Id.* In reviewing that determination, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") held that "[t]he burden is not on the separate respondents to show that their dumping is the same as that of the individually examined respondents. Rather, Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different." *Id.*

The *Albemarle* court outlined two circumstances under which Commerce may depart from the expected methodology and carry forward a prior rate for any particular

respondent. First, the court found that Commerce needed some contemporaneous data to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates could be considered reflective of current rates. *Id.* at 1357. Second, in the AFA context, "where Commerce is allowed to consider deterrence as a factor," the court found that "Commerce may presume that 'a prior dumping margin imposed against an exporter in an earlier administrative review continues to be valid if the exporter fails to cooperate in a subsequent review.'" *Id.* at 1357–58 (quoting *KYD, Inc. v. United States*, 607 F.3d 760, 767 (Fed. Cir. 2010); citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339–40 (Fed. Cir. 2002)). The court further stated that it has "upheld this presumption because 'if it were not so, the [exporter], knowing the rule, would have produced *current* information showing the margins to be less.'" *Id.* at 1358 (quoting *KYD*, 607 F.3d at 766). Other than in these two circumstances, "[t]here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period," thus reinforcing the notion that the expected method is the default. *Id.* at 1356.

One year after the court's decision in *Albemarle*, the Federal Circuit again confirmed the relevance of the assumed representativeness of the mandatory respondents in *Changzhou Hawd*. *See Changzhou Hawd*, 848 F.3d at 1012 ("The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters."). There, the court again found that in order to depart from the expected method, Commerce must identify substantial evidence that the non-selected

respondents' dumping was different from that of the mandatory respondents. *See id.* ("[T]he presumption of representativeness may be overcome . . . [with] 'substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different.'") (quoting *Albemarle*, 821 F.3d at 1353).

Recently, in *Bosun*, the Federal Circuit confirmed that the representativeness of the selected respondents is independent of the results of Commerce's dumping margin analysis.[7] *See* 2022 WL 94172, at *4. In the review underlying *Bosun*, Commerce selected the two largest respondents for examination and calculated a *de minimis* dumping margin for one respondent while basing the other respondent's rate on AFA. *Id.* at *2–3. Commerce determined the rate for the non-selected respondents by finding the simple average of these two rates.[8] *See id.* at *3. The *Bosun* court affirmed Commerce's inclusion of the AFA-based rate in the average assigned to the non-selected respondents. *See id.* at *4. In so doing, the court recalled its discussion in *Albemarle* regarding the "general assumption underlying the statutory framework"—specifically, the assumption that data from the largest volume exporters may be viewed

[7] Although *Bosun* is an unpublished opinion, as discussed herein, this court finds the opinion helpful to its analysis because the reasoning is consistent with and builds on the Federal Circuit's prior reasoning in *Albemarle* and *Changzhou Hawd* and is otherwise persuasive.

[8] By using the simple average, Commerce diverged from the expected method, which calls for using the weighted average of the selected respondents' rates. SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201. Commerce may have used a simple average of the two respondents' rates (in other words, giving equal weight to each rate) in order to avoid revealing the actual volume of imports into the United States by the cooperating respondent if such information was considered business proprietary. Regardless, the Federal Circuit did not fault Commerce's use of a simple average.

as representative of all exporters, *id.* (quoting Albemarle, 821 F.3d at 1353)—and went on to find that "although *Albemarle* concerned a case with *de minimis* rates rather than AFA rates, its reasoning is equally applicable here; the same statutory language in [section] 1673d(c)(5)(B) that permits use of *de minimis* rates also permits use of AFA rates,"[9] *id.* (emphasis added).

These cases all recognize an important assumption that is built into Commerce's statutory authority to engage in respondent selection: that the largest exporters by volume are assumed to be representative of the non-selected respondents. Consistent with this assumption, the cases also stand for the proposition that Commerce is expected to use the mandatory respondents' rates to determine the antidumping duty rate to be assigned to the non-selected respondents.

These concepts, representativeness and expectedness, are connected. Representativeness allows Commerce to select certain respondents for individual examination and, in so doing, decline to individually examine other respondents. By allowing Commerce to focus its resources on certain respondents, the statute

---

[9] Plaintiffs repeatedly cite *Yangzhou Bestpak*, 716 F.3d 1370, to support their assertion that Commerce must demonstrate that the rate yielded by the expected method reasonably reflects the potential dumping margins of the non-selected respondents. *See* PrimeSource's MJAR at 7, 11–12. However, *Bosun* interprets *Bestpak*'s holding narrowly, emphasizing that *Bestpak*, which addressed a challenge to the results of an antidumping duty investigation, "simply found that Commerce's methodology was unreasonable 'as applied,' given the lack of data." 2022 WL 94172, at *4. In this case, as in *Bosun*, Commerce examined the existing data from prior administrative reviews and found that the record evidence did not support a finding that the expected method did not produce a rate that reasonably reflected the potential dumping of the non-selected respondents. *See infra*, pp. 18–21.

necessarily creates the assumption of representativeness because Commerce often will lack further information about the non-selected respondents. *See Albemarle*, 821 F.3d at 1353. Commerce is not otherwise required to collect information about the non-selected respondents because Commerce is permitted, in fact, expected, to treat the mandatory respondents as representative of the non-selected respondents when it determines the non-selected respondents' rate.[10]

This assumption of representativeness, combined with the expectation that Commerce will treat the mandatory respondents as representative of the non-selected respondents, provides a basis for understanding that part of the SAA language upon which PrimeSource focuses: "[I]f [the expected] method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-[examined] exporters or producers, Commerce may use other reasonable

[10] Plaintiffs argue that, despite all this, AFA rates are still impermissible for use in the expected method because they cannot be representative of current non-selected respondents' rates. PrimeSource's MJAR at 14–21. However, Plaintiffs fail to establish that the use of AFA to determine the mandatory respondents' rates in any way detracts from the presumption of representativeness. While Plaintiffs seek to differentiate the use of AFA rates in the expected method from the use of *de minimis* or zero rates by characterizing AFA rates as "punitive," the Federal Circuit has found that AFA rates may be representative of actual dumping because, "if it were not so, the [mandatory respondent], knowing the rule, would have produced *current* information showing the margin to be less." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990). Moreover, the absence of any opposition to the use of AFA in this review by a mandatory respondent suggests that the AFA rates assigned to the mandatory respondents were probative of their dumping—further justifying these rates as representative. *See id.* *Bosun* also clearly resolves this issue in the context of the expected method: AFA rates are permissible in calculating the rate applied to the non-selected respondents. *Bosun*, 2022 WL 94172, at *4 (finding that AFA rates are acceptable inputs to the expected method for calculating all-others rates).

methods." SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201. PrimeSource suggests that this language places an affirmative burden on Commerce to find, based on substantial evidence, that the expected method produces a rate that *is* reasonably reflective of the potential dumping by non-selected respondents. *See* PrimeSource's MJAR at 16. The court finds that the statute, SAA, and relevant opinions of the Federal Circuit do not support placing such a burden on Commerce.

As discussed above, the statute clearly permits Commerce to engage in a respondent selection process pursuant to 19 U.S.C. § 1677f-1(c) when certain conditions have been met. Commerce engaged in that process in this administrative review and no party challenges that decision. Having determined to examine the largest exporters by volume in this review, the statute permits Commerce to proceed with the review without requiring additional information from the non-selected respondents. *See, e.g.*, *Changzhou Hawd*, 848 F.3d at 1012 (discussing the statutory authority to select respondents rather than examining every exporter). Thus, interpreting the SAA to require Commerce to nevertheless engage in a data collection exercise with the non-selected respondents in order to determine their "potential dumping margins" would be inconsistent with the language of 19 U.S.C. § 1677f-1(c) expressly permitting Commerce to "limit[] its examination" to the largest exporters and producers by volume. 19 U.S.C. § 1677f-1(c)(2). Such an interpretation would defeat the purpose of the respondent selection process. Nothing in the statute, SAA, or jurisprudence suggests that such a burden exists.

To the contrary, the courts have long recognized that the burden of establishing relevant facts may properly be assigned to the party in control of the information necessary to establish those facts. *See, e.g.*, *Rhone Poulenc*, 899 F.2d at 1190–91 (placing "the burden of production on the [party] which has in its possession the information capable of rebutting the agency's inference"). In this case, the non-selected respondents are in control of the information that would establish whether applying the expected method based on the rates of the mandatory respondents would not reasonably reflect the potential dumping margins of those non-selected respondents. Thus, the court finds that the non-selected respondents bear the burden of providing evidence that the results of the expected method would not reasonably reflect the potential dumping margins of the non-selected respondents.

Accordingly, the court turns to whether Plaintiffs have provided substantial evidence to rebut the presumption of representativeness and thereby justify deviating from the expected method. Commerce found that the "expected method is reasonable here because the record evidence does not rebut the presumption that the mandatory respondents are representative." I&D Mem. at 9. While Plaintiffs argue that substantial evidence rebutted the presumption of representativeness, PrimeSource's MJAR at 13–34; Consol. Pl.'s MJAR at 3–5, Plaintiffs point to no evidence from this period of review to support their assertion that the expected method result was not reasonably reflective of their actual margins, *see* PrimeSource's MJAR at 27–34 (arguing that AFA rates are punitive and that past reviews yielded rates that were more reflective of current rates). Here, all respondents were aware of the AFA rate from prior reviews that would likely be

utilized in the case of non-participation by one or more mandatory respondents and its potential inclusion in the determination of the non-selected respondents' rate. *See* I&D Mem. at 14–15. Nevertheless, no non-selected respondent provided a timely voluntary questionnaire response or timely evidence that the mandatory respondents were in any way not representative of the remaining respondents (such as operating in a different market segment ("commodity" versus "high-end niche") or other evidence that might provide the agency with cause to question the representativeness of the mandatory respondents). Moreover, there is not sufficient evidence to indicate that the prior, lower rates to which Plaintiffs point are more reflective of current rates than the rate determined by the expected method.

*Bosun* offers some considerations for evaluating Commerce's analysis of the rates from prior reviews. In *Bosun*, as plaintiffs do here, the appellant argued that the rate applied to the non-selected respondents diverged from a "trend" of prior low rates. 2022 WL 94172, at *5. The Federal Circuit considered the individual rates determined for the appellant in the past and found that they were above *de minimis* and, in fact, trending upwards; it found Commerce's decision to weigh the most recent rate most heavily to be reasonable; and it acknowledged Commerce's consideration and rejection of earlier prior rates that, because they were lower, arguably detracted from the rate assigned to Bosun. *See id.* at *5–6.

Here, Commerce rejected Plaintiffs' suggestion of a pattern of lower rates, instead finding a history of AFA usage in previous reviews. *See* I&D Mem. at 14–15. While the non-selected respondents asserted that "calculated margins ranged from zero

percent to 27.69 percent, which [respondents] consider to be 'low' margins," *id.* at 14, Commerce noted that the respondents "omitted any mention of the rates assigned in the history of the proceeding that were based on the 78.17 percent AFA rate," whereas Commerce found that "more than half of the reviews contained [a] determination[] based on" AFA, *id.* at 14. Thus, for Commerce, there was no evidence that the 78.17 percent margins had less probative value than the so-called "low" rates to which respondents pointed. *See id.* at 14–15. As Commerce's analysis highlights, examining only the calculated margins and excluding from consideration the AFA-based margins would not have yielded a full picture of the historical trends.

Commerce also did not ignore the previous antidumping rates. Commerce explained that past rates have been inconsistent from review to review, and that "if there is any pattern from segment-to-segment of the behavior of examined respondents, that pattern demonstrates that, most of the time, the mandatory respondents have failed to cooperate and have been assigned a rate based on AFA." *Id.* at 14. Commerce relied on this assessment to find that there was no basis on which to find that past calculated rates are representative, because there was fluctuation from review to review. *See id.* at 14–15. For example, Commerce pointed to the fact that Pro-Team, a mandatory respondent in this and the previous review, received an AFA rate in this review but a calculated rate in the preceding review. *Id.* at 14. Similarly, Unicatch Industrial Co., Ltd. ("Unicatch"), "another frequent mandatory respondent" that was not under individual review here, was assigned rates of 6.16 percent and 27.69 percent in subsequent reviews—an increase of 350 percent from one review to the next. *Id.* at 15. Moreover,

Bonuts received AFA rates in the first, second, and fourth administrative reviews. *Id.* at 14. The table below demonstrates this lack of consistency—and the lack of consistently "low" rates—in frequent mandatory respondents' rates over the course of the reviews:[11]

| | **Pro-Team** | **Bonuts** | **Unicatch** |
|---|---|---|---|
| Investigation | 2.16%[12] | | |
| POR1 | | 78.17% | 78.17% |
| POR2 | 0% | 78.17% | 6.16% |
| POR3 | 6.72%[13] | | 27.69% |
| POR4 | 78.17% | 78.17% | |

These values support Commerce's conclusion that the rates fluctuated significantly from review to review and, thus, that looking to past reviews for evidence of current dumping lacks a logical foundation. Absent any consistency from review to review, Plaintiffs' arguments in favor of using rates from past reviews are unconvincing. Commerce's determination not to use past rates was therefore reasonable.

Commerce also noted that in each segment of this proceeding, the mandatory respondents' rates have formed the basis for any non-selected respondents' rate. *Id.* at 15. Moreover, "73 of 75 of the non-examined companies have never been examined in any segment of the proceeding," and "there is no evidence on this record or any other record that the 78.17 percent rate does not reflect their commercial reality." *Id.* In other

[11] These values, unless otherwise indicated, are extracted from the analysis in the I&D Memorandum on pages 14 and 15.
[12] *Certain Steel Nails From Taiwan*, 82 Fed. Reg. 55,090, 55,090 (Dep't Commerce Nov. 20, 2017) (notice of court decision not in harmony with final determination in less than fair value investigation and notice of amend. final determination).
[13] *Certain Steel Nails From Taiwan*, 85 Fed. Reg. 14,635, 14,636 (Dep't Commerce Mar. 13, 2020) (final results of antidumping duty admin. review and determination of no shipments; 2017–2018).

words, the relevant data from past reviews was severely limited. *See id.* Commerce found that Plaintiffs presented no compelling argument for why such limited, non-contemporaneous data would be more representative than margins determined in the present review. *See id.*

The above analysis indicates that Commerce's use of the expected method was supported by substantial evidence and in accordance with the law. As required by the substantial evidence standard, Commerce engaged with the data from past reviews and considered its relevance to the present review, finding that the lack of consistency in prior rates made past review data unusable for determining present rates. Commerce examined whether prior rates might be representative of current dumping rates, and it found that there was insufficient evidence on the record to rebut the presumed representativeness of the mandatory respondents' rates from this review. Thus, Plaintiffs' arguments in favor of carrying forward prior rates as a preferable method are unpersuasive. Accordingly, the court sustains Commerce's determination of the non-selected respondents' rate based on the expected method.

**II. Liang Chyuan Is Not Entitled to Different Status**

PrimeSource attempts to distinguish Liang Chyuan from the other non-selected respondents in two ways: first, by noting that Liang Chyuan was "willing and able to submit a response," and, second, that Liang Chyuan had been a respondent in a previous review and received a lower rate. PrimeSource's MJAR at 26.

The Government asserts that Liang Chyuan's cooperation in one prior review is "not sufficient evidence to divert from the expected method and apply [Liang Chyuan's]

rate from the prior review, particularly given the fluctuating rates of Pro-Team and Unicatch, which have both received AFA in certain segments but not others." Def.'s Resp. at 19 (citing I&D Mem. at 19); *see also* Def.-Int.'s Resp. at 10. Further, the Government asserts that Liang Chyuan's willingness to submit a questionnaire response does not by itself entitle it to an individual rate because it did not participate as a voluntary respondent. *See* Def.'s Resp. at 19; *see also* Def.-Int.'s Resp. at 10.

PrimeSource fails to distinguish Liang Chyuan from the other non-selected respondents. Non-selected respondent rates are often applied to multiple non-selected respondents—indeed, that is the purpose of these rates. *See Bosun*, 2022 WL 94172, at *2 ("After Commerce determines the rates for the mandatory respondents, it then assigns a separate rate to the nonindividually examined respondents . . . ."). Non-selected respondents, as a general matter, are not entitled to individually determined rates; however, they may qualify as voluntary respondents and thereby receive individually determined rates if they provide necessary information in a timely fashion. *See* 19 U.S.C. § 1677m(a)(1)(A)(i).

To qualify as a voluntary respondent, a company must respond to the same questionnaire issued to the mandatory respondents within the same timeframe. 19 U.S.C. § 1677m(a)(1)(A)(i). Liang Chyuan did not do so. I&D Mem. at 20. PrimeSource attempts to analogize Liang Chyuan's status to that of a voluntary respondent simply because Liang Chyuan expressed a willingness to submit responses to the questionnaire. PrimeSource's MJAR at 26. However, Liang Chyuan was not required to request or await Commerce's approval to file a timely voluntary response.

*See* 19 U.S.C. § 1677m(a)(1)(A)(i). Moreover, Liang Chyuan did not express its willingness to participate until February 3, 2020, roughly two months after the deadlines for the mandatory respondents to respond to the agency's questionnaires. I&D Mem. at 20 & nn.109–10.

While Liang Chyuan participated as a respondent in one prior review in which it received a calculated margin based on its sales during that period of review, *see id.* at 19, that fact does not entitle Liang Chyuan to retain that calculated rate in the present review. As Commerce noted, "each administrative review is a separate segment of proceedings with its own unique facts." *Id.* at 19 n.103 (quoting *Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005)). In addition, "there is no record evidence substantiating [Liang Chyuan's] claim that it would have received the same result in this review as it did in a previous review, had it been selected for individual examination." *Id.* at 20. In sum, Commerce was justified in finding that Liang Chyuan was not entitled to an individual rate because Liang Chyuan did not take the necessary steps to qualify for an individual rate or otherwise establish that the non-selected respondent rate should not apply.

## CONCLUSION

Based on the foregoing, the court will sustain Commerce's *Final Results*. Judgment will enter accordingly.

/s/ Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: June 16, 2022
New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC.,<br>Plaintiffs,<br><br>and<br><br>CHENG CH INTERNATIONAL CO., LTD., CHINA STAPLE ENTERPRISE CORPORATION, DE FASTENERS INC., HOYI PLUS CO., LTD., LIANG CHYUAN INDUSTRIAL CO., LTD., TRIM INTERNATIONAL INC., UJL INDUSTRIES CO., LTD., YU CHI HARDWARE CO., LTD., AND ZON MON CO., LTD.,<br>Consolidated-Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>Defendant,<br><br>and<br><br>MID CONTINENT STEEL & WIRE INC.,<br>Defendant-Intervenor. | Before: Mark A. Barnett, Chief Judge<br>Consol. Court No. 20-03911 |

**JUDGMENT**

These consolidated cases having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's final results in the fourth administrative review of the antidumping duty order on certain steel nails from Taiwan,

*see Certain Steel Nails From Taiwan*, 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020) (final results of antidumping duty admin. review and final determination of no shipments; 2018-2019), are **SUSTAINED**; and it is further

**ORDERED** that the subject entries must be liquidated in accordance with the final court decision, including all appeals, as provided for in section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e) (2018).

/s/ Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: June 16, 2022
New York, New York

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-2128 and 22-2129

**Short Case Caption:** PrimeSource Building Products, Inc. v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,139 words.

- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.

- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 12/23/2022

Signature: /s/ Jeffrey S. Grimson

Name: Jeffrey S. Grimson