2022-2128 & 2022-2129

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

### PRIMESOURCE BUILDING PRODUCTS, INC., CHENG CH INTERNATIONAL CO., LTD., CHINA STAPLE ENTERPRISE CORP., DE FASTENERS INC., HOYI PLUS CO., LTD., LIANG CHYUAN INDUSTRIAL CO., LTD., TRIM INTERNATIONAL INC., UJL INDUSTRIES CO., LTD., YU CHI HARDWARE CO., LTD., ZON MON CO., LTD.,
*Plaintiffs-Appellants,*

**v.**

### UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,
*Defendants-Appellees*

_____

Appeal from the United States Court of International Trade in No. 1:20-cv-03911-MAB, Chief Judge Mark A. Barnett

_____

## RESPONSE BRIEF OF DEFENDANT-APPELLEE
## MID CONTINENT STEEL & WIRE, INC.

<div style="margin-left: 40%;">

Adam H. Gordon
Jennifer M. Smith
Lauren Fraid
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700
*Counsel to Defendant-Appellee Mid Continent Steel & Wire, Inc.*

</div>

Dated:  March 29, 2023

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ....................................................... 1

ISSUE PRESENTED ................................................................. 1

STATEMENT OF THE CASE .................................................................. 2

I.    NATURE OF THE CASE .................................................................. 2

II.   STATEMENT OF FACTS ................................................................ 3

III.  PROCEDURAL POSTURE ................................................................ 7

SUMMARY OF ARGUMENT ................................................................... 11

ARGUMENT ................................................................................ 13

I.    STANDARD OF REVIEW ................................................................ 13

II.   COMMERCE'S CALCULATION OF THE ALL-OTHERS RATE IS IN ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE ........................................................ 15

    A.    The Statute, The SAA, And Judicial Precedent All Support Commerce's Use Of The Expected Method ........................... 15

    B.    Substantial Evidence Does Not Support A Finding That The All-Others Rate Is Not Reasonably Reflective Of The Non-Selected Companies' Potential Dumping Margins ....... 23

    C.    Commerce Reasonably Determined To Use The Expected Method Rather Than To Carry Forward Liang Chyuan's Rate From A Prior Review ..................................................... 37

CONCLUSION ................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
   802 F.3d 1339 (Fed. Cir. 2015) .............................................. 15

*Albemarle Corp. & Subsidiaries v. United States,*
   821 F.3d 1345 (Fed. Cir. 2016) ....................................... passim

*Atl. Sugar Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984) .............................................. 15

*Bosun Tools Co. Ltd. v. United States,*
   Nos. 2021-1929, 2021-1930, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022)
   ........................................................................................ passim

*Changzhou Hawd Flooring Co., Ltd. v. United States,*
   848 F.3d 1006 (Fed. Cir. 2017) ....................................... passim

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
   701 F.3d 1367 (Fed. Cir. 2012) ....................................... 43, 44

*Chemtall, Inc. v. United States,*
   878 F.3d 1012 (Fed. Cir. 2017) .............................................. 13

*Consol. Edison Co. of N.Y. v. NLRB,*
   305 U.S. 197 (1938) ............................................................... 14

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ............................................................... 15

*Dupont Teijin Films USA, LP v. United States,*
   407 F.3d 1211 (Fed. Cir. 2005) .............................................. 13

*GODACO Seafood Joint Stock Co. v. United States,*
   494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) ......................... 42

*INS v. Elias-Zacarias,*
   502 U.S. 478 (1992) ............................................................... 14

*Mid Continent Steel & Wire, Inc. v. United States*,
   321 F. Supp. 3d 1313 (Ct. Int'l Trade 2018) ............................ 42, 43, 44

*Mid Continent Steel & Wire, Inc. v. United States*,
   941 F.3d 530 (Fed. Cir. 2019) ................................................... 17

*Nat'l Knitwear & Sportswear Ass'n v. United States*,
   779 F. Supp. 1364 (Ct. Int'l Trade 1991) ............................... 29

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ................................................ 14

*Nucor Corp. v. United States*,
   927 F.3d 1243 (Fed. Cir. 2019) ................................................ 17

*PAM, S.p.A. v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009) ............................................... 14

*PrimeSource Bldg. Prods. Inc. v. United States*,
   Consol. Ct. No. 20-03911, slip op. 22-73 (Ct. Int'l Trade
   June 16, 2022) ..................................................................... 2, 3

*Qingdao Qihang Tyre Co. v. United States*,
   308 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ..................... 22, 43

*Shanxi Hairui Trade Co. v. United States*,
   39 F.4th 1357 (Fed. Cir. 2022) ........................................ 19, 21

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ......................................................... 11, 14

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013) ................................... 28, 29, 30

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................... 11, 13, 14

19 U.S.C. § 1673d(c)(5)(A) ................................................. 16

19 U.S.C. § 1673d(c)(5)(B) .......................................... passim

19 U.S.C. § 1673d(c)(5) .................................................................. 17

19 U.S.C. § 1675 .............................................................................. 2

19 U.S.C. § 1677f-1(c) ...................................................................... 3

19 U.S.C. § 1677f-1(c)(2) ............................................................ 8, 25

19 U.S.C. § 1677m(a) .................................................................... 4, 5

19 U.S.C. § 1677m(a)(1)(A)(i) ........................................................ 35

19 U.S.C. § 3512(d) .................................................................... 7, 17

## REGULATIONS

19 C.F.R. § 204(d) ........................................................................ 4, 5

19 C.F.R. § 351.213(f) .................................................................. 4, 5

19 C.F.R. § 351.301(c) ............................................................ 34, 35

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Certain Steel Nails From Taiwan,*
   85 Fed. Reg. 19,138 (Dep't of Commerce April 6, 2020) ................... 5, 6

*Certain Steel Nails From Taiwan,*
   85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020) ............ passim

*Drawn Stainless Steel Sinks from the People's Republic of China:*
   *Preliminary Results of the Antidumping Duty Administrative*
   *Review and Preliminary Determination of No Shipments;*
   *2016-2017,*
   83 Fed. Reg. 658 (Dep't of Commerce Jan. 5, 2018) ........................... 40

*Initiation of Antidumping and Countervailing Duty Administrative*
   *Reviews,*
   84 Fed. Reg. 47,242 (Dep't of Commerce Sept. 9, 2019) ...................... 3

*Stainless Steel Bar from India:  Preliminary Results of the*
   *Antidumping Duty Administrative Review; 2019–2020,*
   86 Fed. Reg. 11,235 (Dep't of Commerce Feb. 24, 2021) ............... 41, 42

*Tapered Roller Bearings and Parts Thereof, Finished and*
*Unfinished, from the People's Republic of China:  Final Results*
*of Antidumping Duty Administrative Review, and Rescission*
*of New Shipper Review; 2015-2016*,
83 Fed. Reg. 1,238 (Dep't of Commerce Jan. 10, 2018)........................40

## MISCELLANEOUS AUTHORITIES

*Statement of Administrative Action accompanying the Uruguay Round*
*Agreements Act,*
H.R. Doc. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040
.................................................................................................... passim

Trade Preferences Extension Act of 2015,
Pub. L. No. 114-27 (June 29, 2015).........................................18, 28, 31

---

**RESPONSE BRIEF OF DEFENDANT-APPELLEE
MID CONTINENT STEEL & WIRE, INC.**

---

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Defendant-Appellee Mid Continent Steel & Wire, Inc. ("Mid Continent") is not aware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title.

Counsel is aware of one related case arising from a decision of the U.S. Court of International Trade (the "Trade Court") that is now pending before the Court: *Pro-Team Coil Nail Enterprise Inc. v. United States*, No. 22-2241. That case will be directly affected by the outcome in the instant case as the issues thereunder are central to both cases.

## ISSUE PRESENTED

Whether the U.S. Department of Commerce's ("Commerce") calculation of the all-others rate assigned to non-selected companies is supported by substantial evidence and is otherwise in accordance with law.

**STATEMENT OF THE CASE**

## I. NATURE OF THE CASE

This appeal arises from an antidumping case involving imports of steel nails from Taiwan, in which an antidumping ("AD") order was imposed in 2015. Since then, periodic or "annual" reviews pursuant to 19 U.S.C. § 1675 have been conducted each year. Annual reviews determine the actual amount of dumping on prior imports, and set the rate used to calculate and collect final duties. This appeal arises from the fourth such review. *See Certain Steel Nails From Taiwan*, 85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020) ("*Final Results*"), Appx0634–36, and accompanying Issues and Decision Memorandum ("IDM"), Appx0612–33. The period of review ("POR") covered by the fourth review and the *Final Results* is July 1, 2018 through June 30, 2019. *See* Appx0634–36.

Plaintiff-Appellant PrimeSource Building Products, Inc. ("PrimeSource") and Consolidated Plaintiffs-Appellants Cheng Ch International Co., Ltd., *et al.* (collectively, "Cheng Ch") appeal the final judgment of the Trade Court in *PrimeSource Bldg. Prods. Inc., et al. v.*

*United States*, Consol. Ct. No. 20-03911, slip op. 22-73 (Ct. Int'l Trade June 16, 2022), Appx0001–23.

## II.    STATEMENT OF FACTS

On September 9, 2019, Commerce initiated the fourth administrative review of its antidumping duty order covering nails from Taiwan. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47,242 (Dep't of Commerce Sept. 9, 2019), Appx0050–63. As permitted by the statute, 19 U.S.C. 1677f-1(c), Commerce selected two Taiwanese companies accounting for the largest volume of exports of subject merchandise during the POR for individual examination in the review: Bonuts Hardware Logistics Co., LLC ("Bonuts") and Create Trading Co., Ltd. ("Create"). *See* Respondent Selection Memorandum (Oct. 22, 2019), Appx0137–42.

Commerce issued questionnaires to Bonuts and Create on October 23, 2019 and October 28, 2019, respectively. *See* Bonuts Questionnaire, Appx0143–298; Create Questionnaire, Appx0299–453. Bonuts did not respond to the questionnaire at all. Create submitted a letter explaining that it had no sales, and therefore, was not required to respond. *See* Create No Sales Submission (Nov. 12, 2019), Appx0454–

518; Appx0620 (IDM). Accordingly, Commerce did not require Create to respond to the questionnaire. *See* Commerce Letter to Create (Jan. 13, 2020), Appx0519.

To replace Create, Commerce conducted an additional respondent selection process, and selected the next largest exporter in terms of volume, Pro-Team Coil Nail Enterprise Inc. ("PT"), for individual examination. *See* Additional Respondent Selection Memorandum (Jan. 17, 2020), Appx0520–22; Appx0620 (IDM). PT submitted a letter to Commerce stating that it would not respond to the antidumping questionnaire. *See* PT Letter (Jan. 31, 2020), Appx0523–25; Appx0620 (IDM).

On February 3, 2020, approximately two months after the deadlines for the mandatory respondents to respond to the agency's questionnaires, Liang Chyuan, a company not selected for individual examination in the review, submitted untimely respondent selection comments to Commerce and indicated its willingness to submit a questionnaire response in the review. *See* Liang Chyuan Selection Comments (Feb. 3, 2020), Appx0526–29. In effect, Liang Chyuan

belatedly sought status as a "voluntary respondent" pursuant to 19 U.S.C. § 1677m(a), 19 C.F.R. § 204(d), and 19 C.F.R. § 351.213(f).

In its comments, Liang Chyuan requested that Commerce "calculate the rate for LC using data from LC," or, in the alternative, "use the rate from the 2017-2018 administrative review for LC, or use the all-others rate from the original less than fair value investigation of certain steel nails from Taiwan." Appx0527–28.

Liang Chyuan, however, did not submit questionnaire responses as required by Commerce's regulations. *See* Appx0631. Further, Mid Continent opposed Liang Chyuan's requests because they were untimely, the company failed to follow the statutory and regulatory requirements to be a "voluntary respondent", and there was insufficient time to develop the record for a new respondent. *See* Mid Continent Response to Liang Chyuan (Feb. 5, 2020), Appx0530–34.

Commerce published its preliminary results on April 6, 2019, and applied preliminary dumping margins of 78.17 percent as total adverse facts available ("AFA") to Bonuts and PT due their failure to respond to the questionnaires. *See Certain Steel Nails From Taiwan*, 85 Fed. Reg. 19,138 (Dep't of Commerce April 6, 2020) (preliminary results),

5

Appx0545–48, and accompanying decision memorandum ("PDM"),
Appx0535–44.

Commerce also found that Liang Chyuan's claimed willingness to
submit questionnaire responses was insufficient for it to be chosen a
mandatory respondent because it was not the next largest exporter of
subject merchandise, and that "willingness to be examined" was not a
consideration in the statutory scheme unless the company had fulfilled
all the statutory and regulatory criteria for consideration.  Appx0537–
38.

In short, Commerce determined that Liang Chyuan did not follow
the statutory and regulatory criteria for consideration as a voluntary
respondent.  *See id.*  Commerce also explained that it could not carry
forward Liang Chyuan's rate from the previous review because
Commerce was legally required to follow the statute's expected method,
and pulling forward the rate was "not a feasible or legally sanctioned
methodology for assigning review-specific rates to non-individually
examined respondents."  Appx0538.

To calculate the rate for the non-selected companies, Commerce
applied the expected method by averaging the AFA-based rates for PT

and Bonuts. This yielded a rate of 78.17 percent for non-selected companies, including Liang Chyuan. *See* Appx0546. These rates remained unchanged in the *Final Results*. *See* Appx0634–36.

## III. PROCEDURAL POSTURE

On December 17, 2020, PrimeSource commenced an action before the Trade Court, challenging Commerce's *Final Results*.[1] *See* Appx0032–33.

On June 16, 2022, the Trade Court denied the companies' motions for judgment on the agency record and affirmed Commerce's *Final Results*. *See* Appx0001–0023. The Trade Court found that Commerce's use of the expected method for determining the non-selected respondents' rate was lawful. *See* Appx0008–21. The Trade Court concluded that Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, "which Congress has approved as an authoritative interpretation of the statute," 19 U.S.C. § 3512(d), "provides an 'expected method' to determine the all-others rate" where the dumping margins assigned to all individually

---

[1] Cheng Ch commenced a separate action before the Trade Court on December 28, 2020. These actions are consolidated by the Trade Court on February 25, 2021. *See* Appx0034.

examined companies are zero, *de minimis*, or based entirely on facts available. Appx0009. In such cases, the expected method "will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." *Id.* (internal citation and quotation marks omitted). "The SAA further provides that if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods." *Id.* (internal citation and quotation marks omitted).

The Trade Court further reasoned that judicial precedent supported Commerce's use of the expected method under these facts for several reasons.

First, courts have held that Commerce has a "statutorily supported assumption that the data from the largest exporters may be viewed as representative of all exporters" when it relies on 19 U.S.C. § 1677f-1(c)(2) to select the largest exporters for individual examination. Appx0010.

Second, pursuant to the SAA, "it is <u>expected</u> that zero, *de minimis*, and facts available rates will be used in determining the non-selected respondents' rate," and precedent from this Court "confirm{s} that the expected method is the default method and that the burden of proof lies with the party seeking to depart from the expected method (or with Commerce as the case may be)."  Appx0011 (emphasis in original).

Third, neither of the two circumstances outlined in *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016), exist here, and therefore, Commerce has no basis to depart from the expected method and carry forward a rate from a prior review.  *See* Appx0010–11.

The Trade Court also found that PrimeSource and Cheng Ch did not point to any evidence to support their claim that the expected method was not reasonably reflective of their potential dumping margins.  *See* Appx0017–21.  The Trade Court stated that:

> no non-selected respondent provided a timely voluntary questionnaire response or timely evidence that the mandatory respondents were in any way not representative of the remaining respondents (such as operating in a different market segment ("commodity" versus "high-end niche") or other evidence that might provide the agency with cause to question the representativeness of the mandatory respondents).

> Moreover, there is not sufficient evidence to indicate that the prior, lower rates to which Plaintiffs point are more reflective of current rates than the rate determined by the expected method.

Appx0018.

Moreover, the Trade Court rejected arguments by PrimeSource and Cheng Ch to carry forward prior rates as "unpersuasive." Appx0021. The Court found that, as required by the substantial evidence standard, Commerce considered and rejected the data from past reviews due the lack of consistency, and therefore determined "that there was insufficient evidence on the record to rebut the presumed representativeness of the mandatory respondents' rates from this review." *Id.*

Therefore, the Trade Court concluded that, "{w}hile Liang Chyuan participated as a respondent in one prior review in which it received a calculated margin based on its sales during that period of review, . . . that fact does not entitle Liang Chyuan to retain that calculated rate in the present review." Appx0023 (internal citation omitted). Further, the Trade Court held that "there is no record evidence substantiating {Liang Chyuan's} claim that it would have received the same result in this review as it did in a previous review, had it been selected for

individual examination." *Id.* (internal citation omitted).  Accordingly, the Trade Court held that "Commerce was justified in finding that Liang Chyuan was not entitled to an individual rate because Liang Chyuan did not take the necessary steps to qualify for an individual rate or otherwise establish that the non-selected respondent rate should not apply." *Id.*

On August 17, 2022, PrimeSource and Cheng Ch appealed the decision of the Trade Court.

## SUMMARY OF ARGUMENT

Commerce's determination must be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Additionally, "{t}he specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

PrimeSource and Cheng Ch fail to satisfy this rigorous standard in the instant appeal.  First, neither PrimeSource nor Cheng Ch have demonstrated that Commerce's use of the expected method to calculate the margins for non-selected respondents in this proceeding was

unlawful or unreasonable.  Nor can they.  Indeed, Commerce's use of
the expected method to calculate such rates has been upheld repeatedly
by the Court as lawful under 19 U.S.C. § 1673d(c)(5)(B), the SAA, and
judicial precedent.  In fact, just last year, the Court affirmed
Commerce's use of the expected method to calculate the margins for
non-selected respondents based on the total AFA rates.  PrimeSource
and Cheng Ch cannot deny the outcomes of these decisions.

Second, Commerce reasonably determined that substantial
evidence did not demonstrate that the rates for the mandatory
respondents did not reflect the rates for the non-selected respondents.
In *Albemarle*, the Court held that that the rates for mandatory
respondents should be considered to be representative unless
substantial evidence demonstrates otherwise.  *See generally Albemarle*,
821 F.3d 1345.  PrimeSource and Cheng Ch have failed to rebut this
presumption.

Third, there is no substantial evidence on the record to support a
deviation from using the expected method to calculate the all-others
rate by carrying forward rates from past reviews for Liang Chyuan.  As
the Trade Court properly found, "each administrative review is a

separate segment of proceedings with its own facts," and "Commerce was justified in finding that Liang Chyuan was not entitled to an individual rate because Liang Chyuan did not take the necessary steps to qualify for an individual rate or otherwise establish that the non-selected respondent rate should not apply." Appx0023.

Accordingly, the Trade Court's decision should be affirmed, and Commerce's *Final Results* should be sustained.

## ARGUMENT

## I.    STANDARD OF REVIEW

The Court applies the same standard of review that was applied by the Trade Court when reviewing a final antidumping determination by Commerce. *See Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (internal citation omitted). In this context, the Court "give{s} great weight to the informed opinion of that court, which has expertise in international trade matters." *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1018 (Fed. Cir. 2017) (internal quotation marks and citation omitted).

Commerce's determination must be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in

accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). Additionally, "{t}he specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *Eurodif S.A.*, 555 U.S. at 316 n.6. Accordingly, a party challenging Commerce's findings under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotation marks omitted).

Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (internal citations and quotation marks omitted); *see also Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938) (internal citation omitted). Here, because Congress has entrusted Commerce to administer the statute at issue in fact-intensive inquiries, Commerce's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinding" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992).

14

Moreover, "{a}n agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). In other words, Commerce's factual determinations will be upheld if they are reasonable and supported by the record, even if some evidence detracts from them. *See Atl. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II. COMMERCE'S CALCULATION OF THE ALL-OTHERS RATE IS IN ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE

### A. The Statute, The SAA, And Judicial Precedent All Support Commerce's Use Of The Expected Method

As the Trade Court correctly held, the statute, the SAA, and judicial precedent all support Commerce's use of the expected method to calculate the all-others rate based on the total AFA rates. *See generally* Appx0001–23. Indeed, the Trade Court engaged in an in-depth discussion of the statutes and the relevant judicial precedent, all of which support Commerce's lawful — in fact, <u>expected</u> — use of this method to calculate that rate. *See* Appx0010–14. Based on this analysis, the Trade Court held that per the SAA and precedent from

15

this Court, "it is <u>expected</u> that zero, *de minimis*, and facts available rates will be used in determining the non-selected respondents' rate." Appx0011 (emphasis in original) (citing *Bosun Tools Co. Ltd. v. United States*, Nos. 2021-1929, 2021-1930, 2022 WL 94172, at *4 (Fed. Cir. Jan. 10, 2022)). PrimeSource and Cheng Ch do not (and cannot) provide any legitimate counterarguments to the Trade Court's discussion and conclusion. Accordingly, the Trade Court's decision should be affirmed.

In general, Commerce calculates the all-others rate as the weighted average of dumping margins calculated for individually examined respondents, excluding any zero, *de minimis*, and total facts available margins. *See* 19 U.S.C. § 1673d(c)(5)(A). An exception exists where all dumping margins calculated for individually examined respondents are zero, *de minimis*, or total facts available margins. In such a situation (like the one present here), 19 U.S.C. § 1673d(c)(5)(B) provides that Commerce "may use any reasonable method" to determine the all-others rate, "including averaging" the zero, *de minimis*, or total

16

facts available margins calculated for individually examined

respondents.[2]

The SAA is recognized by Congress as authoritative regarding the

interpretation and application of the Tariff Act of 1930, as amended (the

"Act"),[3] *see* 19 U.S.C. § 3512(d).  *See* H.R. Doc. No. 103–316, Vol. 1 at

873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040.  Where the statutory

exception applies, such as is the case here, the SAA provides that the

"expected method" should be used to calculate the all-others rate under

such circumstances, which is to "weight-average the zero and *de*

*minimis* margins and margins determined pursuant to the facts

available, provided that volume data is available."  SAA at 4201.  The

SAA also permits Commerce to use other reasonable methods for the

---

[2] While, on its face, 19 U.S.C. § 1673d(c)(5) applies to investigations
only, Commerce generally employs the same methodology for
calculating the all-others rate in administrative reviews.  *See* Appx0621
(citing *Albemarle*, 821 F.3d at 1352–53).

[3] *See, e.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d
530, 539 (Fed. Cir. 2019) (stating that the Congress declared the SAA
"to be 'an authoritative expression by the United States concerning the
interpretation and application of the {URAA} in any judicial proceeding
in which a question arises concerning such interpretation or
application.'") (quoting 19 U.S.C. § 3512(d)); (citing *Nucor Corp. v.
United States*, 927 F.3d 1243, 1252 (Fed. Cir. 2019)).

calculation where the expected method "is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers. . . ." SAA at 4201.[4]

The Court has repeatedly affirmed Commerce's use of the expected method. In *Albemarle*, the Court held that Commerce erred in using data from a previous review to determine the separate rate (the equivalent of the all-others rate in non-market economy cases) instead of basing the separate rate on an average of the *de minimis* rates calculated for mandatory respondents under the expected method:

> The SAA thus makes clear that under the statute, when all individually examined respondents are assigned *de minimis* margins, Commerce is <u>expected</u> to calculate the separate rate by taking the average of those margins. Commerce may use "other reasonable methods," but only if Commerce reasonably concludes that the expected method is "not feasible" or "would not be reasonably reflective of potential dumping margins."

---

[4] Contrary to any insinuation by Cheng Ch, the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27 (June 29, 2015) ("TPEA"), did not revoke, refute, or undermine the SAA's language that Commerce is expected to rely on rates consisting entirely of zero, *de minimis*, or AFA margins in situations such as the one present in the underlying review. *See* Cheng Ch Br. at 12. Indeed, since the passage of the TPEA, the Court has confirmed the lawfulness of the expected method. *See generally Albemarle*, 821 F.3d 1345; *Changzhou Hawd Flooring Co., Ltd. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017); *Bosun Tools*, 2022 WL 94172.

*Albemarle*, 821 F.3d at 1352 (emphasis added).

In *Changzhou Hawd,* the Court held that Commerce erred when it assigned a separate rate that was declared to be more than *de minimis*, even though the agency found zero or *de minimis* margins for all three mandatory respondents. *See generally Changzhou Hawd*, 848 F.3d 1006. The Court stated that Commerce "could not deviate from the expected method unless it found, based on substantial evidence, that the separate-rate firms' dumping is different from that of the mandatory respondents," which it had not done in that case. *Id.* at 1012.

Last year, the Court again upheld Commerce's use of the expected method. *See generally Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357 (Fed. Cir. 2022); *Bosun Tools*, 2022 WL 94172. In *Shanxi Hairui Trade Co.*, the Court found Commerce's use of AFA rates to calculate the all-others rate to be reasonable. *See id.* at 1361, 1364.

In *Bosun Tools*, the Court affirmed Commerce's inclusion of an AFA-based rate in the average rate assigned to the non-selected respondents, holding that:

> § 1673d(c)(5)(B) provides that Commerce may factor an AFA rate into its calculation of a separate rate. The

> SAA reinforces the statute.  It provides that relying on an AFA rate is not only permitted, but expected.  *See* SAA at 4201.

*Id.* at *4 (emphasis added).  The Court noted its prior approval of "the methodology in § 1673d(c)(5)(B)" in its *Albemarle* decision, and stated that "Congress has unmistakably explained its preference for such methodology."  *Id.*  The Court further explained that "{t}he very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters."  *Id.* (internal citations and quotation marks omitted).

Finally, and importantly, the Court stated that "although *Albemarle* concerned a case with de minimis rates rather than AFA rates, its reasoning is equally applicable here; the same statutory language in § 1673d(c)(5)(B) that permits use of de minimis rates also permits use of AFA rates."  *Id.* at *4 (emphasis added).

The Trade Court recognized the *Bosun Tools* decision as relevant to the instant appeal.  Specifically, the Trade Court held that the *Bosun Tools* decision confirms that "it is expected that zero, *de minimis*, and facts available rates will be used in determining the non-selected

respondents' rate." Appx0011 (emphasis in original) (citing *Bosun Tools*, 2022 WL 94172 at \*4).

As *Albemarle*, *Changzhou Hawd*, *Shanxi Hairui Trade Co.*, and *Bosun Tools* all make clear, Commerce's use of the expected method to calculate the all-others rate in this proceeding is lawful. Commerce used the expected method to calculate the all-others rate based on an average of the two total AFA margins assigned to Bonuts and PT. As Commerce explained in its final decision memorandum:

> There is a well-established basis both in law and Commerce's practice to "calculate the nonselected respondents' dumping margin based on the mandatory respondents' rates." Moreover, in this case, and consistent with our practice and the prevailing law, Commerce has applied the "expected method" as intended by Congress.

> \*        \*        \*

> As the case in *Qihang Tyre*, the CBP data on the record here demonstrate that the largest exporters, by volume, "were not only the two largest . . . but also accounted for a substantial portion of the subject merchandise exports of all exporters and producers for which Commerce had remaining requests for review." Commerce therefore had a basis, grounded in substantial record evidence and according to a statutorily-authorized method, to conclude that the two largest exporters were representative of all exporters and producers for which a review had been requested. The mandatory respondents in this case, Bonuts and PT, represent the vast majority of exports of subject

merchandise, by volume, during the POR.  In *Albemarle*, the Court opined that "the very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." The Court further stated that "the statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters."  As Primesource noted, the CIT stated that, "{t}he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents."  In the instant review, under section 777A(c)(2), we examined the largest exporters, by volume, which also account for the vast majority of the total volume of subject exports during the POR.  Thus, the rates assigned to the mandatory respondents are representative unless substantial evidence shows otherwise, whether we had calculated a zero rate, a *de minimis* rate, or assigned to them a rate based entirely on facts available.

Appx0621–22; Appx0624 (citing *Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329, 1363 (Ct. Int'l Trade 2018)).

In sum, 19 U.S.C. § 1673d(c)(5)(B), the SAA, and judicial precedents all support Commerce's calculation of the all-others rate based on an average of the total AFA margins assigned to Bonuts and PT.  Neither PrimeSource nor Cheng Ch provide any real counterarguments to this point.  To the contrary, Cheng Ch concedes that in the *Bosun Tools* decision, the Court "rejected the appellants'

argument that Commerce unreasonably based the separate rate, in part, on an AFA rate as 'expressly foreclosed by statute.'"  Cheng Ch Br. at 11.  PrimeSource also recognizes that "Bosun III similarly involved a simple average of an AFA and zero rate."  PrimeSource Br. at 25 n.5.  In other words, both PrimeSource and Cheng Ch acknowledge, as they must, that the Court has affirmed Commerce's use of the expected method as lawful, even where the all-other rates is based on AFA margins.

### B.  Substantial Evidence Does Not Support A Finding That The All-Others Rate Is Not Reasonably Reflective Of The Non-Selected Companies' Potential Dumping Margins

The Trade Court correctly affirmed Commerce's determination that the record did not contain substantial evidence that the mandatory respondents' dumping margins were not reasonably reflective of the rates of the non-selected respondents.  This determination was reasonable and supported by substantial evidence, and should be upheld by the Court.

As discussed above, the SAA provides that the "expected method," *i.e.*, the default method, to calculate the all-others rate under such circumstances is to "weight-average the zero and *de minimis* margins

and margins determined pursuant to the facts available, provided that volume data is available." SAA at 4201. The SAA permits Commerce to use other reasonable methods for the calculation where the expected method "is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers. . . ." SAA at 4201.

As they did before the Trade Court, PrimeSource and Cheng Ch reiterate their argument that because the mandatory respondents' rates were based on AFA, the expected method did not yield results reasonably reflective of the non-selected respondents' potential dumping margins. *See* PrimeSource Br. at 6, 8–9, 13, 16–35; Cheng Ch Br. at 6, 9–14; Appx0007. As discussed below, this argument is without merit and was properly rejected by the Trade Court.[5]

---

[5] PrimeSource dedicates a substantial portion of its brief attempting to resurrect its claim that the burden lies with Commerce to affirmatively demonstrate that the expected method results in a rate reasonably reflective of Plaintiff Liang Chyuan's potential dumping margin. *See* PrimeSource Br. at 16–27. Yet, PrimeSource provides no basis for shifting the burden to Commerce to demonstrate that the expected method should be used here. *See generally id.* PrimeSource's argument should be rejected for the reasons provided by the Trade Court: "the burden is on the party seeking a departure from the expected method, in this case, Plaintiffs," Appx0004, and that "the statute, SAA, and

The Trade Court correctly explained that "the selected respondents are assumed to be representative of the non-selected respondents without regard to whether their final antidumping duty margin is zero, *de minimis*, based entirely on the use of AFA, or calculated based on the questionnaire responses of the selected respondents." Appx0010 (citing *Albemarle*, 821 F.3d at 1353; *Bosun Tools*, 2022 WL 94172, at *4).

In reaching this conclusion, the Trade Court observed that precedent from this Court "confirms that when Commerce relies on 19 U.S.C. § 1677f-1(c)(2) to select the largest exporters by volume for individual examination, it does so based on a statutorily supported assumption that the data from the largest exporters may be viewed as representative of all exporters." Appx0010 (citing *Albemarle*, 821 F.3d at 1353; *Changzhou Hawd*, 848 F.3d at 1012). As the Trade Court noted, respondent selection is based on export volumes and not on the results of the dumping analysis, occurring early in the administrative

---

relevant opinions of the Federal Circuit do not support placing such a burden on Commerce." Appx0016.

proceed before questionnaires are even issued. *See* Appx0010 (internal citations omitted).

Here, Commerce found that there is no substantial evidence that the non-selected companies' potential dumping margins differ from those of the mandatory respondents so that the agency should deviate from the expected method of calculating the all-others rate.

Commerce specifically explained that the history of margins in this proceeding shows that three out of five segments resulted in AFA rates being assigned to mandatory respondents. *See* Appx0625. "Therefore, if there is any pattern from segment-to-segment of the behavior of examined respondents, that pattern demonstrates that, most of the time, the mandatory respondents have failed to cooperate and have been assigned a rate based on AFA." *Id.*

For example, PT, a mandatory respondent in every segment, has been assigned margins ranging from zero to 78.17% (based on total AFA). *See id.* Due to its uncooperative behavior, Bonuts has been assigned the total AFA rate every time it was selected as a mandatory respondent, *i.e.*, in the first, second, and fourth reviews. *See* Appx0625–26. Unicatch, another frequent mandatory respondent, received an

AFA margin in the first review, a margin of 6.16% in the second review, and a margin of 27.69% in the third review (representing a 350% increase from the second review). *See* Appx0626. Thus, in the fourth review (the proceeding involved in the instant appeal), Commerce reasonably concluded:

> Essentially, Huttig *et al.*'s listing of the calculated margins as "substantial evidence" lacks acknowledgement of the consistently upward trend of those margins, review to review, especially the 350 percent increase for Unicatch. Additionally, the non-examined companies argue that the review-specific rate assigned to them is not a "commercial reality." However, as 73 of 75 of the non-examined companies have never been examined in any segment of the proceeding, there is no evidence on this record or any other record that the 78.17 percent rate does not reflect their commercial reality. Their claim is not substantiated by any record evidence. Huttig *et al.* argues that the *Solianus* decision does not support the record in this review because "the 'sanctioned methodology was improperly applied in this administrative proceeding' and {Huttig} has provided substantial evidence establishing that the 78.17 percent 'all-others' rate is unreasonably high or unrepresentative of 'all other' exporters." Based on Commerce's analysis of all the assigned rates, segment to segment, it is apparent that there is no pattern of "low" margins in this proceeding, as claimed by Huttig *et al.* Thus, the evidence on the record does not show that the assumed representativeness (as recognized in *Albemarle*) for mandatory respondents should not apply. We find that the facts here do not present a situation where our methodology is unreasonable.

*Id.*

PrimeSource also asserts that the presumption of reasonableness of the all-others rate calculated under the expected method has been rebutted here because the rate is unrepresentative of non-selected companies' potential dumping margins.  *See* PrimeSource Br. at 27–35.  In support of this argument, PrimeSource cites to decisions of this Court, relying heavily on the Court's decision in *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ("*Bestpak*").  *See* PrimeSource Br. at 27–35.  Relatedly, Cheng Ch argues that the TPEA does not free Commerce from its obligation to demonstrate that the margin for non-selected respondents reflects some form of commercial reality.  *See* Cheng Ch. Br. at 12.

None of the cases cited by PrimeSource supports its claim, however.  In *Bestpak*, the Court held that Commerce's calculation methodology was not reasonable <u>as applied to the facts of that case</u>.  *See Bestpak*, 716 F.3d at 1378–80.  There, the Court found that the record was "so thin" that Commerce could not have reasonably "found evidence to support {its} determination."  *Id.* at 1379.  As the Court recently explained in *Bosun Tools*, in the *Bestpak* decision "we expressly

confirmed that Commerce's separate rate calculation <u>could</u> include an AFA rate. . . .  We simply found that Commerce's methodology was unreasonable 'as applied,' given the lack of data." *Bosun Tools*, 2022 WL 94172, at *4 (emphasis in original) (citing *Bestpak*, 716 F.3d at 1378–79).

In *Albemarle*, Commerce deviated from the expected method and used data from a previous review to determine the separate rate, which the Court found unreasonable because there was no substantial evidence that the separate rate companies' dumping was different from that of the mandatory respondents.  *See Albemarle*, 821 F.3d at 1353–59.  The Court stated, however:

> The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters.  The statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters.  As the CIT has explained, "{t}he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents." *Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F. Supp. 1364, 1373–74, 15 C.I.T. 548, 559 (1991).

*Albemarle*, 821 F.3d at 1353.

Similarly, in *Changzhou Hawd*, the Court found Commerce's deviation from the expected method to be unreasonable when all three mandatory respondents received zero or *de minimis* margins and the agency assigned a separate rate that was declared to be more than *de minimis*. *See Changzhou Hawd*, 848 F.3d at 1011–12. Again, the Court emphasized that "recognizing that the presumption of representativeness may be overcome, *Albemarle* holds that, <u>in order to depart from the expected method</u>, Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different." *Id.* at 1012 (emphasis added) (internal citation and quotation marks omitted). The Court also made no distinction between AFA rates and zero/*de minimis* rates when it comes to the representativeness of the mandatory respondents' dumping.

Unlike *Bestpak*, the record evidence here was not "so thin" that Commerce could not have reasonably "found evidence to support {its} determination." 716 F.3d at 1379. In fact, after examining the history of margins determined in this proceeding, Commerce found no evidence that the mandatory respondents' dumping was not representative of the

30

experience of non-selected companies, as discussed above.  *See* Appx0624–26.  Moreover, in contrast to *Albemarle* and *Changzhou Hawd*, here, Commerce used, rather than deviated from, the expected method.

With respect to Cheng Ch's claim, the TPEA did not revoke or alter the language of the SAA, which confirms that Commerce is <u>expected</u> to rely on rates consisting entirely of zero, *de minimis*, or AFA margins in situations such as the one present in the underlying review. Moreover, *Albemarle* (a case decided after the passing of the TPEA) created a presumption in favor of the representativeness of the mandatory respondents, which must be rebutted by substantial evidence to the contrary.  *See Albemarle*, 821 F.3d at 1353; *see also Changzhou Hawd*, 848 F.3d at 1012.  Therefore, nothing in the TPEA can be reasonably construed as rendering Commerce's determination unlawful.

PrimeSource then attempts to downplay the multiple AFA margins assigned to mandatory respondents in the history of this proceeding, as Commerce pointed out in its Final IDM discussed above, and instead attempts to highlight the lower, calculated margins for

mandatory respondents. *See* PrimeSource Br. at 33–34. PrimeSource

focuses on Liang Chyuan, a non-selected company in this review,

arguing that "the significantly lower rate of 2.54 percent calculated for

Liang Chyuan in the third administrative review, as well as its

willingness to participate in the fourth administrative review, rebuts

any presumption that the high AFA rate assigned to the mandatory

respondents was reasonably reflective of Liang Chyuan's potential

dumping margin." *Id.* at 13. Cheng Ch raises a similar claim, asserting

"{w}hat is less clear is whether it was 'reasonable' for Commerce to treat

Taiwan Plaintiff-Appellants, parties who were cooperative respondents

not selected for individual examination, with a punitive, total AFA rate

as an 'all others' AD rate as well." Cheng Ch Br. at 6.

This argument fails for several reasons. First, as the Trade Court

stated, because "each administrative review is a separate segment of

proceedings with its own facts," Liang Chyuan is not entitled to retain a

rate in a previous review where it participated as a respondent and

received a calculated margin based on its sales during that period of

review. Appx0023.

Second, "there is no record evidence substantiating {Liang Chyuan's} claim that it would have received the same result in this review as it did in a previous review, had it been selected for individual examination." Appx0023.

Third, Commerce "did not ignore the previous antidumping rates," and instead determined that "'if there is any pattern from segment-to-segment . . . the pattern demonstrates that, most of the time, the mandatory respondents have failed to cooperate and have been assigned a rate based on AFA.'" Appx0019 (quoting Appx0625 (IDM)).

Accordingly, the Trade Court properly found that "Commerce was justified in finding that Liang Chyuan was not entitled to an individual rate because Liang Chyuan did not take the necessary steps to qualify for an individual rate or otherwise establish that the non-selected respondent rate should not apply." Appx0023.

Moreover, merely because Commerce has calculated non-AFA margins in the past does not diminish the significance of the multiple AFA margins in the history of this proceeding. Given the multiple AFA margins and the fluctuating calculated margins received by PT and Unicatch, Commerce reasonably determined that "there is no pattern of

33

'low' margins in this proceeding, . . . Thus, the evidence on the record

does not show that the assumed representativeness (as recognized in

*Albemarle*) for mandatory respondents should not apply." Appx0626.

PrimeSource next argues that Commerce erred by not calculating

an individual rate for Liang Chyuan, and that the agency could have

solicited further information from the non-selected companies

concerning their potential dumping margins. *See* PrimeSource Br. at

46–47.

PrimeSource argues that this is especially true with Liang

Chyuan because the company submitted a letter to Commerce stating

its willingness to submit responses to the agency's antidumping duty

questionnaire. *See id.* For its part, Cheng Ch asserts that "{i}n this

case, Taiwan Plaintiff-Appellants were effectively being penalized just

for being smaller exporters, despite their cooperativeness in the

proceeding." Cheng Ch. Br. at 10–11.

PrimeSource's and Cheng Ch's recitation of the facts is

misleading. Non-selected companies such as Liang Chyuan had

multiple opportunities to present such information to Commerce, yet

never did so. For example, they could have submitted factual

information concerning their potential dumping margins or the non-representativeness of mandatory respondents' margins by the deadlines established in 19 C.F.R. § 351.301(c). They could have requested voluntary respondent status by submitting questionnaire responses by the deadlines set for mandatory respondents pursuant to 19 U.S.C. § 1677m(a)(1)(A)(i). None of them, however, pursued any of these avenues.

Despite its alleged willingness to submit questionnaire responses, Liang Chyuan failed to meet the requirement of 19 U.S.C. § 1677m(a)(1)(A)(i) by not submitting any such responses by the deadlines set for the mandatory respondents. *See* Appx0530–34 (Mid Continent's Request for Total AFA to PT and Opposition to Liang Chyuan's Request); Appx0631 (IDM). In fact, as the Trade Court noted, "Liang Chyuan did not express its willingness to participate until February 3, 2020, <u>roughly two months</u> after the deadlines for the mandatory respondents to respond to the agency's questionnaires." Appx0022 (emphasis added).

Furthermore, in *Bosun Tools*, the Court flatly rejected the respondent's claim that "because it cooperated throughout the review,

Commerce should not have assigned it a separate rate based on AFA."
*Bosun Tools*, 2022 WL 94172, at **3–4.  The Court agreed with the
Government's response that Commerce was authorized by statute to
rely on the AFA rate, finding that the respondent's "argument is
expressly foreclosed by statute." *Id.* at *4.

Moreover, the Trade Court found that PrimeSource had "fail{ed} to
distinguish Liang Chyuan from the other non-selected respondents,"
noting that "{n}on-selected respondent rates are often applied to
multiple non-selected respondents—indeed, that is the purpose of these
rates." Appx0022 (citing *Bosun Tools*, 2022 WL 94172, at *2).  Thus,
the suggestion that Liang Chyuan's cooperation and supposed
willingness to submit questionnaire responses would invalidate
Commerce's assignment of an all-others rate based on AFA should be
rejected.

In sum, given the multiple AFA margins and the fluctuating
calculated margins received by mandatory respondents in the history of
this proceeding, there is no substantial evidence on the record that the
non-selected companies' potential dumping margins are different from
those of the mandatory respondents so that Commerce should deviate

from the expected method of calculating the all-others rate. Here, Commerce has fulfilled all requirements set out in the statute, the SAA, and the judicial precedents in using the expected method to calculate the all-others rate, and therefore, its determination should be affirmed.

### C. Commerce Reasonably Determined To Use The Expected Method Rather Than To Carry Forward Liang Chyuan's Rate From A Prior Review

Finally, PrimeSource and Cheng Ch argue that Commerce should have pulled forward the margin rate calculated for Liang Chyuan in the third review as its individual rate in the instant review. *See* PrimeSource Brief at 50–54; Cheng Ch. Br. at 13. In particular, PrimeSource asserts that "Liang Chyuan's history of cooperation in the third review and its willingness to submit its own data in the review under appeal establishes that its dumping margin was likely lower than the AFA rate." PrimeSource Br. at 42. As discussed above, there is no substantial evidence on the record to support a deviation from using the expected method to calculate the all-others rate. Thus, Commerce had no reason to resort to pulling forward rates from past reviews.

The Trade Court explained that in *Albemarle*, this Court "reinforced the notion that the expected method is the default" by

outlining only "two circumstances under which Commerce may depart from the expected methodology and carry forward a prior rate for any particular respondent." Appx0011–12.

The first circumstance is where "Commerce needed some contemporaneous data to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates could be considered reflective of current rates." Appx0012 (citing *Albemarle*, 821 F.3d at 1357).

The second situation exists within the AFA context, "where Commerce is allowed to consider deterrence as a factor," "Commerce may presume that a prior dumping margin imposed against an exporter in an earlier administrative review continues to be valid if the exporter fails to cooperate in a subsequent review." Appx0012 (citing *Albemarle*, 821 F.3d at 1357–58) (internal citations and quotation marks omitted)).

Importantly, this presumption has been upheld under such circumstances because "'if it were not so, the {exporter}, knowing the rule, would have produced <u>current</u> information showing the margins to be less.'" Appx0012 (emphasis in original) (quoting *Albemarle*, 821 F.3d at 1358 (internal citation and quotation marks omitted)).

Following the standard set out by *Albemarle*, the Trade Court
stated that:

> {a}s required by the substantial evidence standard,
> Commerce engaged with the data from past reviews
> and considered its relevance to the present review,
> finding that the lack of consistency in prior rates made
> past review data unusable for determining present
> rates. Commerce examined whether prior rates might
> be representative of current dumping rates, and it
> found that there was insufficient evidence on the
> record to rebut the presumed representativeness of the
> mandatory respondents' rates from this review. Thus,
> Plaintiffs' arguments in favor of carrying forward prior
> rates as a preferable method are unpersuasive.

Appx0021. The Trade Court therefore concluded that, "{w}hile Liang
Chyuan participated as a respondent in one prior review in which it
received a calculated margin based on its sales during that period of
review, . . . that fact does not entitle Liang Chyuan to retain that
calculated rate in the present review." Appx0023 (internal citation
omitted).

The Trade Court also found that "there is no record evidence
substantiating {Liang Chyuan's} claim that it would have received the
same result in this review as it did in a previous review, had it been
selected for individual examination." *Id.* (internal citation omitted).
Accordingly, the Trade Court held that "Commerce was justified in

finding that Liang Chyuan was not entitled to an individual rate because Liang Chyuan did not take the necessary steps to qualify for an individual rate or otherwise establish that the non-selected respondent rate should not apply." *Id.*

Despite the Trade Court's analysis and holding, here, PrimeSource attempts to resuscitate its flawed argument that Commerce has an established practice of carrying forward past rates, relying on *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, and Rescission of New Shipper Review; 2015-2016*, 83 Fed. Reg. 1,238, 1,239 (Dep't of Commerce Jan. 10, 2018) ("*TRBs*") and *Drawn Stainless Steel Sinks from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017*, 83 Fed. Reg. 658, 659 (Dep't of Commerce Jan. 5, 2018) ("*Sinks*").  *See* PrimeSource Br. at 50.

As the agency explained in its IDM, however, in *TRBs* and *Sinks*, "Commerce neither calculated any individual rates nor assigned any rates based on facts available." Appx0629.  Instead, Commerce found

the mandatory companies to be part of the China-wide entity and assigned them the China-wide rates. In contrast, here, Commerce has assigned AFA rates to two non-cooperative mandatory respondents in a market economy (Taiwan).

PrimeSource then asserts that "Commerce not only has a clearly established practice but has confirmed in implementing this practice that pulling forward rates is consistent with Court precedent," citing to *Stainless Steel Bar from India: Preliminary Results of the Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 11,235 (Dep't of Commerce Feb. 24, 2021), and accompanying Decision Memorandum ("*Steel Bar PDM*") at 8–9. PrimeSource Br. at 50–51.

Contrary to the instant appeal, however, in *Steel Bar*, Commerce determined that the circumstances outlined in *Albemarle* had been met, and thus pulled forward the rate from the most recently completed administrative review for the only non-selected company, Ambica. *See Steel Bar PDM* at 8. Moreover, PrimeSource's generic description of this determination omits a key rationale of Commerce's decision: "{i}n reviews where it has been individually examined over the last ten years, Ambica has consistently received a zero percent dumping

41

margin." *Id.* at 9.  In contrast, here, the Trade Court held that the

*Albemarle* circumstances were not present.  *See* Appx0021–23.

Additionally, Commerce determined that the lack of consistency in prior

rates made past review data unusable for determining present rates.

*See* Appx0021.  In any event, Commerce's administrative

determinations are not binding on this Court.

The case cited by PrimeSource for support is also distinguishable

from the instant appeal.  In *GODACO Seafood Joint Stock Co. v. United

States*, 494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021), Commerce deviated

from the expected method and the court held that substantial evidence

on the record did not support such a deviation.  *See id.* at 1305–06.  In

contrast, Commerce used the expected method to calculate the all-

others rate here.

The facts underlying the instant appeal more strongly resemble

those present in *Mid Continent Steel & Wire, Inc. v. United States*, 321

F. Supp. 3d 1313 (Ct. Int'l Trade 2018).  In that case, Mid Continent

argued that the separate rate, which was based on one mandatory

respondent's (Stanley) dumping margin because the other mandatory

respondent received a total AFA rate, was unreasonable as applied and

42

did not reflect the potential dumping margins of separate rate companies, because Stanley's rate had been much lower than rates calculated for other individually examined respondents in all previous reviews. *See Mid Continent*, 321 F. Supp. 3d at 1322–23. The Trade Court rejected this argument, stating:

> the rates assigned to non-Stanley respondents in prior segments do not demonstrate that the general rule was unreasonable as applied. It is a commonplace {*sic*} that each "'administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.'" *Albemarle*, 821 F.3d at 1357 (quoting *Qingdao*, 766 F.3d at 1387). Indeed, part of the idea behind periodic reviews is to test if respondents that previously dumped have mended their ways. While the Federal Circuit has identified circumstances where it may, nonetheless, be reasonable to use information from prior segments, those circumstances are not present here. For example, Mid Continent makes no argument that "the overall market and the dumping margins have not changed from period to period." *Id.* On the contrary, the fluctuation in margins over the last several segments suggests otherwise. Thus, "{t}his is not a situation in which there was any consistency with respect to the dumping margins of the individually examined respondents throughout the reviews." *Id.* Additionally, there has been no allegation that the Separate Rate Companies have failed to cooperate with Commerce such that the use of higher rates from a prior segment may be justified as AFA on deterrence grounds. *See id.*; *see also Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701

F.3d 1367, 1378 (Fed. Cir. 2012) ("Deterrence is not relevant here, where the 'AFA rate' only impacts cooperating respondents.").

Finally, even if circumstances were such that it was reasonable to look to information from prior segments, it is difficult to see how the prior rates of non-Stanley mandatory respondents from the last six reviews and a new shipper review are probative of the Separate Rate Companies' dumping during the POR, when only two of those respondents are among the seventeen Separate Rate Companies chosen for the underlying review: Tianjin Jinghai County Hongli Industry and Business Co., Ltd. ("Hongli") and Tianjin Jinchi Metal Products Co., Ltd. ("Jinchi"). *See* 81 Fed. Reg. at 19,218. While it is true that Hongli and Jinchi have been individually examined before, these examinations took place in the second and third annual reviews, which covered the 2009 to 2010, and 2010 to 2011 periods, respectively—that is, several years prior to the POR of the underlying review. Thus, there is little to suggest that Hongli's and Jinchi's prior rates would be indicative of the "economic reality and actual dumping margins," of the Separate Rate Companies during the POR, as Mid Continent suggests.

*Id.* at 1323–24. Similarly, here, lower all-others rates or lower calculated margins in past reviews "do not demonstrate that the general rule was unreasonable as applied," and it is difficult to see how the prior rates are probative of the non-selected companies' dumping during the period of review when only one of them has been previously examined.

In sum, the Trade Court correctly found that Commerce had reasonably determined not to pull forward rates from past reviews as the all-others rate as there is no substantial evidence on the record to support a deviation from using the expected method to calculate the all-others rate.

## CONCLUSION

For the reasons discussed above, the Court should affirm the Trade Court's decision to deny PrimeSource's and Cheng Ch's motions for judgment upon the agency record and affirm Commerce's *Final Results* in all respects.

Respectfully submitted,

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Lauren Fraid, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700
Dated: March 29, 2023      *Counsel to Defendant-Appellee Mid Continent Steel & Wire, Inc.*

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   22-2128, 22-2129

**Short Case Caption**   PrimeSource Building Products, Inc. v. US

**Filing Party/Entity**   Mid Continent Steel & Wire, Inc.

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/29/2023

Signature:   /s/ Adam H. Gordon

Name:   Adam H. Gordon

FORM 9. Certificate of Interest

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Mid Continent Steel & Wire, Inc. | | Wholly owned by DEACERO USA Inc., a subsidiary of DEACERO S.A.P.I. de C.V. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| The Bristol Group PLLC | Adam H. Gordon | Jennifer M. Smith |
| Lauren Fraid | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| Pro-Team Coil Nail Enterprise Inc. v. US, Ct. No. 22-2241 | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# CERTIFICATE OF COMPLIANCE

This response brief complies with the type-volume limitation of Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure.

This response brief contains 8,664 words.

This response complies with the typeface requirements Rule 32(a)(5) of the Federal Rules of Appellate Procedure, and the typestyle requirements of Rule 32(a)(6) of the Federal Rule of Appellate Procedure, in accordance with Rule 27(d)(1)(E) of the Federal Rule of Appellate Procedure.

This response has been prepared in a proportionally spaced type face using Microsoft Word in Century Schoolbook 14-point font.

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
Dated:  March 29, 2023          *Counsel to Defendant-Appellee Mid Continent Steel & Wire, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of March, 2023, a copy of the foregoing opposition was served on the following parties by operation of the Court's electronic-filing system:

Sosun Bae
Senior Trial Attorney
**U.S. Department of Justice**
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email: sosun.bae@usdoj.gov

Jeffrey S. Grimson
Partner
**MOWRY & GRIMSON, PLLC**
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
Email: jsg@mowrygrimson.com

Kelly Alice Slater
Partner
**Appleton Luff Pte. Ltd.**
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
Email: slater@appletonluff.com

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Defendant-Appellee Mid Continent Steel & Wire, Inc.*

Dated: March 29, 2023