UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PRIMESOURCE BUILDING PRODUCTS, INC.,

Plaintiff-Appellant,

CHENG CH INTERNATIONAL CO., LTD., CHINA STAPLE
ENTERPRISE CORP., DE FASTENERS INC., HOYI PLUS CO., LTD.,
LIANG CHYUAN INDUSTRIAL CO., LTD., TRIM INTERNATIONAL
INC., UJL INDUSTRIES CO., LTD., YU CHI HARDWARE CO., LTD.,
ZON MON CO., LTD.,

Plaintiffs-Appellants,

v.

UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,

Defendants-Appellees.

## **BRIEF FOR RESPONDENT-APPELLEE**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
VANIA WANG
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel For Trade
   Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7568
Fax: (202) 514-7965
Email: Sosun.Bae@usdoj.gov

March 29, 2023

Attorneys for Defendant-
Appellee

# TABLE OF CONTENTS

**PAGE(S)**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES............................................... viii

STATEMENT OF THE ISSUE .......................................................... 1

STATEMENT OF THE CASE ........................................................... 2

    I.    Nature Of The Case ........................................................... 2

    II.    Legal Framework For Calculation Of Antidumping Duties............... 3

        A.    Commerce's Decision To Issue An Antidumping Duty Order . 3

        B.    Statutory And Regulatory Scheme For Conducting Administrative Reviews ........................................................... 4

        C.    Calculation Of A Rate For Companies Not Individually Examined ................................................................ 6

    III.    Statement Of Facts And Course Of Proceedings Below ..................... 7

        A.    Administrative Proceedings Before Commerce........................ 7

        B.    Trial Court Proceedings ......................................................... 11

SUMMARY OF THE ARGUMENT ................................................... 14

ARGUMENT...................................................................................... 16

    I.    Standard Of Review........................................................... 16

    II.    Liang Chyuan Is Not Entitled To An Individual Rate ...................... 18

A.      Liang Chyuan's Willingness To Provide Information Is Not Relevant To Whether It Should Receive A Special Rate ........ 18

B.      Liang Chyuan's Previously Calculated Rate Does Not Entitle It To A Special Rate In This Review ...................................... 22

III.    Commerce's Reliance On The Expected Method Was In Accordance With Law And Supported By Substantial Evidence ...... 26

A.      Commerce's Use Of The Expected Method Was Lawful ....... 26

1.      Commerce Does Not Bear The Burden To Show It Should Adhere To The Expected Method .................... 28

2.      Plaintiffs-Appellants' Arguments Regarding The AFA Rates Assigned To Mandatory Respondents Fail ......... 35

B.      Commerce's Determination To Not Depart From The Expected Method Was Supported By Substantial Evidence ... 39

C.      Commerce Appropriately Declined To Pull Forward A Past Rate ....................................................................................... 45

CONCLUSION ................................................................................. 50

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Ad Hoc Shrimp Trade Action Committee v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015)...........................................................17

*Albemarle Corp. v. United States*,
  821 F.3d 1345 (Fed. Cir. 2016).....................................................passim

*Am. Silicon Techs. V. United States*,
  261 F.3d 1371 (Fed. Cir. 2001)..........................................................44

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984).........................................................18

*Bosun Tools Co. v. United States*,
  No. 2021-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ........................passim

*Bosun Tools Co., Ltd. v. United States*,
  493 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ......................................48

*Changzhou Hawd Flooring Co. v. United States*,
  848 F.3d 1006 (Fed. Cir. 2017)...................................................passim

*Changzhou Hawd Flooring Co. v. United States*,
  947 F.3d 781 (Fed. Cir. 2020)....................................................21, 24

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ..................................................................18

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ..................................................................17

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ..................................................................17

*Corus Staal BV v. United States*,
  502 F.3d 1370 (Fed. Cir. 2007).........................................................34

*Downhole Pipe & Equip., L.P. v. United States*,
  776 F.3d 1369 (Fed. Cir. 2015)...........................................................................44

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996)............................................................................17

*GODACO Seafood Joint Stock Co. v. United States*,
  494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) ...............................................46, 47

*GODACO Seafood Joint Stock Co. v. United States*,
  539 F. Supp. 3d 1286 (Ct. Int'l Trade 2021) ...............................................46, 47

*Hyundai Heavy Indus., Co. v. United States*,
  332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ....................................................29

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)..........................................................................17

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003)..........................................................................16

*Novosteel SA v. United States*,
  284 F.3d 1261 (Fed. Cir. 2002)..........................................................................34

*PrimeSource Bldg. Products, et al. v. United States*,
  581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) ......................................................2

*Pro-Team Coil Nail Enter. Inc. v. United States*,
  587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ....................................................36

*QVD Food Co., Ltd. v. v. United States*,
  658 F.3d 1318, 1324 (Fed. Cir. 2011)................................................................29

*Sandvik Steel Co. v. United States*,
  164 F.3d 596 (Fed. Cir. 1998)............................................................................33

*Shandong Huarong Mach. Co. v. United States*,
  29 C.I.T. 484 (2005) ...................................................................................23, 46

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
   298 F.3d 1330 (Fed. Cir. 2002)..........................................................29

*Torrington Co. v. United States*,
   82 F.3d 1039 (Fed. Cir. 1996)..........................................................18

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013)..........................................................17

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013)......................................26, 32, 33, 35

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................17
19 U.S.C. § 1673..............................................................................3
19 U.S.C. § 1673d(a)(1)......................................................................4
19 U.S.C. § 1673d(b)(1)......................................................................4
19 U.S.C. § 1673d(c)(2)......................................................................4
19 U.S.C. § 1673d(c)(5)......................................................................6
19 U.S.C. § 1673d(c)(5)(A)..................................................................6
19 U.S.C. § 1673d(c)(5)(B)...............................................31, 32, 35, 37
19 U.S.C. § 1675..............................................................................5
19 U.S.C. § 1675(a)(2)(A)....................................................................3
19 U.S.C. § 1675(a)(2)(C)....................................................................3
19 U.S.C. § 1677b............................................................................3
19 U.S.C. § 1677b(a).........................................................................3
19 U.S.C. § 1677b(b).........................................................................3
19 U.S.C. § 1677b(b)(1)(B)..................................................................3
19 U.S.C. § 1677e............................................................................6
19 U.S.C. § 1677e(b)(2)(C)................................................................37
19 U.S.C. § 1677e(c)(2)....................................................................37
19 U.S.C. § 1677f-1(c)..................................................................12, 30
19 U.S.C. § 1677f-1(c)(2)...............................................................5, 30
19 U.S.C. § 1677f-1(c)(2)(A)............................................................5, 39
19 U.S.C. § 1677f-1(c)(2)(B)........................................................5, 19, 42
19 U.S.C. § 1677m(a)....................................................................19, 39
19 U.S.C. § 1677m(a)(1)(A)(i)..............................................................20
19 U.S.C. § 3512(d)..........................................................................7

# REGULATIONS

19 C.F.R. § 351.204(d) ...............................................................passim
19 C.F.R. § 351.205(a) .................................................................... 4
19 C.F.R. § 351.207 ......................................................................... 4
19 C.F.R. § 351.210(a) .................................................................... 4
19 C.F.R. § 351.213 ......................................................................... 4

# OTHER AUTHORITIES

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
   83 Fed. Reg. 12,717 (Dep't of Commerce Mar. 23, 2018) ................................49

*Certain Quartz Surface Products from India*,
   88 Fed. Reg. 1,188 (Dep't of Commerce Jan. 9, 2023) ......................................25

*Certain Steel Nails From Taiwan*,
   85 Fed. Reg. 19,138 (Dep't of Commerce April 6, 2020) .............................9, 10

*Certain Steel Nails From Taiwan*,
   85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020).....................2, 10, 11

*Certain Steel Nails From Taiwan*,
   86 Fed. Reg. 61,139 (Dep't of Commerce Nov. 5, 2021)...................................45

*Certain Steel Nails From Taiwan*,
   87 Fed. Reg. 63,034 (Dep't of Commerce Oct. 18, 2022)...........................24, 45

*Diamond Sawblades and Parts Thereof From the People's Republic of China*,
   83 Fed. Reg. 17,527 (Dep't of Commerce Apr. 20, 2018) ................................48

*Drawn Stainless Steel Sinks from the People's Republic of China*,
   83 Fed. Reg. 658 (Dep't of Commerce Jan. 5, 2018) .........................................48

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   84 Fed. Reg. 47,242 (Dep't of Commerce Sept. 9, 2019) ................................. 8

*Refillable Stainless Steel Kegs From the People's Republic of China*,
   84 Fed. Reg. 57,010 (Dep't of Commerce Oct. 24, 2019).................................48

*Stainless Steel Bar from India*,
    86 Fed. Reg. 11,235 (Dep't of Commerce Feb. 24, 2021)..................................49

*Stainless Steel Bar from India*,
    86 Fed. Reg. 47,474 (Dep't of Commerce Aug. 25, 2021)................................49

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the
    People's Republic of China*,
    83 Fed. Reg. 1,238 (Dep't of Commerce Jan. 10, 2018) ...................................48

Statement of Administrative Action
    H.R. Rep. No. 103-316, at 873 (1994) as reprinted in 1994 U.S.C.C.A.N.
    4040........................................................................................................passim

Trade Preferences Extension Act,
    Pub. L. No. 114-27, 129 Stat 362 (2015) .........................................................34

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for defendant-appellee states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title.

Counsel for defendant-appellee is aware of two cases pending that may affect or be affected by the decision in this appeal:  Mid Continent Steel & Wire, Inc. v. United States, Consol. No. 15-00213 (Ct. Int'l Trade) and Pro-Team Coil Nail Enterprise Inc. v. United States, No. 22-2241 (Fed. Cir.).

Nos. 22-2128 & 22-2129

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

PRIMESOURCE BUILDING PRODUCTS, INC.,
Plaintiff-Appellant,

CHENG CH INTERNATIONAL CO., LTD., CHINA STAPLE ENTERPRISE
CORP., DE FASTENERS INC., HOYI PLUS CO., LTD., LIANG CHYUAN
INDUSTRIAL CO., LTD., TRIM INTERNATIONAL INC., UJL INDUSTRIES
CO., LTD., YU CHI HARDWARE CO., LTD., ZON MON CO., LTD.,
Plaintiffs-Appellants,

v.

UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,
Defendants-Appellees.

**BRIEF FOR RESPONDENT-APPELLEE**

**STATEMENT OF THE ISSUE**

Whether the Department of Commerce's (Commerce) calculation of the

review-specific antidumping rate for non-selected respondents (*i.e.*, the all-others

rate), which followed the expected method of averaging the margins determined

for the individually examined respondents, is lawful and supported by substantial

evidence.

## STATEMENT OF THE CASE

I.    Nature Of The Case

This appeal concerns the final results of the fourth administrative review of the antidumping duty order covering certain steel nails from Taiwan. *See Certain Steel Nails From Taiwan,* 85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020) (final results), and accompanying Issues and Decision Memorandum (IDM). Appx0612-0636.   Plaintiff-appellant PrimeSource Building Products Inc. (PrimeSource) and plaintiffs-appellants Cheng Ch International Co., Ltd., China Staple Enterprise Corporation, De Fasteners Inc., Hoyi Plus Co., Ltd., Liang Chyuan Industrial Co., Ltd. (Liang Chyuan), Trim International Inc., UJL Industries Co., Ltd., Yu Chi Hardware Co., Ltd., and Zon Mon Co., Ltd. (collectively, non-selected appellants) separately appeal from the final judgment of the United States Court of International Trade (trial court) in *PrimeSource Bldg. Products, et al. v. United States*, 581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022). Appx0001-0023.  This Court has consolidated the appeals.

PrimeSource challenges Commerce's application of the all-others rate solely with respect to Liang Chyuan.  The non-selected (*i.e.*, non-individually examined) appellants separately challenge Commerce's calculation of the all-others rate with respect to all named plaintiffs-appellants.  All plaintiffs-appellants argue that Commerce's reliance on the expected method for calculating the rate for non-

examined respondents resulted in a rate not reasonably reflective of their potential dumping margins.

## II.  Legal Framework For Calculation Of Antidumping Duties

### A.  Commerce's Decision To Issue An Antidumping Duty Order

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices.  If Commerce "determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," it will impose an antidumping duty on the merchandise in the amount that "the normal value exceeds the export price."  19 U.S.C. § 1673.  Thus, in an antidumping proceeding, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (the price of the goods sold in the United States) and the "normal value" of the merchandise.  *See* 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C), 1677b(a).

To ensure that the normal value is an appropriate benchmark against which to measure whether sales in the United States are dumped, Commerce tests the normal value sales to determine if they are made below cost.  19 U.S.C. § 1677b(b).  Commerce calculates a respondent-specific per unit cost of production of the merchandise and compares it to the normal value sales to ensure they are made above cost.  Below cost sales are "disregarded in the determination of normal

3

value." 19 U.S.C. § 1677b(b)(1)(B).  Using the normal value sales that are made

above cost, if Commerce finds that a foreign producer or importer is selling its

good for less than these normal value sales, it makes an affirmative determination

of dumping.  The United States International Trade Commission (ITC), in turn,

determines whether such dumping has "materially injured" or threatened material

injury to a United States industry.  19 U.S.C. § 1673d(b)(1).

If Commerce makes a final determination that "the subject merchandise is

being, or is likely to be, sold in the United States at less than its fair value," and if

the ITC makes a final determination that a United States industry has suffered

injury or is threatened with material injury, Commerce issues an antidumping duty

order.  *See* 19 U.S.C. § 1673d(a)(1), (b)(1), (c)(2); *see also* 19 C.F.R. § 351.207;

19 C.F.R. §§ 351.205(a), 351.210(a).  Such an order imposes a duty in an amount

equal to the amount by which the normal value exceeds the export price (or the

constructed export price).

B.    Statutory And Regulatory Scheme For Conducting Administrative
      Reviews

Respondents and petitioners[1] may request an annual administrative review

---

[1] Commerce refers to foreign producers or exporters in an antidumping proceeding as "respondents," and domestic manufacturers of the domestic like product who file petitions for relief as "petitioners."  *See*, *e.g.*, 19 C.F.R. § 351.204(d); 19 C.F.R. § 351.213.

of entries in which Commerce again determines the United States price and normal value for respondents subject to the review.  This enables respondents and petitioners to have the dumping margins and assessment rates updated to reflect the trading activity during the review period.  *See* 19 U.S.C. § 1675.  The administrative review statute establishes deadlines for Commerce to issue preliminary and final results of its review.  *Id.*

Commerce has broad authority to limit the number of respondents in an administrative review where it is not practicable to examine all known producers and/or exporters of the subject merchandise.  Commerce may examine either: (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available at the time of selection, or (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can reasonably be examined.[2]  19 U.S.C. § 1677f-1(c)(2). These individually examined companies are commonly referred to as mandatory respondents.

---

[2]  Commerce's more common practice is to rely on subsection 1677f-1(c)(2)(B), and limit respondents by selecting the exporters and producers accounting for the largest volume.  Sampling pursuant to subsection1677f-1(c)(2)(A) occurs relatively infrequently.

To conduct a dumping analysis for the mandatory respondents, Commerce must obtain from respondents the information necessary to determine the United States prices and the normal value information. Commerce does this by issuing an extensive initial questionnaire and supplemental questionnaires, as necessary.

    C.    <u>Calculation Of A Rate For Companies Not Individually Examined</u>

Because the governing statute does not address a method for calculating the rate to be assigned to non-individually examined respondents in an administrative review, Commerce's practice is to follow the methodology set forth in 19 U.S.C § 1673d(c)(5), which provides instructions for calculating the all-others rate in investigations. *See Albemarle Corp. v. United States*, 821 F.3d 1345, 1351-53 (Fed. Cir. 2016).

Pursuant to 19 U.S.C. § 1673d(c)(5)(A), Commerce calculates the all-others rate by weight-averaging the dumping margins assigned to the mandatory respondents, excluding any margins that are zero, *de minimis*, or determined entirely under 19 U.S.C. § 1677e (*i.e.*, on the basis of facts available). *See* 19 U.S.C. § 1673d(c)(5)(A). If, however, all the dumping margins for the individually examined respondents are zero, *de minimis*, or determined based entirely on the basis of facts available, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average

dumping margins determined for exporters and producers individually investigated."

The Statement of Administration Action (SAA) accompanying the Uruguay Round Agreements Act[3] provides that, when the dumping margins for all mandatory respondents are zero, *de minimis*, or determined entirely on the basis of facts available, "{t}he expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available," unless it "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers{.}" Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, 873 (1994) *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4201.

III.    Statement Of Facts And Course Of Proceedings Below

A.    Administrative Proceedings Before Commerce

Commerce initiated the fourth administrative review of its antidumping duty order covering nails from Taiwan on September 19, 2019.  *See Initiation of*

---

[3]  "{The SAA} is an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {the Tariff Act of 1930, as amended,} in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

*Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47,242 (Dep't of Commerce Sept. 9, 2019) (initiation notice). Commerce selected Bonuts Hardware Logistics Co., LLC (Bonuts) and Create Trading Co., Ltd. (Create), the two companies accounting for the largest volume of subject merchandise from Taiwan during the period of review, as mandatory respondents to be individually examined. Appx0137-0142.

On October 23, 2019, Commerce issued its antidumping questionnaire to Bonuts, and on October 28, 2019, its questionnaire to Create. Appx0143-0298, Appx0299-0453. Bonuts did not respond. Create submitted a letter along with evidence explaining that it had no sales because of Commerce's reseller policy. Appx0454-0518, Appx0620. Based on Create's submission, Commerce did not require Create to respond to the questionnaire. Appx0519. Commerce then conducted an additional respondent selection process, selecting Pro-Team Coil Nail Enterprise Inc. (Pro-Team), the next largest exporter in terms of volume. Appx0520-0522, Appx0620. On January 31, 2020, Pro-Team submitted a letter to Commerce stating that it would not respond to the antidumping questionnaire. Appx0523-0525, Appx0620.

On February 3, 2020, Liang Chyuan, a non-individually examined (*i.e.*, non-selected) exporter of subject merchandise during the period of review, submitted respondent selection comments to Commerce. Appx0526-0528. In its so-called

8

comments, Liang Chyuan requested that Commerce "calculate the rate for {Liang Chyuan} using data from {Liang Chyuan}." Appx0527.  In the alternative, Liang Chyuan asked that Commerce "use the rate from the 2017-2018 administrative review for {Liang Chyuan}, or use the all-others rate from the original less than fair value investigation of certain steel nails from Taiwan." Appx0527-0528. Petitioner Mid Continent Steel & Wire Inc. (Mid Continent) opposed Liang Chyuan's request, arguing that it was untimely and that Liang Chyuan had failed to follow statutory and regulatory requirements to be a voluntary respondent.  Mid Continent also cited the lack of time to develop the record for a new respondent. Appx0530-0534.

On April 6, 2019, Commerce published its preliminary results. *Certain Steel Nails From Taiwan*, 85 Fed. Reg. 19,138 (Dep't of Commerce Apr. 6, 2020) (preliminary results), and accompanying decision memorandum (PDM), Appx0535-0548.  Commerce preliminarily applied adverse facts available (AFA) to both Bonuts and PT as a result of their failures to respond to Commerce's questionnaire.  Appx0541-0543.  Commerce also found that Liang Chyuan's willingness to submit questionnaire responses constituted insufficient grounds for it to be chosen a mandatory respondent because it was not the next largest exporter of subject merchandise, and stated that willingness to be treated as a voluntary respondent was not a consideration pursuant to the statutory scheme unless the

company had fulfilled all the statutory and regulatory criteria. Appx0537-0538. And, as Commerce found, Liang Chyuan had not followed the statutory and regulatory criteria for such consideration. Appx0537-0538. Commerce also addressed Liang Chyuan's alternative request to pull its rate from the previous review forward and explained that Commerce could not do so because it was required to follow the expected method, and pulling forward the rate was "not a feasible or legally sanctioned methodology for assigning review-specific rates to non-individually examined respondents." Appx0538.

Commerce, relying on this Court's decision in *Albemarle*, then applied the expected method to calculate the rate for non-selected respondents by averaging the AFA-based rates for Pro-Team and Bonuts, which in this situation was the same rate assigned to those mandatory respondents. Appx0544. Commerce thus preliminarily assigned antidumping rates of 78.17 percent for Bonuts, Pro-Team, and the non-selected respondents, including Liang Chyuan. *Preliminary Results*, 85 Fed. Reg at 19,139.

After considering the interested parties' letters and case briefs, Commerce issued its final results on November 27, 2020. *See Final Results*, 85 Fed. Reg. at 76,014. Commerce continued to employ the expected method in calculating the all-others rate, explaining why the expected method was lawful, as well as appropriate, given the history of rates assigned in previous segments of the

10

proceeding.  Appx0620-0631.  Commerce continued to assign the antidumping

duty rate of 78.17 percent to Bonuts, Pro-Team, and the non-selected respondents.

*See Final Results*, 85 Fed. Reg. at 76,015.

     B.    <u>Trial Court Proceedings</u>

PrimeSource and the non-examined respondents separately appealed the

final results to the Court of International Trade; the court subsequently

consolidated the actions.  Appx0033-0034.  On June 16, 2022, the trial court

entered an opinion sustaining Commerce's final results in their entirety.

Appx0001-0023.

The trial court held that Commerce's use of the expected method for

determining the rate for non-selected respondents was lawful.  The court first noted

that, when the dumping margins assigned to all individually examined companies

are zero, *de minimis*, or based entirely on facts available, the SAA states that the

expected method for determining the all-others rate is to weight-average those

margins.  Appx0008.  The court then explained that, when Commerce selects

mandatory respondents by volume, this Court has held that those selected

respondents should be viewed as representative of non-selected respondents.

Appx0010.  Specifically, the court stated that the selected respondents are assumed

to be representative of the non-selected respondents *without regard to* whether

11

their final margins are zero, *de minimis*, based entirely on AFA, or calculated based on questionnaire responses. *Id.*

The trial court, reviewing the case law from this Court, then held that the expected method is the default method, and the burden of proof lies with the party seeking to *depart* from the expected method. Appx0011-0014. In doing so, it explained that, because the largest exporters are assumed to be representative of the non-selected respondents, Commerce is expected to use the mandatory respondents' rates to determine the rate to be assigned to non-selected respondents.[4] Appx0014.

While PrimeSource argued (as it does here) that Commerce has the affirmative burden to find that the expected method produces a rate reasonably reflective of non-examined respondents' potential dumping margins, the trial court disagreed, stating that the statute, the SAA, and this Court's case law do not support placing such a burden on Commerce. Appx0016. As the court pointed out, requiring Commerce to affirmatively engage in a data collection exercise with non-examined respondents to determine their potential dumping margins would be inconsistent with section 19 U.S.C. § 1677f-1(c), which expressly allows

---

[4] The court also noted that Commerce is not required to collect information about non-selected respondents because it is expected to treat the mandatory respondents as representative of the non-selected respondents when determining the all-others rate. Appx0015.

Commerce to limit its examination to the largest respondents, and thus defeat the

whole purpose of limiting respondent selection. *Id*.

The trial court then turned to whether the plaintiffs had provided substantial

evidence to rebut the presumption of representativeness and justify deviation from

the expected method, and agreed with Commerce that the record evidence did not

rebut the presumption. Appx0017. The court noted that no party had put evidence

on the record to support an assertion that the expected method was not reasonably

reflective, even though all respondents were aware of the AFA rate from prior

reviews, as well as the likelihood of such a rate being used if a mandatory

respondent did not participate. Appx0017-0018.

The court also looked at the history of antidumping rates from earlier

segments of the administrative proceeding, and agreed with Commerce that

examining only the calculated margins while excluding from consideration

multiple margins based on AFA would not have yielded a full picture of the

historical trends. Appx0019. Because the rates had fluctuated significantly from

review to review, and even for single respondents from review to review, the court

determined that turning to past reviews for evidence of current dumping activities

was not logical, and that Commerce reasonably declined to not rely on past rates.

Appx0019-0020.

The trial court also held that Liang Chyuan was not entitled to a different rate than the other non-examined respondents. Appx0021-0023. The court pointed out that non-examined respondents are not generally entitled to individually determined rates, and that Liang Chyuan had not followed the procedures to qualify as a voluntary respondent entitled to an individual rate, instead waiting approximately two months after the deadlines for the initial mandatory respondents to express a willingness to participate. Appx0022. The court then explained that, simply because Liang Chyuan received a calculated rate as a mandatory respondent in an earlier review, that did not entitle Liang Chyuan to retain that rate for the present review. Appx0023.

Accordingly, the court sustained the final results in their entirety. This appeal followed.

## SUMMARY OF THE ARGUMENT

No party challenges the application of AFA to both mandatory respondents or the selection of 78.17 percent as the AFA rate. Thus, the sole issue in front of this Court is whether Commerce's determination to apply the expected method in calculating the rate to apply to non-selected respondents was lawful and supported by substantial evidence.[5]

---

[5] The non-selected appellants generally challenge Commerce's calculation of the all-others rate; PrimeSource purports to limit its appeal to only the rate

As a threshold matter, PrimeSource completely fails to demonstrate that Liang Chyuan is entitled to a rate different from the other non-selected respondents. As the trial court stated, non-selected respondents are not entitled to an individually calculated rate, and Liang Chyuan failed to timely submit information that might have qualified it for voluntary respondent status. Moreover, Liang Chyuan's selection as a mandatory respondent in one earlier review, and its receipt of a calculated rate in that review, does not entitle it to retain that calculated rate, particularly in light of the lack of record evidence showing that Liang Chyuan would have received a similar rate in the underlying review, and the drastic fluctuations in rates assigned to mandatory respondents in earlier reviews.

Commerce's reliance on the expected method was clearly lawful. The SAA explicitly anticipates that Commerce use the expected method to weight-average zero, *de minimis*, and AFA rates to determine the all-others rate when no calculated rate above *de minimis* exists for a mandatory respondent in the current segment of the proceeding; hence, the term "expected method." Furthermore, this Court has held that the rates for mandatory respondents should be considered representative unless substantial evidence demonstrates otherwise. Commerce followed the directive of the SAA and the guidance of this Court in relying on the expected

---

received by Liang Chyuan (the same rate received by all the non-selected appellants).

method to calculate the rate for non-individually examined respondents.
Furthermore, the trial court correctly held that the burden lies with the party
seeking to *depart* from the expected method; because Commerce *complied* with the
expected method, the burden was on the interested parties in the administrative
proceeding to put evidence on the record showing that the expected method would
result in an all-others rate not reasonably reflective of the non-selected
respondents' dumping margins.  They failed to do so.

Finally, Commerce's determination that the record did not support a
departure from the expected method should be upheld.  Plaintiffs-appellants cannot
show that the totality of the rates from earlier segments of the administrative
proceeding demonstrate that the rates for the mandatory respondents are not
reflective of the rates for the non-selected respondents in the underlying review.
Accordingly, this Court should affirm the trial court's judgment.

## **ARGUMENT**

I.    Standard Of Review

In reviewing the trial court's judgments, this Court "reappl{ies} the statutory
standard of review that the Court of International Trade applied in reviewing the
administrative record."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379
(Fed. Cir. 2003).  Accordingly, this Court will uphold Commerce's determination
unless it is unsupported by substantial record evidence, or otherwise unlawful.  *See*

*Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19

U.S.C. § 1516a(b)(1)(B)(i)); *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d

1034, 1038 (Fed. Cir. 1996).  Although precedent set by the trial court is not

binding, this Court has declared that it "will not ignore the informed opinion of the

{trial court}."  *Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d

1339, 1348 (Fed. Cir. 2015) (cleaned up).

      Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938).  Substantial evidence may also be "less than the weight of

the evidence," and the possibility of drawing two different conclusions from the

record does not render Commerce's findings unsupported by substantial evidence.

*See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Moreover,

Commerce is accorded particular deference in antidumping and countervailing

duty determinations.  *See, e.g.*, *Fujitsu*, 88 F.3d at 1039 ("Antidumping and

countervailing duty determinations involve complex economic and accounting

decisions of a technical nature, for which agencies possess far greater expertise

than courts.") (citation omitted).  A party disputing Commerce's determination as

unsupported by substantial evidence thus "has chosen a course with a high barrier

to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

2006), and the Court will sustain Commerce's determinations if they are

17

reasonable and supported by the record as a whole, even if some evidence detracts from them.  *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When determining whether Commerce's actions accord with the law, this Court relies upon the two-step analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  The Court considers first "whether Congress has directly spoken to the precise question at issue{;}" if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 842–43.  "Any reasonable construction of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

II.    Liang Chyuan Is Not Entitled To An Individual Rate

As stated above, PrimeSource purportedly limits its argument to only Liang Chyuan's rate.  PrimeSource Br. at 2.  But Liang Chyuan is not entitled to a different rate than the other non-examined respondents; thus, PrimeSource's arguments can be largely disregarded.

A.    Liang Chyuan's Willingness To Provide Information Is Not Relevant To Whether It Should Receive A Special Rate

Significantly, PrimeSource barely engages with the trial court's core reasoning for sustaining Commerce's decision to not give Liang Chyuan, a non-

18

selected respondent, an individual rate—non-selected respondents are not generally entitled to individual rates, and Liang Chyuan had failed to follow the procedures to qualify for voluntary respondent status and therefore potentially receive an individually calculated rate.  Appx0022-0023.

Instead, PrimeSource relies on Liang Chyuan's "willingness" to cooperate and submit data to show that its dumping margin would be lower than the rate assigned to the mandatory respondents.  *See, e.g.*, PrimeSource Br. at 13, 42, 49. But, as Commerce pointed out in its preliminary results, Liang Chyuan would not have been eligible for selection as a mandatory respondent because it is not the next largest exporter of subject merchandise, or even one of the next five largest exporters.  Appx0537 (citing Appx0137-Appx0142).  "Therefore, {Liang Chyuan's} 'willingness' to submit questionnaire responses as a respondent in this case does not qualify it for individual examination;" willingness is not a consideration under 19 U.S.C. § 1677f-1(c)(2)(B) "unless a company has requested status as a voluntary respondent under {19 U.S.C. § 1677m(a)} and fulfilled all the relevant statutory and regulatory criteria for consideration of such status." Appx0538.

Commerce further elaborated on the voluntary respondent scheme in its final results, explaining that, "{w}hen Commerce limits the number of exporters and producers examined in an investigation, {19 U.S.C. 1677m(a)} directs

19

Commerce to establish an individual antidumping rate for any exporter or producer not initially selected for individual examination that voluntarily submits the information requested from mandatory respondents," so long as "(1) the information is submitted by the due date specified for exporters or producers initially selected for examination; and (2) the number of exporters and producers subject to the investigation is not so large that any additional individual examination of such exporters and producers would be unduly burdensome and inhibit the timely completion of the investigation."  Appx0631.

Liang Chyuan did not satisfy these criteria; indeed, as the trial court noted, Liang Chyuan only reached out to Commerce to express its "willingness" roughly *two months* after the deadlines for the initial mandatory respondent questionnaires had passed.  Appx0023.  Liang Chyuan waited until after it was clear that Bonuts and Pro-Team would not participate (and would therefore be subject to AFA-based rates); presumably, it did so in hopes that at least one mandatory respondent would receive a calculated rate lower than its own actual dumping margin.  But the statute does not sanction this wait-and-see approach, or require Commerce's request or approval prior to seeking voluntary respondent status.  *See* 19 U.S.C. § 1677m(a)(1)(A)(i); Appx0022-0023.  Rather, it explicitly requires those seeking voluntary respondent status to submit their information by the date specified for exporters and producers that were initially selected for examination.  *Id.*

As Commerce stated in its final results, "{Liang Chyuan} did not request an administrative review of itself nor did it participate in the respondent selection process by filing respondent selection comments or requesting voluntary respondent status."  Appx0630.  Accordingly, Commerce correctly determined that Liang Chyuan's late-expressed "willingness" did not warrant the assignment of a special dumping margin to Liang Chyuan; PrimeSource cannot demonstrate otherwise.

PrimeSource contends that the submission of a full questionnaire response is not required to receive voluntary respondent status and/or entitlement to a special individual rate; in doing so, it relies on this Court's decision in *Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781 (Fed. Cir. 2020) (*Changzhou Hawd II*).  PrimeSource Br. at 47-48.  But that case is distinguishable.  The question in *Changzhou Hawd II* was whether respondents who requested voluntary status but were denied should also be excluded from the antidumping duty order, *not* whether those respondents would have qualified as voluntary respondents entitled to an individual rate.  *Id.* at 784-85, 793-94.  Significantly, the "voluntary-review firms" were denied voluntary respondent status by Commerce, and this Court did not even address the issue of whether voluntary respondent status should depend on the timely submission of a full questionnaire response.  Thus, *Changzhou Hawd II* cannot possibly stand for the proposition that a respondent can

21

be treated as a voluntary respondent and/or entitled to an individual rate regardless of the timeliness or adequacy of their questionnaire responses.

PrimeSource provides no compelling authority that a non-selected respondent, simply by virtue of being displeased at the likely rates for mandatory respondents, can be treated as a voluntary respondent, or be otherwise entitled to a special individual rate, without complying with the statutorily-sanctioned procedures for voluntarily respondent qualification.  Accordingly, this Court should affirm the trial court's determination that Liang Chyuan should not receive an individual rate.

> B.    Liang Chyuan's Previously Calculated Rate Does Not Entitle It To A Special Rate In This Review

PrimeSource argues that Liang Chyuan's dumping margin of 2.54 percent in an earlier administrative review and its willingness to volunteer as an examined respondent rebuts the presumption that the expected method is reasonably reflective of Liang Chyuan's dumping.  *See* PrimeSource Br. at 40-42.  However, Commerce reasonably determined that a single instance of Liang Chyuan as a cooperative mandatory respondent did not constitute sufficient evidence to diverge from the expected method, particularly given the fluctuating rates of Pro-Team and Unicatch Industrial Co., Ltd. (Unicatch), mandatory respondents who have both received AFA-based rates in certain segments of the proceeding but low calculated rates in others.  Appx0020, Appx0630.  As Commerce explained, reviews must

stand alone and "{Liang Chyuan} is not entitled to a special dumping margin in this review on the basis of having been previously examined." Appx0630; *see also Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484, 491 (2005) ("each administrative review is a separate segment of proceedings with its own unique facts.").

While PrimeSource alleges that Liang Chyuan's 2.54 percent rate from the earlier review constitutes evidence that the all-others rate is not reasonably reflective of Liang Chyuan's dumping margin, *see* PrimeSource Br. at 43, this completely ignores the history of Pro-Team's and Unicatch's dumping margins. As PrimeSource's own table demonstrates, Pro-Team was a mandatory respondent in every segment of the proceeding and received either low calculated rates or zero percent rates during the investigation and the three prior administrative reviews. PrimeSource Br. at 39. One might have assumed from Pro-Team's history that it would have received a zero or low rate in the underlying review as well; instead, Pro-Team refused to respond to the questionnaire and was consequently assigned an AFA rate. Appx0620. Unicatch received an AFA rate during the first administrative review, a 6.26 percent rate in the second review, and a 27.69 percent rate in the third. PrimeSource Br. at 39. As Commerce stated, "there is no record evidence substantiating {Liang Chyuan's} claim that it would have received the same result in this review as it did in a previous review, had it been selected for

individual examination." Appx0023. If anything, the evidence demonstrates that a single respondent's margin can vary considerably from review to review. Finally, the argument that Liang Chyuan's rate could not reasonably vary so wildly from segment to segment appears especially disingenuous given that, in a subsequent administrative review, Liang Chyuan was, in fact, assigned a 78.17 percent AFA-based rate. *See Certain Steel Nails From Taiwan*, 87 Fed. Reg. 63,034 (Dep't of Commerce Oct. 18, 2022).

PrimeSource also contends that Liang Chyuan's "willingness" to volunteer to be examined should be considered evidence that its dumping margins are likely to be lower than the mandatory respondents' rates. PrimeSource Br. at 41-42. In doing so, PrimeSource again cites *Changzhou Hawd II*. But, again, *Changzhou Hawd II* involved an entirely different situation from the one presented in the underlying review and does not support PrimeSource's claims. Moreover, as stated above, Liang Chyuan had ample opportunity to timely submit information to qualify it for voluntary respondent status; its failure to avail itself of that opportunity should not be rewarded by the assignment of a special individual rate. Finally, even assuming, for the sake of argument, that Liang Chyuan's rate might be *somewhat* lower than the mandatory respondents' rates, there is no reason to suppose the rate is as low as the one it received in the prior review, or even significantly lower than the mandatory respondents' rates at all. And, as discussed

above, there is no authority dictating that Commerce should be required to reopen the record to allow Liang Chyuan to submit a full questionnaire response and receive a calculated rate based on its activities during the underlying period of review. As the trial court indicated, to require Commerce to engage in a data collection exercise to determine a non-selected respondent's dumping margin would defeat the purpose of the respondent selection process. Appx0016.

Commerce followed its customary procedures and analyzed the history of the rates in the proceeding, evaluating, based on the information before it, whether the expected method was not reasonably reflective.[6] This Court should not disturb that finding.[7]

---

[6] Commerce has actually found in other proceedings that the history of the rates constituted sufficient evidence that the expected method is not reasonably reflective and therefore diverged from the expected method. *See, e.g., Certain Quartz Surface Products from India*, 88 Fed. Reg. 1,188 (Dep't of Commerce Jan. 9, 2023).

[7] The non-selected appellants have not offered any proof with respect to their individual past dumping margins that would support an analogous argument to the one made for Liang Chyuan. Therefore, even if the Court were to find in PrimeSource's favor with regard to its argument regarding Liang Chyuan's past dumping margin—which it should not—the Court should not extend relief to the other non-selected respondents on the basis of such an argument.

III.    Commerce's Reliance On The Expected Method Was In Accordance With
        Law And Supported By Substantial Evidence

    A.    Commerce's Use Of The Expected Method Was Lawful

The trial court correctly held that Commerce's use of the expected method

was lawful, relying on the relevant statute, the SAA and this Court's prior case law

to conclude that the expected method should be the default, and that the burden to

establish whether the expected method leads to a reasonably reflective rate lies

with the party seeking to depart from the expected method.[8]  Indeed, the trial court

catalogued, in detail, the import of this Court's decisions in *Albemarle*, *Changzhou*

*Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017) (*Changzhou*

*Hawd I*); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370

(Fed. Cir. 2013); and *Bosun Tools Co. v. United States*, No. 2021-1929, 2022 WL

94172 (Fed. Cir. Jan. 10, 2022).  Appx0010-0016.  None of plaintiffs-appellants'

arguments demonstrate the unlawfulness of Commerce's determination.

As an initial matter, it is important to recognize certain indisputable factual

considerations.  First, the SAA, which is the authoritative interpretation of the

relevant statute, provides that the "expected," or default, method for determining

the all-others rate when all the margins for the examined respondents are zero, *de*

---

[8]  While true that PrimeSource limits its arguments to Liang Chyuan's rate,
we address certain of its arguments in these sections, as these arguments also apply
generally to the expected method assigned to all non-examined respondents.

*minimis*, or based entirely on facts available, is to weight-average those margins. SAA at 873. Second, no authority forbids Commerce from including an AFA rate assigned to a mandatory respondent when utilizing the expected method; indeed, the SAA expressly contemplates such inclusion.[9] Third, the rates of the largest respondents (*i.e.*, the mandatory respondents) are presumed to be representative of the non-selected respondents.[10] Appx0010 (citing *Albermarle*, 821 F.3d at 1353; *Changzhou Hawd*, 848 F.3d at 1012; *Bosun*, 2022 WL 94172, at *4). Fourth, Commerce followed the expected method in determining the all-others rate in the underlying proceeding. Fifth, despite the opportunity to do so, no party put evidence on the record of the underlying proceeding purporting to show that the rates of the mandatory respondents would not be reflective of the non-selected respondents' dumping margins.[11] Appx0018.

---

[9] Of course, plaintiffs-appellants dispute the reliance on AFA-based rates in this underlying proceeding. They also posit, without adequate support, that reliance on AFA-based rates in calculating the all-others rate should be frowned upon. But no plaintiff-appellant makes the outlandish claim that consideration of AFA-based rates in calculating the all-others rate is unlawful.

[10] We do not dispute that the presumption of representativeness may be rebutted, only that the party seeking departure from the expected method has the burden and that the record does not demonstrate that the presumption is rebutted.

[11] This, of course, does not include the list of rates assigned to mandatory respondents in previous segments of the proceeding, which Commerce clearly considered and which is not evidence of the non-selected respondents' practices during the relevant period of review.

Taking these factors into consideration, plaintiffs-appellants' arguments rest on narrow, and tenuous, grounds—that the trial court erred in holding that the burden to demonstrate the non-reflectiveness of the expected method lies with the party seeking to depart from that method, and that reliance on AFA rates for the purposes of calculating an all-others rate should be treated with increased scrutiny. Neither of these contentions have merit.

## 1.     Commerce Does Not Bear The Burden To Show It Should Adhere To The Expected Method

As the trial court noted, this Court has held that "{t}he very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." *Albemarle*, 821 F.3d at 1353; *see also Changzhou Hawd I*, 848 F.3d at 1012 ("Thus, the mandatory respondents in this matter are assumed to be representative."). "The statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." *Albemarle*, 821 F.3d at 1353. This Court further explained that, to divert from the expected method, substantial evidence must demonstrate that that the non-examined companies' dumping behavior would be different than that of the mandatory respondents. *Id*. But, despite the clear rule that Commerce cannot deviate from the expected method *unless* it finds, based on substantial evidence, that the dumping behavior of non-selected respondents differs

from that of mandatory respondents, *see Changzhou Hawd I*, 848 F.3d at 1012,

PrimeSource alleges that the SAA and this Court's case law show that Commerce

also has the burden to *adhere* to the expected method.

   As a prefatory matter, PrimeSource overstates the significance of the burden

issue.  Regardless of which party bears the burden of showing that adherence to the

expected method is warranted, Commerce still analyzed the only relevant

information on the record—the list of rates assigned to mandatory respondents in

previous reviews.  Simply because Commerce found that the prior rates did not

justify a departure from the expected method does not justify a conclusion that its

actions were inherently unlawful.  The burden issue would seem to mostly matter

insofar as plaintiffs-appellants believe that Commerce is required to affirmatively

solicit information from the parties, or to itself put information on the record

demonstrating that the expected method produces a rate that is reasonably

reflective of the non-selected respondents' dumping margin.  But such a standard

would be absurd.

   First, "{t}he burden to build the record in each segment {of an

administrative proceeding} lies with the respondent." *Hyundai Heavy Indus., Co.*

*v. United States*, 332 F. Supp. 3d 1331, 1342 (Ct. Int'l Trade 2018) (citing *Ta Chen*

*Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002));

*see also QVD Food Co., Ltd. v. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir.

2011) ("the burden of creating an adequate record lies with interested parties and not with Commerce.") (cleaned up).  There is no cause to depart from this standard, especially when the respondents could have timely submitted relevant factual information.  Commerce was not required to affirmatively solicit such information, or place the information on the record itself (if it even could).

In addition, 19 U.S.C. § 1677f-1(c) permits Commerce to review *only* the largest respondents without requiring additional information from the other respondents.  Appx0016.  As the trial court recognized:

> {I}nterpreting the SAA to require Commerce to nevertheless engage in a data collection exercise with the non-selected respondents in order to determine their "potential dumping margins" would be inconsistent with the language of 19 U.S.C. § 1677f-1(c) expressly permitting Commerce to "limit[] its examination" to the largest exporters and producers by volume. 19 U.S.C. § 1677f-1(c)(2). Such an interpretation would defeat the purpose of the respondent selection process. Nothing in the statute, SAA, or jurisprudence suggests that such a burden exists.

*Id.*  This Court should not countenance an argument so at odds with the objective of the statutory scheme.

PrimeSource contends that, contrary to the trial court's conclusions, not placing the burden on Commerce would conflict with the statutory mandate that Commerce select a reasonable method that bears a relationship to the non-selected respondents' dumping margins, and support that determination with substantial

evidence. *See* PrimeSource Br. at 22. PrimeSource also alleges that the trial court's conclusions are not supported by this Court's precedent. *Id.* at 20-26. But, again, while 19 U.S.C. 1673d(c)(5)(B) does not mandate that Commerce use the expected method, the SAA directs that "{t}he expected method in such cases will be to weight-average the zero and de minimis margins and *margins determined pursuant to the facts available. . . .*" SAA at 873 (emphasis added). *Albemarle* further explains that the "burden is not on the separate respondents to show that their dumping is the same as that of the individually examined respondents." *Id.*, 821 F.3d at 1353. But neither the trial court nor Commerce required non-selected respondents to show that their dumping margin was the same as the individually examined respondents.

*Albemarle* also plainly states that the standard for diverging from the expected method is "based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different." *Id.* In *Albemarle*, the Court placed the burden on Commerce because Commerce wanted to *depart* from the expected method. *Id.* Here, Commerce did not diverge from the expected method, but rather adhered to it; thus, the burden was not on Commerce to demonstrate by substantial evidence that it could use the expected method.

PrimeSource additionally claims that this Court's recent decision in *Bosun*

confirms that the burden is on Commerce to find that the record supports the all-others rate as reasonably reflective of potential dumping margins even when Commerce applies the expected method. *See* PrimeSource Br. at 24. But the Court did not release Bosun of the obligation to demonstrate that the mandatory respondents' rates were nonrepresentative. *Bosun,* 2022 WL 94172, at \*6 ("Because Bosun does not adequately explain why the 39.66% rate was nonrepresentative, its argument cannot be persuasive."). Moreover, in *Bosun*, on remand Commerce acted similarly to how it did here—it reviewed the history of the rates in the proceeding and found that the evidence did not support a conclusion that the expected method was not reasonably reflective. *See Bosun,* 2022 WL 94172 at \*13-15. That determination was sustained by the trial court and affirmed by this Court.

PrimeSource also argues that the trial court failed to properly consider this Court's decision in *Bestpak*, in which the Court held that the simple average of a *de minimis* rate and a China-wide AFA rate led to an all-others rate not reasonably reflective of the non-selected' respondents' margins. *See* PrimeSource Br. at 19, 30; *see also Bestpak*, 716 F.3d 1370. But in *Bestpak*, Commerce did not *use* the expected method but rather departed from it. Moreover, this Court in *Bestpak* determined that averaging *de minimis* and AFA rates was not legally impermissible, because "{19 U.S.C.} § 1673d(c)(5)(B) and the SAA explicitly

allow Commerce to factor both de minimis and AFA rates into the calculation methodology." *Bestpak*, 716 F. 3d at 1378.  In addition, the all-others rate in *Bestpak*, 123.83 percent, was nearly twice as high as the 78.17 percent all-others rate calculated for the underlying proceeding.

Finally, as the trial court correctly stated, this Court's decision in *Bosun* suggests a limited interpretation of *Bestpak*.  Appx0014.  As the trial court observed, *Bestpak* "simply found that Commerce's methodology was unreasonable 'as applied,' given the lack of data." *Bosun*, 2022 WL 94172, at *4.  In the underlying review, Commerce considered the issue of whether the mandatory respondents' rates were reflective, and reasonably determined that the record did not contain substantial evidence that the mandatory respondents' dumping differed from that of the non-selected respondents.  Appx0014, Appx0626-0630.  Nothing in *Bestpak* suggests that the Commerce's determination was unlawful.

PrimeSource claims that the fact that Commerce found that an initially selected respondent, Create, had no sales during the period of review calls into question the validity of the respondent selection methodology.  PrimeSource Br. at 32.  First, PrimeSource failed to exhaust this argument during the administrative review, and so cannot present it here.  *See, e.g., Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (a party is not "'entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been

exhausted'") (citations omitted); *Novosteel SA v. United States*, 284 F.3d 1261, 1273 (Fed. Cir. 2002) ("Novosteel, however, failed to preserve this issue for our review, for it waived this retroactivity argument by not presenting it in the principal summary judgment brief filed with the Court of International Trade.") (citation omitted).  And, while limited exceptions to the exhaustion requirement exist, the exceptions do not apply.  *See Corus Staal BV v. United States*, 502 F.3d 1370, 1389 n.4 (Fed. Cir. 2007).  The argument does not raise a pure question of law, there is no intervening judicial interpretation, and PrimeSource cannot establish the futility of the argument.  Moreover, even though Commerce allowed parties an opportunity to submit comments on respondent selection, only Mid Continent chose to do so, and no party challenged Commerce's use of data from Customs and Border Protection to select respondents.  Appx0064; Appx0620.  And, of course, the respondent selection methodology is statutorily prescribed.

For their part, the non-selected appellants argue that, while the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27 (June 29, 2015) (TPEA), freed Commerce from any obligation to demonstrate that the margin selected for a non-cooperative respondent reflects some form of commercial reality, Commerce must still do so when it comes to non-selected respondents.  *See* Non-Selected Appellants Br. at 12.  But the TPEA did not revoke, refute, or in any way undermine the statements in the SAA.  This argument also misses the point of

*Albemarle*, a case decided after the passing of the TPEA—that there is a presumption in favor of the representativeness of the mandatory respondents. *Albemarle*, 821 F.3d at 1351; *see also Changzhou Hawd I*, 848 F.3d at 1012. Finally, as explained below, Commerce reasonably determined that substantial evidence did not support a finding of non-representativeness. Nothing in the TPEA can be reasonably construed as rendering Commerce's determination unlawful.

> 2.   Plaintiffs-Appellants' Arguments Regarding The AFA Rates Assigned To Mandatory Respondents Fail

Even though, as stated above, the use of AFA rates in determining an all-others rate is unquestionably legal, plaintiffs-appellants lodge a multitude of arguments designed to undermine Commerce's reliance on AFA rates in calculating the all-others rate.

For instance, PrimeSource states that Commerce's decision was even more tenuous than its determination in *Bestpak*, because *Bestpak* involved *de minimis* and AFA rates whereas, in the underlying review, all mandatory respondents received an AFA rate. *See* PrimeSource Br. at 32-34. But, as already stated, *Bestpak* itself recognizes that the statute and the SAA explicitly contemplate AFA rates as part of the expected method. *Bestpak*, 716 F.3d at 1378; *see also* 19 U.S.C. 1673d(c)(5)(B); SAA at 873. Moreover, the trial court has held that the concept of representativeness holds equally in situations where mandatory

respondents received *de minimis* and AFA rates.  *See, e.g., Pro-Team Coil Nail Enter. Inc. v. United States*, 587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022).  Nothing in *Bestpak* or this Court's other cases stands for the proposition that it is unlawful for Commerce to base an all-others rate solely on the multiple AFA rates of the mandatory respondents.

PrimeSource also contends that the specific amount assessed as the AFA rate (78.17 percent) is outdated and unrepresentative of at least Liang Chyuan.  *See* PrimeSource Br. at 34-36.  However, no party challenged Commerce's application of AFA to the mandatory respondents for failing to participate or the selection of 78.17 percent as the AFA rate; to the extent PrimeSource does so here, the Court should ignore it, as it did not raise the arguments earlier.  Moreover, the expected method allows Commerce to weight-average the mandatory respondents' AFA rates in situations such as the one below, and, as explained elsewhere in this brief, Commerce reasonably determined that the evidence did not justify diverging from the expected method.  Appx0621, Appx0624-0626.

This Court in *Bosun* rejected a similar argument regarding the contemporaneity of the AFA rate assigned to a mandatory respondent.  The appellant in *Bosun* contended that Commerce should not have relied on an 82.05 AFA rate because it was derived from an earlier review.  *Bosun*, 2022 WL 94172, at *4.  The Court, however, stated that "Bosun ignores that its argument is

foreclosed by statute." *Id*. The statute, of course, "allows Commerce, when calculating the separate rate, to rely on an AFA rate derived from a prior administrative review." *Id*. (citing 19 U.S.C. §§ 1673d(c)(5)(B); 1677e(b)(2)(C)). And, while a rate derived from the petition should be corroborated, it is undisputed that Commerce did so as part of the litigation regarding the first administrative review; thus, Commerce was not required to re-corroborate that rate. *See* 19 U.S.C. § 1677e(c)(2).

The non-selected appellants also assert sundry AFA-related arguments. First, they improperly frame the issue as one of Commerce applying facts an AFA rate to the non-selected respondents. *See* Non-Selected Appellants Br. at 9-14. But Commerce did not apply such a rate to those respondents. Rather, without any objection, Commerce applied an adverse inference to the mandatory, non-cooperative respondents: Bonuts and Pro-Team. Then, Commerce calculated the all-others rate using the expected method—the averaging of zero, *de minimis*, and AFA-based rates assigned to the mandatory respondents. Appx0620. Because both Bonuts and Pro-Team were assigned rates based on total AFA, Commerce calculated an all-others rate that is, in this circumstance, equivalent to the AFA rate. *Id*.

The non-selected appellants also argue that the rationale set forth in *Albemarle* should not apply to AFA rates. *See* Non-Selected Appellants Br. at 13-

37

14.  But this ignores the explicit language of the SAA, which states that "{t}he expected method in such cases will be to weight-average the zero and de minimis margins and *margins determined pursuant to the facts available*."  SAA at 873 (emphasis added).   As Commerce stated in its final results, "{w}hile both *Albemarle* and *Changzhou Hawd* contemplated *de minimis* rates, and this review contemplates the inclusion of rates based entirely on facts available, the congressionally approved 'expected method' allows for zero, *de minimis* and rates based entirely on facts available, with no prejudice of one type of rate over another."  Appx0629.

Finally, the non-selected appellants also claim that smaller exporters will never be individually examined by Commerce and are thus being penalized by the assessment of an all-others rate based entirely on the AFA rates of the mandatory respondents.  Non-Selected Appellants Br. at 10.  First, this argument was not exhausted this argument during the underlying administrative proceeding and does not meet any of the limited exhaustion exceptions.  Therefore, it should not be considered.

Even were this Court to consider the argument, it would still lack merit. Commerce allowed parties to comment on its respondent selection.  Appx0064. Smaller exporters could have timely filed respondent selection comments as to the respondent selection methodology or requested voluntary respondent status and

followed the statutory and regulatory criteria to become a voluntary respondent and obtain individual rates based on their own data. 19 U.S.C. § 1677m(a); 19 C.F.R. § 351.204(d). However, only petitioner Mid Continent filed timely respondent selection comments, and no party followed the statutory or regulatory requirements to become a voluntary respondent. *Id.* Plaintiffs-appellants should not be permitted to take a results-oriented approach by waiting and seeing whether the all-others rate is too high for their liking, then complaining that they did not have the opportunity to be examined. Moreover, there is no evidence that smaller exporters, even if individually examined, would not have also received AFA rates; again, the presumption is that the rates of the largest respondents are representative. Finally, if the smaller exporters thought the mandatory respondents' rates and their history of non-cooperation were unrepresentative, they have the option to request that Commerce employ a sampling methodology for selecting respondents, pursuant to 19 U.S.C. § 1677f-1(c)(2)(A).

> **B.    Commerce's Determination To Not Depart From The Expected Method Was Supported By Substantial Evidence**

Commerce's determination that the record did not contain sufficient evidence to justify a departure from the expected method was reasonable and supported by substantial evidence. No evidence on the record of the underlying proceeding substantiated a conclusion that the all-others rate was not reasonably

reflective of the non-selected respondents' potential dumping margins.  Appx0017-

0018, Appx0626, Appx0630.  As the trial court stated:

> Here, all respondents were aware of the AFA rate from
> prior reviews that would likely be utilized in the case of
> non-participation by one or more mandatory respondents
> and its potential inclusion in the determination of the non-
> selected respondents' rate. . . . Nevertheless, no non-
> selected respondent provided a timely voluntary
> questionnaire response or timely evidence that the
> mandatory respondents were in any way not representative
> of the remaining respondents (such as operating in a
> different market segment ("commodity" versus "high-end
> niche") or other evidence that might provide the agency
> with cause to question the representativeness of the
> mandatory respondents).

Appx0017-0018.

The only "evidence" on the record appearing to address the non-selected

respondents' dumping margins is a listing of the calculated rates assigned to

mandatory respondents throughout the previous segments of the administrative

proceeding.  Appx0624-0625.  As noted by the trial court, this Court's decision in

*Bosun*, while not binding, suggests that, at least in the absence of information on

the record of the contemporaneous review, Commerce can consider the assessment

of antidumping margins from prior segments of the administrative proceeding.

Appx0018-0019.  Consistent with *Bosun*, Commerce did just that, and reasonably

rejected the argument that the rates assigned to mandatory respondents throughout

the prior segments showed that the use of the expected method in *this* proceeding

resulted in an all-others rate that was not reasonably reflective of the non-selected respondents' potential dumping margins.

As Commerce explained, it "reviewed all the rates assigned in this proceeding and analyzed that data from segment to segment." Appx0624. In doing so, it observed that "73 of 75 of the non-examined companies have never been examined in any segment of the proceeding, {and} there is no evidence on this record or any other record that the 78.17 percent rate does not reflect their commercial reality." Appx0626.

When Commerce examined the history of past rates assigned in prior segments of the proceeding, it noted multiple instances of AFA margins having been assigned to the individually examined respondents. Appx0624-0626. Although plaintiffs-appellants feign that Commerce should not take into account the number of AFA rates previously assigned and that prior AFA rates are somehow unrepresentative of potential dumping margins, the multiple instances of the 78.17 percent AFA-based rate in earlier segments of the proceeding is just as much part of the history of the rates assigned in the proceeding as the *de minimis* and zero rates, and are clearly indicative of the behavior of various mandatory respondents from segment-to-segment. Appx0624-0625. Therefore, Commerce appropriately took into account the previously-assigned AFA rates in analyzing the segment-to-segment rates for mandatory respondents. Appx0626. Commerce

41

found that AFA was assigned "in three out of five segments"—more than half of the reviews to that point. Appx0625. Moreover, three out of the respondents who have been individually examined in the proceeding—Pro-Team, Bonuts, and Unicatch—had been assigned AFA rates at some point. Therefore, as Commerce reasonably found, "if there is any pattern from segment-to-segment of the behavior of examined respondents, that pattern demonstrates that, most of the time, the mandatory respondents have failed to cooperate and have been assigned a rate based on AFA." *Id.*

As discussed above with regard to Liang Chyuan, Commerce looked at the mandatory respondents most frequently examined, starting with Pro-Team, because it had been a mandatory respondent in every segment from the investigation to the current review and because it, along with the other mandatory respondents, represented the largest volume of exports that Commerce could reasonably examine for each segment. Commerce explained that Pro-Team, throughout the proceeding, had been assigned margins ranging from zero percent to 78.17 percent (the AFA rate). Appx0625; *see also* 19 U.S.C. § 1677f-1(c)(2)(B). Commerce also found that Bonuts, another frequent mandatory respondent, was assigned an AFA rate in each review for which it was selected. Appx0625. Additionally, as Commerce pointed out, Unicatch, the other frequent mandatory respondent, has had a fluctuating pattern of rates: it was assigned an

42

AFA rate in the first administrative review, a 6.16 percent rate in the second review, and a 27.69 percent rate in the third review. Appx0626. Commerce then observed that the increase in Unicatch's rate from the second administrative review to the third administrative review was a 350 percent increase. *Id.*

Considering the fluctuations and patterns of the mandatory respondents in previous segments, which includes multiple instances of AFA rates across mandatory respondents, Commerce appropriately determined that "{t}here has been no indication in the history of the proceeding that the selected mandatory respondents were not representative of the experience of the non-selected companies, even when the rates of the mandatory respondents were based on AFA." *Id.*

The trial court agreed with Commerce, observing that "examining only the calculated margins and excluding from consideration the AFA-based margins would not have yielded a full picture of the historical trends" and finding that "Commerce [ ] did not ignore the previous antidumping rates." Appx0019. As the court stated, "Commerce engaged with the data from past reviews" and "found that there was insufficient evidence on the record to rebut the presumed representativeness of the mandatory respondents' rates from this review." Appx0021. This conclusion was sound and should not be disturbed.

The Court should reject PrimeSource's invitation to reweigh the evidence already considered by Commerce (and agreed with by the trial court). *See, e.g., Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2015) ("While Appellants invite this court to reweigh this evidence, this court may not do so.") (citation omitted). This is especially so because, even assuming PrimeSource's characterization of the evidence could be considered reasonable (it is not), this would not render Commerce's interpretation unreasonable or its determination unsupported by substantial evidence. *See, e.g., Am. Silicon Techs. V. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence.").

To the extent the Court considers PrimeSource's arguments in detail, those arguments are nonetheless unconvincing. For instance, PrimeSource argues that the 350 percent fluctuation in Unicatch's rate only seems large because the rates are low to begin with. PrimeSource Br. at 42-43. But this ignores that Unicatch, along with Pro-Team and Bonuts, has also received an AFA rate in a review.

PrimeSource also contends that the trial court failed to account for certain facts in rendering its decision: (1) the rate of the mandatory respondents in the investigation; (2) that Pro-Team was assigned a zero percent rate following

44

litigation of the first administrative review; and that (3) Liang Chyuan received a

2.54 percent rate in the third review. PrimeSource Br. at 39-40. But none of these

facts warrant vacatur of judgment. That Pro-Team received a zero percent rate

after litigation of the first administrative review does not alter the incontrovertible

truth that Pro-Team has been assigned margins ranging from zero percent to 78.17

percent (the AFA rate). Nor does it change that, in the fourth review, Pro-Team, a

previously cooperative respondent, stopped cooperating, announced it would not

be responding to Commerce's request for information, and was consequently

assigned an AFA rate. Appx0620. Finally, with regard to Liang Chyuan's rate, to

the extent the Court deems it relevant, in the sixth administrative review, all three

mandatory respondents, including Liang Chyuan, received a 78.17 percent AFA

rate.[12] *Certain Steel Nails From Taiwan*, 87 Fed. Reg. 63,034 (Dep't of

Commerce Oct. 18, 2022).

  C. <u>Commerce Appropriately Declined To Pull Forward A Past Rate</u>

  Plaintiffs-appellants suggest that Commerce could have "pulled forward"

rates from the past reviews rather than using the expected method. *See*

PrimeSource Br. at 50-54; Non-Selected Appellants' Br. at 13. This argument

---

[12] In the fifth administrative review (the review directly subsequent to the underlying one), only one company, Create, was under review, and Commerce found that Create had no shipments during that period of review. *See Certain Steel Nails From Taiwan*, 86 Fed. Reg. 61,139 (Dep't of Commerce Nov. 5, 2021). Therefore, no rates were assigned during the fifth administrative review. *Id.*

does not bear scrutiny.  First, as already exhaustively established, Commerce reasonably determined that substantial evidence did not justify a departure from the expected method.  And, pursuant to *Albemarle* and its ilk, substantial evidence that the dumping of the mandatory respondents is different from the dumping of the non-selected respondents is required to even consider pulling forward a rate. *Albemarle*, 821 F.3d at 1353.  Moreover, "{t}here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period." *Albemarle*, 821 F.3d at 1356.  Indeed, "if the facts remained the same from period to period, there would be no need for administrative reviews." *Id.* (quoting *Shandong Huarong*, 29 C.I.T. at 490-91.

PrimeSource cites *GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294, 1305 (Ct. Int'l Trade 2021) (*GODACO I*), and *GODACO Seafood Joint Stock Co. v. United States*, 539 F. Supp. 3d 1286, 1290 (Ct. Int'l Trade 2021) (*GODACO II*), to support its contentions. *See* PrimeSource Br. at 52-54.  But these cases, in addition to being non-binding, are distinguishable and do not suggest an outcome in this appeal.

In *GODACO I*, the trial court considered whether Commerce adequately explained its departure from the expected method, whereas in the underlying proceeding Commerce used the expected method. *GODACO I*, 494 F. Supp. 3d at 1305 ("The court observes that Commerce did not appear to employ the 'expected

method' of determining the all-others rate in this case{.}"). Moreover, in that case, Commerce appears not to have examined the past rates from prior segments of the proceeding; here, Commerce of course considered previously assigned rates. *Id*. at 1306; Appx0625-0626. Additionally, in *GODACO I*, Commerce relied only on one mandatory respondent's rate to determine the all-others rate. *GODACO I*, 494 F. Supp. 3d at 1304. Here, Commerce relied on the rates for two mandatory respondents.

In *GODACO II*, where Commerce, under protest, explained its departure from the expected method, Commerce calculated the rate for non-examined respondents by averaging the all-others rate from the four previous reviews. *GODACO II*, 539 F. Supp. 3d at 1290. Thus, Commerce did not even truly "pull forward" a rate. More importantly, and unlike in *GODACO*, the history of the rates in this proceeding fails to show that the non-selected respondents' dumping would not be reasonably reflected by the mandatory respondents' rates. Finally, even if Commerce's decision to ultimately rely on some amalgamation of rates in *GODACO II* was supported by substantial evidence, this does not render Commerce's decision here unsupported by substantial evidence, given the differing facts on the record and the different history of rates in the proceeding.

PrimeSource also relies on Commerce's past determinations in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's*

Case: 22-2128    Document: 41    Page: 57    Filed: 03/29/2023

*Republic of China*, 83 Fed. Reg. 1,238, 1,239 (Dep't of Commerce Jan. 10, 2018) (TRBs), and accompanying IDM (TRBs IDM), and *Drawn Stainless Steel Sinks from the People's Republic of China*, 83 Fed. Reg. 658, 659 (Dep't of Commerce Jan. 5, 2018), and accompanying PDM (Sinks PDM). *See* PrimeSource Br. at 50. But this reliance is misplaced, as those administrative proceedings concerned China, a non-market economy country, whereas Taiwan has a market economy.  In non-market economy cases, Commerce presumes that companies are part of the country-wide entity, but if a company can rebut that presumption of government control, Commerce will grant that company separate rate status. *See* TRBs IDM at 15-16.  If a company does not rebut the presumption of government control, that company will get the country-wide entity rate.  However, if the company rebuts the presumption of government control, Commerce will assign a rate separate from the country-wide entity rate.  Commerce would ordinarily use a rate from individually-investigated separate rate companies to calculate the separate rate. *See, e.g.,* Sinks PDM at 12; *Bosun Tools Co., Ltd. v. United States,* 493 F. Supp. 3d 1351, 1353 (Ct. Int'l Trade 2021); *Refillable Stainless Steel Kegs From the People's Republic of China*, 84 Fed. Reg. 57,010 (Dep't of Commerce Oct. 24, 2019); *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 83 Fed. Reg. 17,527 (Dep't of Commerce Apr. 20, 2018), and accompanying IDM at 20, 27.

48

In the TRBs and Sinks proceedings, because the individually investigated companies were found to be part of the China-wide entity, Commerce "neither calculated any individual rates nor assigned any rates based on facts available" to be able to calculate the rate for non-selected separate rate companies. Appx0629 (quoting *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 83 Fed. Reg. 12,717 (Dep't of Commerce Mar. 23, 2018), and accompanying IDM). These non-market economy cases involve the presumption of government control and the demonstration of independence from such control, and, as such, are inapposite.

PrimeSource cites *Stainless Steel Bar from India*, 86 Fed. Reg. 11,235 (Dep't of Commerce Feb. 24, 2021), *unchanged by Stainless Steel Bar from India*, 86 Fed. Reg. 47,474 (Dep't of Commerce Aug. 25, 2021), as an example of a market economy case in which Commerce pulled forward a rate. *See* PrimeSource Br. 50-51. In that proceeding, Commerce found that rate of the sole mandatory respondent was not reasonably reflective of the non-examined company. As noted above, Commerce will diverge from the expected method when it determines that the expected method is not reasonably reflective. Here, Commerce reasonably determined that sufficient evidence did not support a departure from the expected method; accordingly, there was no cause to consider whether to "pull forward" rates or not. PrimeSource has not established that these isolated instances in the

aforementioned proceedings constitute an "established practice" of pulling forward rates, and, more importantly, has not demonstrated that the sources it relies on are so similar so as to mandate, or even indicate, that Commerce act similarly here.

## **CONCLUSION**

For these reasons, we respectfully request that the Court affirm the trial court's judgment.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

/s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

OF COUNSEL:
VANIA WANG
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel For Trade
   Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

/s/Sosun Bae
SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7568
Fax: (202) 514-7965
Email: Sosun.Bae@usdoj.gov

March 29, 2023

Attorneys for Defendant-Appellee

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify under penalty of perjury that the attached brief is proportionately spaced using Microsoft Word, uses a Times New Roman typeface in 14 point font size, and, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), contains 10,813 words.


/s/ Sosun Bae
SOSUN BAE