22-2128 & 22-2129

_____

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

**PRIMESOURCE BUILDING PRODUCTS, INC., CHENG CH INTERNATIONAL CO., LTD., CHINA STAPLE ENTERPRISE CORP., DE FASTENERS INC., HOYI PLUS CO., LTD., LIANG CHYUAN INDUSTRIAL CO., LTD., TRIM INTERNATIONAL INC., UJL INDUSTRIES CO., LTD., YU CHI HARDWARE CO., LTD., ZON MON CO., LTD.,**

*Plaintiffs-Appellants*

**v.**

**UNITED STATES, MID CONTINENT STEEL & WIRE, INC.,**

*Defendants-Appellees*

_____

Appeal from the United States Court of International Trade in
case no. 1:20-cv-03911-MAB, 1:20-cv-03934-MAB, Judge Mark A. Barnett

_____

## REPLY BRIEF OF PLAINTIFF-APPELLANT PRIMESOURCE BUILDING PRODUCTS, INC.

May 25, 2023

Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel to PrimeSource Building Products, Inc.*

**FORM 9. Certificate of Interest**

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---:|:---|
| **Case Number** | 22-2128 and 22-2129 |
| **Short Case Caption** | PrimeSource Building Products, Inc. v. US |
| **Filing Party/Entity** | PrimeSource Building Products, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/25/2023

Signature: /s/ Jeffrey S. Grimson

Name: Jeffrey S. Grimson

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| PrimeSource Building Products, Inc. | N/A | PriSo Acquisition Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| Wenhui (Flora) Ji<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K St NW, Washington, DC 20006 | Yixin (Cleo) Li Jacob M. Reiekin<br>5335 Wisconsin Avenue, NW, Suite 810<br>Washington, DC 20015 | Jacob M. Reiekin<br>5335 Wisconsin Avenue, NW, Suite 810<br>Washington, DC 20015 |
|---|---|---|
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ................................................... ii

INTRODUCTION ................................................................1

ARGUMENT ......................................................................1

  I.  COMMERCE HAS THE BURDEN TO SUPPORT ITS USE OF THE EXPECTED METHOD .......................................................1

  II.  COMMERCE'S USE OF THE EXPECTED METHOD WAS NOT REASONABLE AS APPLIED TO LIANG CHYUAN ......................................10

    A.  The Presumption of Representativeness of the Mandatory Respondents Does Not Support Commerce's Use of the Expected Method ..................................10

    B.  Liang Chyuan Rebutted the Presumption of Representativeness ...............14

  III.  COMMERCE SHOULD HAVE CALCULATED AN INDIVIDUAL RATE FOR LIANG CHYUAN ...........................................22

    A.  Liang Chyuan Is Entitled to Its Own Rate .................................22

    B.  Commerce Should Have Solicited Further Information From Liang Chyuan or Pulled Forward Its Prior Rate From the Third Review ...............................26

CONCLUSION AND RELIEF SOUGHT ............................................29

# TABLE OF AUTHORITIES

**Cases**

Albemarle Corp. v. United States,
  821 F.3d 1345 (Fed. Cir. 2016)............................................................11, 22, 26, 27

Baroque Timber Indus. (Zhongshan) Co. v. United States,
  971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014)...........................................................5

Bosun Tools Co. v. United States,
  2022 U.S. App. LEXIS 624 (Fed. Cir. 2022)............................................... 4, 7, 14

Changzhou Hawd Flooring Co. v. United States,
  848 F.3d 1006 (Fed. Cir. 2017)...........................................................................11

Changzhou Hawd Flooring Co. v. United States,
  947 F.3d 781 (Fed. Cir. 2020)........................................................................ 18, 24

Changzhou Trina Solar Energy Co. v. United States,
  975 F.3d 1318 (Fed. Cir. 2020)...................................................................... 15, 16

Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,
  701 F.3d 1367 (Fed. Cir. 2012).........................................................................3, 22

Dorbest Ltd. v. United States,
  602 F. Supp. 2d 1287 (Ct. Int'l Trade 2009).........................................................25

Dorbest Ltd. v. United States,
  604 F.3d 1363 (Fed. Cir. 2010)...........................................................................25

GODACO Seafood Joint Stock Co. v. United States,
  539 F. Supp. 3d 1286 (Ct. Int'l Trade 2021).........................................................27

Linyi Chengen Imp. & Exp. Co. v. United States,
  609 F. Supp. 3d 1392 (Ct. Int'l Trade 2023).........................................................5

Mid Continent Steel & Wire, Inc. v. United States,
  321 F. Supp. 3d 1313 (Ct. Int'l Trade 2018)........................................................28

Navneet Publications (India) Ltd. v. United States,
  999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014)..........................................................5

PrimeSource Building Products, Inc. v. United States,
  No. 20-3911, slip op. 22-73 (Ct. Int'l Trade June 16, 2022) ...................... 1, 2, 14

Pro-Team Coil Nail Enter. Inc. v. United States,
  587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022)........................................................12

Qingdao Qihang Tyre Co. v. United States,
  308 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) .......................................................24

Shenzhen Xinboda Indus. Co. v. United States,
  180 F. Supp. 3d 1305 (Ct. Int'l Trade 2016)..........................................................9

Tung Mung Dev. Co., Ltd. v. United States,
  354 F.3d 1371 (Fed. Cir. 2004) ..............................................................................3

Yangzhou Bestpak Gifts & Crafts Co. v. United States,
  716 F.3d 1370 (Fed. Cir. 2013)..................................................................... passim

**Statutes**

19 U.S.C. § 1673d.................................................................................................2, 3

19 U.S.C. § 1677f-1 ................................................................................................23

**Other Authorities**

Certain Steel Nails from Taiwan, 87 Fed. Reg. 63,034 (Dep't of Commerce Oct. 18, 2022) .................................................................................................................17

Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Determination of No Shipments; 2017-2018, 85 Fed. Reg. 14,635 (Dep't of Commerce Mar. 13, 2020) ............................................................ 15, 17

Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019, 85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020) .........................................................2

Certain Steel Nails From Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018-2019, 85 Fed. Reg. 19,138 (Dep't of Commerce Apr. 6, 2020) ............................9

Quartz Surface Products from India, 88 Fed. Reg. 1,188 (Dep't of Commerce Jan. 9, 2023) ...................................................................................................................6

# INTRODUCTION

Defendant-Appellee the United States and Defendant-Appellee Mid Continent Steel & Wire, Inc. ("Mid Continent") argue unpersuasively that Commerce properly relied on the expected method to calculate the non-selected respondents' rate. See Corrected Brief for Defendant-Appellee United States (Apr. 12, 2023), ECF No. 46 ("Def.'s Br."); Corrected Response Brief of Defendant-Appellee Mid Continent Steel & Wire Inc. (Apr 11, 2023), ECF No. 44 (Mid Continent's Br."). Commerce's use of the expected method was not supported by substantial evidence or otherwise in accordance with law because it resulted in a rate that did not reasonably reflect respondent Liang Chyuan Industrial Co. Ltd.'s potential dumping margin.

# ARGUMENT

## I. COMMERCE HAS THE BURDEN TO SUPPORT ITS USE OF THE EXPECTED METHOD

It is Commerce, and not the respondent, that has the burden of establishing that an antidumping rate is reasonably reflective of the respondent's potential dumping margin. See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1380 (Fed. Cir. 2013). In sustaining Commerce's determination, the Court of International Trade ("CIT") overlooked this principle. See PrimeSource Building Products, Inc. v. United States, No. 20-3911, slip op. 22-73 at 16 (Ct. Int'l Trade June 16, 2022), Appx0016; see also Certain Steel Nails From Taiwan: Final

Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019, 85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020), Appx0634-0636, and accompanying Issues and Dec. Mem. at 12-13 ("Final I&D Mem."), Appx0623-0624.

Commerce is required to select a method that is reasonable based on the underlying facts. See 19 U.S.C. § 1673d(c)(5)(B). The CIT found that the statute places the burden of proof on the party seeking a departure from the expected method to show that Commerce's assigned rate did not reasonably reflect the respondents' potential dumping margin. See PrimeSource, No. 20-3911, slip op. 22-73 at 11, Appx0011. The United States and Mid Continent argue that Commerce did not have the burden of proof to establish reasonableness because it relied on the expected method. See Def.'s Br. at 16, Mid-Continent's Br. at 24, n. 5. These arguments ignore the statute, which provides that Commerce must select a "reasonable method" to calculate its non-selected respondents' rate when all the rates calculated for the mandatory respondents are based on adverse facts available ("AFA"). 19 U.S.C. § 1673d(c)(5)(B). The statute's mandate that Commerce must use a reasonable method "imposes a duty on Commerce to select a method appropriate for the circumstances." Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,

2

701 F.3d 1367, 1378-79 (Fed. Cir. 2012).[1]  When selecting a rate that is appropriate for the circumstances, Commerce's "rate determinations for non-mandatory, cooperating separate rate respondents must also bear some relationship to their actual dumping margins." Bestpak, 716 F.3d at 1380.  A court can only sustain Commerce's administrative determination if it is supported by substantial evidence on the record.  See Tung Mung Dev. Co., Ltd. v. United States, 354 F.3d 1371, 1378 (Fed. Cir. 2004).  Commerce, therefore, has the burden of supporting its determination with substantial evidence to establish that the selected rate reasonably reflects the potential dumping margins of the non-selected respondents regardless of whether Commerce relies on the expected method or any other method.

The mandate that Commerce must ensure its selected rate reasonably reflected Liang Chyuan's potential dumping margin is confirmed in Bestpak where the Court held that "{w}hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case." Bestpak, 716 F.3d at 1379 (internal citation omitted).  The United States' and Mid Continent's contentions that Bestpak's holding is narrow based on the Court's later

---

[1] Commerce determined that Wujin is distinguishable because, in that case, the Court determined that it was unreasonable for Commerce to apply a hypothetical AFA rate that Commerce created based on information from the record.  See Final I&D Mem. at 17-18, Appx0627-0628 (citing Wujin, 701 F.3d at 1373).  The Federal Circuit, however, interpreted the language of 19 U.S.C. § 1673d(c)(5) to establish a general legal principle that it later applied to the facts.

interpretation of that case in <u>Bosun Tools Co. v. United States</u>, 2022 U.S. App.
LEXIS 624 (Fed. Cir. 2022) ("<u>Bosun III</u>") are not compelling.  <u>See</u> Def.'s Br. at 33;
Mid Continent's Br. at 28-29.  The Court in <u>Bosun III</u> merely concluded that <u>Bestpak</u>
"did not cre-ate a categorical rule against relying on an AFA rate," but acknowledged
that the Court held in <u>Bestpak</u> that "Commerce's methodology was unreasonable 'as
applied,' given the lack of data."  <u>Bosun III</u>, 2022 U.S. App. LEXIS 624 at *11.
PrimeSource does not challenge the general legality of the expected methodology
nor that an AFA rate may be used to calculate the non-selected respondents' rate.
<u>See</u> Final I&D Mem. at 11, Appx0622.    Instead, PrimeSource challenges
Commerce's unlawful use of the expected method to average the AFA rates assigned
to the mandatory respondents resulting in a rate that did not reasonably reflect Liang
Chyuan's potential dumping margin.

"Commerce may not select unreasonably high rates having no relationship to
the respondent's actual dumping margin."  <u>Bestpak</u>, 716 F.3d at 1380.  The United
States wrongly asserts that <u>Bestpak</u> is distinguishable from this action because the
"the all-others rate in <u>Bestpak</u>, 123.83 percent, was nearly twice as high as the 78.17
percent all-others rate calculated for the underlying proceeding."  Def.'s Br. at 32-
33.  Regardless of whether Commerce selects the expected method or any other
"reasonable method," or whether the rate was 78.17 percent instead of 121.83
percent, Commerce's methodology must reasonably reflect the potential dumping

margins of the non-selected respondents.  Indeed, the CIT has adopted the holding set forth in <u>Bestpak</u> to reject rates applied to non-mandatory respondents where that rate does not reasonably reflect the potential dumping margins of the non-selected respondents.  <u>See</u> <u>Linyi Chengen Imp. & Exp. Co. v. United States</u>, 609 F. Supp. 3d 1392, 1403 (Ct. Int'l Trade 2023) (holding that applying the expected method would not have been reasonable because "both mandatory respondents received total AFA rates, which are calculated from adverse inferences . . . are much higher than the previous rates selected for separate rate respondents"); <u>Navneet Publications (India) Ltd. v. United States</u>, 999 F. Supp. 2d 1354, 1365 (Ct. Int'l Trade 2014) (holding that "Commerce cited no evidence below suggesting that its {all-others rate} reflects the economic reality of all-others rate respondents");[2] <u>Baroque Timber Indus. (Zhongshan) Co. v. United States</u>, 971 F. Supp. 2d 1333, 1345 n.37 (Ct. Int'l Trade 2014) (holding that Commerce failed to explain how the method it chose "reflect{ed} or ha{d} some reasonable relationship to the economic reality of the separate rate companies").[3]  Precedent is clear that Commerce has the burden of

---

[2] Commerce concluded that <u>Navneet</u> was distinguishable because, unlike in <u>Navneet</u>, here Commerce did not elevate the expected methodology "above other, more reasonable methods." Final I&D Mem. at 16, Appx0627 (quoting <u>Navneet</u>, 999 F. Supp. 2d at 1361-62).  To the contrary, Commerce did elevate the expected method over more reasonable methods that reasonably reflected Liang Chyuan's potential dumping margin.

[3] Mid Continent cites to <u>Shanxi Hairui Trade Co. v. United States</u>, 39 F.4th 1357 (Fed. Cir. 2022), as an example of the Court finding Commerce's use of AFA rates to calculate the non-selected respondents' rate as reasonable. <u>See</u> Mid Continent's

demonstrating that the non-selected respondents' rate reasonably reflects the potential dumping margins of the respondents.

Not only does the interpretation of <u>Bestpak</u> espoused by the CIT below, as adopted by the United States and Mid Continent, conflict with general precedent on this issue, it also ignores Commerce's own interpretation of its burden in other administrative cases. For example, in an administrative review of the antidumping duty order on quartz surface products ("Quartz") from India, Commerce relied on the expected method to average an AFA rate assigned to one mandatory respondent with the zero percent rate calculated for the other respondent. <u>See</u> <u>Quartz Surface Products from India</u>, 88 Fed. Reg. 1,188 (Dep't of Commerce Jan. 9, 2023), and accompanying I&D Mem. at 54 ("Quartz I&D Mem."). After reviewing the parties' arguments, however, Commerce ultimately determined that it could no longer rely on the expected method because that methodology resulted in a rate that was "not reasonably reflective of the non-selected companies' potential dumping margin during the {period of review}." <u>Id.</u> Commerce itself determined that the burden was on it to select a "reasonable methodology for calculating a rate for the non-selected companies." <u>Id.</u> The position articulated by the United States here that the burden of proof lies with the party seeking a departure from the expected method

---

Br. at 19. The facts in that case, however, are distinguishable because Commerce's selected mandatory respondents using a statistical-sampling methodology rather than the largest-volume exporters. <u>See</u> <u>Shanxi</u>, 39 F.4th at 1362.

therefore also directly conflicts with Commerce's own interpretation of its obligations under the statute and statement of administrative action.

This Court should also not be convinced by the United States' argument that Bestpak is distinguishable and not controlling because in Bestpak Commerce sought to depart from the expected methodology whereas it relied on the expected method in this case. See Def.'s Br. at 32. In Bestpak, Commerce did not rely on the expected method, which requires a weighted average of the mandatory respondent's rates, and instead used a simple average of an AFA rate and a de minimis rate. See Bestpak, 716 F3d at 1375. In Bosun III, however, both Commerce and the Court treated a simple average of the mandatory respondent's rates as the equivalent of the expected methodology. See Opening Brief of Plaintiff-Appellant PrimeSource at 25, n. 5 (Dec. 23, 2022), ECF No. 30 ("PrimeSource Br."). Even though the Court in Bosun III concluded that Commerce relied on the expected method, the Court nevertheless only sustained Commerce's remand redetermination "because, unlike in Bestpak, Commerce's methodology was not unreasonable as applied because there was 'no lack of data' on the record." 2022 U.S. App. LEXIS 624, *10-11.[4] In Bosun III, the

---

[4] The United argues that the holding in Bosun III did not "release Bosun of the obligation to demonstrate that the mandatory respondents' rates were nonrepresentative" referring to the Court's language that "{b}ecause Bosun does not adequately explain why the 39.66% rate was not representative, its argument cannot be persuasive." Def.'s Br. at 32 (quoting Bosun III, 2022 U.S. App. LEXIS 624, *6). The United States fails to provide the context surrounding this quotation from Bosun III. The Court was referring to Bosun's arguments on appeal. See id. The

Court confirmed that Commerce's burden to support the reasonableness of its non-selected respondents' rate applies regardless of whether Commerce uses a weighted average (expected method) or a simple average (any other reasonable method).

Adopting the United States' and Mid Continent's interpretation of Bestpak would lead to the illogical result where Commerce could shirk its duty to calculate a reasonable rate by merely relying on a weighted average as opposed to a simple average. Both the United States and Mid Continent acknowledge, as the CIT held, that the burden would be on Commerce to support the reasonableness of the non-selected respondents' rate if Commerce departed from the expected method by using a simple average (any other reasonable method) but here they argue that the burden was not on Commerce because it instead used a weighted average (expected method). See Def.'s Br. at 10, 12; Mid Continent's Br. at 6-7, 9. There is no record evidence establishing that Commerce used a weighted average as opposed to a simple average. Commerce's decision memoranda merely provided that Commerce used a weighted average, but there is no subsequent calculation memorandum illustrating a weighted average calculation that would be expected in a normal review. Nor could Commerce have completed a weighted average given that it lacked volume data as none of the mandatory respondents submitted responses to

Court was not suggesting that the respondent had the burden to support a departure from the expected method but instead explaining it was unpersuaded by the respondent's argument on appeal. See id.

Commerce's questionnaires.  See <u>Certain Steel Nails From Taiwan: Preliminary</u> <u>Results of Antidumping Duty Administrative Review and Preliminary</u> <u>Determination of No Shipments; 2018-2019</u>, 85 Fed. Reg. 19,138 (Dep't of Commerce Apr. 6, 2020), Appx0545-0548, and accompanying Issues and Dec. Mem. at 7-8 ("Prelim. I&D Mem."), Appx0541-0542 (providing that Bonus and Pro-Team did not respond to Commerce's questionnaire); <u>see also</u> <u>Shenzhen Xinboda</u> <u>Indus. Co. v. United States</u>, 180 F. Supp. 3d 1305, 1321 (Ct. Int'l Trade 2016) ("Commerce reasonably did not apply the 'expected method' of averaging the rates of the mandatory respondents in this case because volume data is not available."). Even if Commerce had used a weighted average (expected method), the non-selected respondents' rate would be the same if Commerce had used simple average (any other reasonable method) because both mandatory respondents received the same rate based on AFA.  Where a weighted average and simple average would result in the same dumping margin regardless, Commerce cannot hide behind its claim that it relied on a weighted average (expected method) to avoid meeting its burden of proof to show that the rate it calculated for Liang Chyuan reasonably reflected its potential dumping margin.

Contrary to the arguments of the United States and Mid Continent, <u>Bestpak</u> is controlling and firmly places the burden on Commerce to support with substantial evidence that the rate it assigned to Liang Chyuan reasonably reflected its potential

9

dumping margin. Commerce failed to meet this burden, rendering its decision unsupported by substantial evidence and contrary to law, and the CIT's judgment sustaining Commerce's determination was incorrect.

## II. COMMERCE'S USE OF THE EXPECTED METHOD WAS NOT REASONABLE AS APPLIED TO LIANG CHYUAN

Commerce's reliance on the expected methodology was unreasonable as applied because it resulted in a rate that did not reasonably reflect Liang Chyuan's potential dumping margin. The United States and Mid Continent assert that Commerce's selection of the expected methodology was supported by substantial evidence because the dumping margins of the mandatory respondents are presumed to be representative of all exporters. See Def.'s Br. at 28-45; Mid Continent's Br. at 22-37. Further, both parties assert that the rates from past reviews demonstrate that the AFA rate reasonably reflected Liang Chyuan's potential dumping margin. See id. This Court must reject both arguments given that Commerce calculated a significantly lower rate for Liang Chyuan in the prior review.

### A. The Presumption of Representativeness of the Mandatory Respondents Does Not Support Commerce's Use of the Expected Method

Commerce incorrectly relied on a presumption that the mandatory respondents are representative of all exporters to support its use of the expected method. See Final I&D Mem. at 12-13, Appx0623-0624. As did Commerce, the United States and Mid Continent rely on Albemarle Corp. v. United States, 821 F.3d

1345, 1353 (Fed. Cir. 2016) and <u>Changzhou Hawd Flooring Co. v. United States</u>, 848 F.3d 1006, 1012 (Fed. Cir. 2017) to maintain that Commerce's statutory mandate presumes that the largest exporters by volume are representative of all respondents. <u>See</u> Def.'s Br. at 27; Mid Continent's Br. at 25. Although the Court held in <u>Albemarle</u> that the data for the mandatory respondents can be "viewed as representative of all exporters," 821 F.3d at 1353, the Court later clarified in <u>Changzhou Hawd I</u> that <u>Albemarle</u> nonetheless establishes that the "presumption of representativeness may be overcome." <u>Changzhou Hawd I</u>, 848 F.3d at 1012. Not only may the presumption of representatives be overcome, but the "{t}he burden is not on the separate respondents to show that their dumping is the same as that of the individually examined respondents." <u>Albemarle</u>, 821 F.3d at 1353.

Here, the presumption of representativeness does not equate to substantial evidence to support Commerce's use of the expected method because the mandatory respondents' rate was based on AFA. As Mid Continent recognizes, <u>Albemarle</u> and <u>Changzhou Hawd I</u> are factually distinguishable in that both of those cases dealt with situations where all mandatory respondents received <u>de</u> <u>minimis</u> rates whereas in the administrative proceeding at issue here, Commerce assigned both mandatory respondents an AFA rate. <u>See</u> Mid Continent's Br. at 18-19. The facts at issue here are instead analogous to <u>Bestpak</u> where the Court held that Commerce did not support with substantial evidence its chosen methodology to calculate the non-

11

selected respondents' rate by averaging an AFA and <u>de minimis</u> rate.  <u>See</u> 716 F.3d

at 1379.  The Court reasoned that the AFA margin assigned to one of the mandatory

respondents was "unknown" because the rate was grounded in the respondent's "lack

of participation," and Commerce cannot "cannot base a determination of economic

reality on such slim findings."  <u>Id.</u>  The arguments that the AFA rates assigned to the

mandatory respondents can be presumed to reflect the dumping margin of Liang

Chyuan are meritless given that those rates were unrelated to any current data on the

record.  <u>See</u> Def.'s Br. at 36; Mid Continent's Br. at 29-30.  The record here is even

more bare than in <u>Bestpak</u> where Commerce's all-others rate calculation included an

actual, calculated <u>de minimis</u> rate i.e., a rate based on contemporaneous data,

averaged with an AFA rate.  <u>See</u> <u>Bestpak</u>, 716 F.3d at 1378-79.  The United States'

claim that <u>Pro-Team Coil Nail Enter. Inc. v. United States</u>, 587 F. Supp. 3d 1364 (Ct.

Int'l Trade 2022) suggests that a presumption of representativeness holds for AFA

rates is equally unpersuasive.  <u>See</u> Def.'s Br. at 35-36.  The CIT's holding in <u>Pro-</u>

<u>Team</u> is not binding on this Court and the non-selected respondents' rate is currently

on appeal.  As in <u>Bestpak</u>, here too Commerce did not act reasonably by presuming

that the AFA rate assigned to both of the mandatory respondents reasonably reflected

Liang Chyuan's potential dumping margin without further evidence on the record to

support this finding.  As detailed below, such evidence did not exist.

The presumption of representativeness also does not support Commerce's use of the expected method because the factual premise underlying the presumption was not met. Here, there is evidence that customs data relied on by Commerce may not reflect the largest exporters. Based on customs data that Commerce placed on the record, Commerce initially chose Create Trading Co., Ltd. as a mandatory respondent because it was one of "two exporters and producers with the largest volumes of entries of subject merchandise." Mem. from Irene Gorelik to Irene Darzenta Tzafolia re: Respondent Selection at 5 (Oct. 22, 2019) (Public Version), Appx0141. Commerce ultimately determined that Create had no reviewable sales. See Prelim. I&D Mem. at 6, Appx0540. The presumption that the mandatory respondents were representative of all exporters is not substantial evidence to support Commerce's use of the expected method when there is record evidence calling into question Commerce's factual assertion that it selected the largest-volume exporters. See Final I&D Mem. at 12-13, Appx0623-0624.

The United States wrongly claims that PrimeSource failed to exhaust the argument that Commerce cannot rely on the presumption of representativeness because PrimeSource failed to submit comments on Commerce's respondent selection or use of the CBP data. See Def.'s Br. at 33-34. PrimeSource did not waive this argument. PrimeSource did raise the argument that the mandatory respondents cannot be presumed to be representative of all exporters both at Commerce and the

13

CIT. <u>See</u> Letter on Behalf of PrimeSource to Dep't of Commerce re: Letter in Lieu of Case Brief at 2-3 (June 25, 2020) (Public Document), Appx0561-562; Rule 56.2 Mot. for J. Upon the Agency Record of Plaintiff PrimeSource at 16 (June 1, 2021), ECF No. 25, Appx0680.  Further, PrimeSource is not challenging Commerce's selection of mandatory respondents but instead highlighting that Commerce's presumption of representativeness is rebuttable.

Based on the facts of this case, Commerce cannot reasonably rely on the presumption that the AFA rate assigned to the mandatory respondents was representative of all exporters, including Liang Chyuan to support Commerce's use of the expected method.  Commerce acted unreasonably when it found that the AFA rate assigned to both of the mandatory respondents reasonably reflected Liang Chyuan's potential dumping margin when record evidence called into question Commerce's assertion that it selected the largest-volume exporters.

## B. Liang Chyuan Rebutted the Presumption of Representativeness

By showing that its potential dumping margin was significantly lower than the AFA rate assigned to the mandatory respondents, Liang Chyuan rebutted the presumption of representativeness of the mandatory respondents.  In its decision, the CIT recognized that <u>Bosun III</u> "offers some considerations for evaluating Commerce's analysis of the rates from prior reviews." <u>PrimeSource</u>, No. 20-3911, slip op. at 18, Appx0018.  The United States and Mid Continent do not contest that

14

rates from prior reviews can offer substantial evidence to show that Commerce's

non-selected respondents' rate does not reasonably reflect the potential dumping

margins of these respondents.  <u>See</u> Def.'s Br. at 25; Mid Continent's Br. at 26.  Nor

do they dispute that a specific margin of only 2.54 percent was calculated for Liang

Chyuan for a period separated from the instant review by only one day.  <u>See</u> <u>Certain</u>

<u>Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative</u>

<u>Review and Determination of No Shipments; 2017-2018</u>, 85 Fed. Reg. 14,635,

14,636 (Dep't of Commerce Mar. 13, 2020) ("POR3").  Instead, both parties reiterate

Commerce's flawed reasoning that the AFA rate assigned to both mandatory

respondents reflected the potential dumping margins of all exporters.  <u>See</u> <u>id.</u>

PrimeSource does not ask this Court to reweigh the evidence.  <u>Cf.</u> Def.'s Br. at 44.

Commerce, however, is not permitted to ignore certain record evidence.  <u>See</u>

<u>Changzhou Trina Solar Energy Co. v. United States</u>, 975 F.3d 1318, 1326 (Fed. Cir.

2020) (citation omitted).  Yet that is what it did here.  When the record is fairly

examined, the only reasonable conclusion is that the AFA rate did not reasonably

reflect Liang Chyuan's potential dumping margin.

In adopting Commerce's flawed finding that there was a pattern of non-

cooperation by the mandatory respondents in past reviews, the United States and

Mid Continent vastly overstate the record evidence.  <u>See</u> Def.'s Br. at 41-43, Mid

Continent's Br. at 26-27.  Prior to the current review under appeal, Commerce

calculated an actual rate for mandatory respondents in significantly more instances than it has relied on AFA. See PrimeSource's Br. at 38-39. Further, prior to the instant review, only one mandatory respondent had received an AFA rate in all of the reviews prior to and including the fourth review. See id. at 40. There are no reviews prior to and including the fourth review where Commerce assigned all the mandatory respondents a rate based on AFA. See id. No "reasonable mind" can support Commerce's claim (as sustained by the CIT) that the past reviews indicate a history of non-cooperation by the mandatory respondents when only one mandatory respondent has been assigned an AFA rate in every proceeding prior to and including the fourth review for which it has been individually examined. See Changzhou Trina, 375 F.3d at 1326. Indeed, there are instances of non-cooperation by the mandatory respondents in past reviews, but these instances do not rise to the level of a pattern that Commerce used to support its finding that the AFA rate assigned to the mandatory respondents reflected Liang Chyuan's potential dumping margin.

The United States and Mid Continent also suggest that PrimeSource downplays the AFA rates calculated for the mandatory respondents in past reviews. See Def.'s Br. at 41; Mid Continent's Br. at 43. AFA rates represent unknown margins that do not reasonably support Commerce's conclusion that the mandatory respondents are representative of all exporters because these rates are not based on any contemporaneous record data. See Bestpak, 716 F.3d at 1379. Notably, Liang

Chyuan itself was never assigned a rate based on AFA prior to the fourth review.  See PrimeSource Br. at 41.  In the third review that ended the day before the fourth review period, Liang Chyuan was a mandatory respondent and received a low margin of 2.54 percent.  See POR3, 85 Fed. Reg. at 14,636.  It was unreasonable for Commerce to have assumed that Liang Chyuan's dumping margin skyrocketed from 2.54 percent on the last day of the third review to approximately 78 percent on the first day of the fourth review.    Such a conclusion, without explanation, lacks reasonableness and is unsupported by substantial evidence.

The United States' argument that Liang Chyuan later received an AFA rate in the sixth review is irrelevant to the question of whether Liang Chyuan would have cooperated in the fourth review.  See Def.'s Br. at 45 (citing Certain Steel Nails from Taiwan, 87 Fed. Reg. 63,034 (Dep't of Commerce Oct. 18, 2022)).   For one, at the time of its decision in the fourth review, this event had not yet happened.  Further, there are many reasons why Liang Chyuan may have chosen to not cooperate in a subsequent review (resulting in AFA), including that Liang Chyuan's business operations may have been harmed after receiving an AFA rate in the fourth review.  This Court need not speculate whether Liang Chyuan would have cooperated in the fourth review because it volunteered to serve as a voluntary respondent.  See Letter on Behalf of Liang Chyuan to Dep't of Commerce re: Comments on Sampling

Determination at 2-3 (Feb. 3. 2020) (Public Document) ("Liang Chyuan Sampling Comments"), Appx0527-0528.

Liang Chyuan's willingness to cooperate in the fourth administrative review demonstrates that its potential dumping margin is likely lower than the AFA rate assigned to the mandatory respondents and is more reasonably reflected by the low rate it received in the prior review.  See Changzhou Hawd Flooring Co. v. United States, 947 F.3d 781, 793-794 (Fed. Cir. 2020) ("Changzhou Hawd II").  There would have been no reason for Liang Chyuan to volunteer and shoulder the associated costs with participating unless its potential dumping margin was lower than the AFA rate.  The United States' argument that Changzhou Hawd II is distinguishable lacks merit.  See Def.'s Br. at 21.  Although Changzhou Hawd II examined whether respondents who requested voluntary status should be excluded from the antidumping duty order, see Def.'s Br. at 21, the facts in that case are analogous to this action.  In sustaining the CIT's judgment, the Court in Changzhou Hawd II agreed with the CIT's reasoning that by "volunteering for investigation" there was "some reason to think" that the voluntary respondents were more similar to those mandatory respondents who were excluded from the order after receiving de minimis rates.  Changzhou Hawd II, 947 F.3d at 793-94.  At a minimum, Liang Chyuan's willingness to volunteer, combined with its low calculated rate from the third review, placed a burden on Commerce to substantiate with other record

evidence that the AFA rate assigned to the mandatory respondents reasonably reflected Liang Chyuan's potential dumping margin. Commerce failed to do so and cannot now hide behind the unwillingness of other mandatory respondents to cooperate as substantial evidence supporting its use of the expected method to assign Liang Chyuan a high rate based on AFA.

Second, the United States is mistaken that Commerce correctly determined that the increasing rates assigned to the mandatory respondents in past reviews demonstrates that the AFA rate reasonably reflected Liang Chyuan's potential dumping margin. See Def.'s Br. at 43; see also Final I&D Mem. at 15, Appx0626. The calculated rates from the prior reviews are significantly lower than the AFA rate assigned to the mandatory respondents in the fourth review. See PrimeSource Br. at 42-43. Liang Chyuan itself received a much lower individual rate in the single instance when it was selected as a mandatory respondent during a period separated from the instant review by only one day. See id. at 44. There is no reasonable reading of the record that supports Commerce's finding that the AFA rate assigned to the mandatory respondents reasonably reflected the potential dumping margin of Liang Chyuan when no such trend of increasing rates existed for Liang Chyuan.

Mid Continent's repetition of Commerce's finding that Liang Chyuan failed to submit evidence to show it would have received a similar rate in the fourth review is wrong because Liang Chyuan did build a record sufficient to establish that its

19

dumping margin was similar to the immediately prior review.  See Mid Continent's Br. at 33.  In its letter volunteering to submit a response to Commerce's AD questionnaire, Liang Chyuan expressly stated that the AFA rate would not reasonably reflect its potential dumping margin given that it had received a significantly lower margin in the prior review.  See Liang Sampling Comments at 2-3, Appx0527-0528. Liang Chyuan's willingness to participate represents contemporaneous evidence from the relevant period of review that its potential dumping margin was likely closer to its prior rate of 2.54 percent than the significantly higher AFA rate.  Cf. Mid Continent's Br. at 34-35.  Commerce's emphasis on a lack of contemporaneous evidence on the record concerning Liang Chyuan's potential dumping margin in the fourth review is nonsensical because it instead chose to rely on an outdated AFA rate based on information provided by the Petitioner years earlier in the initial investigation.  See Prelim. I&D Mem. at 9-10, Appx0543-0544; see also PrimeSource Br. at 33.  The United States does not debate this fact but rather argues that Commerce "was not required to re-corroborate that rate."  Def.'s Br. at 37. Corroboration of that rate, however, is irrelevant to the underlying issue that Commerce cannot in one instance claim that it is treating each review separately while at the same time relying on data from a prior segment to assign its AFA rate. Liang Chyuan demonstrated that its potential dumping margin was more reasonably reflected by its lower calculated rate from the third review and it was unreasonable

for Commerce to dismiss this evidence in favor of outdated information from the Petition.

Further, the United States' argument that a single instance of Liang Chyuan receiving a lower rate did not constitute sufficient evidence to depart from the expected method conflicts with Commerce's own past practice. See Def.'s Br. at 22. In Quartz, supra, Commerce departed from the expected method because "the history of the rates for this Order" demonstrated that Commerce's non-selected respondents' rate was "not reasonably reflective of the non-selected companies' potential dumping margins during the {period of review}." Quartz I&D Mem. at 54. Commerce specifically rejected the argument that "the short history of this Order . . . distinguishes the record from previous instances where Commerce has deviated from the expected method because we have found the expected method to not be reasonably reflective." Id. at 55. Here too the low rate that Liang Chyuan received in the prior review was sufficient to rebut Commerce's conclusion that the AFA rate was representative of Liang Chyuan's potential dumping margin. Commerce's use of the expected method was not supported by substantial evidence or otherwise in accordance with law because the only reasonable reading of the record based on the historical rates and Liang Chyuan's willingness to participate is that Liang Chyuan's potential dumping margin was significantly lower than the AFA rate assigned to the mandatory respondents.

21

## III.  COMMERCE SHOULD HAVE CALCULATED AN INDIVIDUAL RATE FOR LIANG CHYUAN

Commerce's finding that Liang Chyuan was "not entitled to a <u>special</u> dumping margin in this review" emphasizes Commerce's fundamental misunderstanding of the statutory framework.  Final I&D Mem. at 19, Appx0630.  PrimeSource has never advocated for Liang Chyuan to receive a "<u>special</u> rate" but rather that Commerce was required to select one of the multiple reasonable options available to it to calculate a rate that reasonably reflected Liang Chyuan's potential dumping margin.

### A. Liang Chyuan Is Entitled to Its Own Rate

Commerce's conclusion that Liang Chyuan was not entitled to its own rate, perpetuated by the United States and Mid Continent in their response briefs, is inconsistent with Commerce's statutory framework, Court precedent and Commerce's past practice.  <u>See</u> Final I&D Mem. at 20, Appx0631.

The United States' and Mid Continent's claims that Liang Chyuan is not entitled its own rate contradicts the guiding principles behind Commerce's statutory framework.  <u>See</u> Def.'s Br. at 18-25; Mid Continent's Br. at 32-33, 35. "Fairness or accuracy, is the 'overriding purpose' of the antidumping statue when calculating a rate for a cooperating party." <u>Wujin</u>, 701 F.3d at 1378; <u>see also</u> <u>Albemarle</u>, 821 F.3d at 1354.  Calculating an accurate and fair margin requires that Commerce's "rate determinations for non-mandatory, cooperating separate rate respondents must also bear some relationship to their actual dumping margins." <u>Bestpak</u>, 716 F.3d at 1380.

22

The general rule is that Commerce shall calculate a dumping margin for "each known exporter and producer of subject merchandise." 19 U.S.C. § 1677f-1(c)(1) It is the exception to the rule that allows Commerce to limit its examination to "a reasonable number of exporters or producers." Id. at § 1677f-1(c)(2). The exception to Commerce's general rule is inapplicable if it conflicts with Commerce's underlying obligation to calculate a respondent's dumping margin as accurately as possible by ensuring that it "bears some relationship" to the respondent's actual dumping margin.

Commerce's obligation to calculate an individual rate for Liang Chyuan is supported by Bestpak. In Bestpak, the Court rejected arguments by Commerce that its separate rate was as accurate as possible based on the limited record available when Commerce was aware early in the preceding that a mandatory respondent would be unresponsive. See 716 F.3d at 1380. Commerce applied the same rate for "twelve respondents that qualified for a separate rate" including Bestpak. Id. at 1374. Nonetheless, the Court's holding pertained only to Bestpak. See, e.g., id. at 1337. The Court then vacated and remanded the CIT's decision "so that {the CIT} may remand the case back to Commerce" relating to Bestpak and not the other separate rate respondents. Id. at 1380. In other words, Bestpak was the sole non-selected respondent eligible for a new rate consistent with the Court's holding.

Consistent with <u>Bestpak</u>, this Court should vacate and remand the CIT's judgment with respect to Liang Chyuan.

Vacating and remanding the CIT's judgment with respect to Liang Chyuan is also consistent with the Court's holding in <u>Changzhou Hawd II</u>.  Although the United States and Mid Continent correctly acknowledge that Liang Chyuan was willing to cooperate as voluntary respondent, both parties wrongly conclude, as did Commerce, that this willingness was insufficient for Liang Chyuan to qualify for its own rate when it failed to submit responses to Commerce's questionnaires.  <u>See</u> Def.'s Br. at 19-20; Mid Continent's Br. at 32-33, 35.  In <u>Changzhou Hawd II</u>, in sustaining Commerce's determination to exclude the voluntary respondents from the antidumping duty order, the Court did not distinguish between voluntary respondents who submitted full questionnaire responses and those respondents, like Liang Chyuan, who instead submitted a request to be treated as a voluntary respondent. <u>See</u> 947 F.3d at 784.  The United States' assertion that <u>Changzhou Hawd II</u> is distinguishable because the voluntary-review firms were denied voluntary respondent status by Commerce does not undermine the applicability of the holding of <u>Changzhou Hawd II</u> to this action.  <u>See</u> Def.'s Br. at 21-22.  Commerce routinely rejects requests for voluntary respondent status.  <u>See</u> <u>generally</u> <u>Qingdao Qihang Tyre Co. v. United States</u>, 308 F. Supp. 3d 1329, 1365 (Ct. Int'l Trade 2018) (holding that Commerce has "discretion in deciding whether or not to accept a request

for voluntary respondent status"). It would be unreasonable for Commerce to now refuse to calculate a rate for Liang Chyuan when its efforts to seek voluntary respondent status would have likely been futile. Liang Chyuan's willingness to cooperate, therefore, was sufficient for it to be entitled to its own rate.

Finally, the United States' argument that Liang Chyuan is not entitled to its own rate conflicts with Commerce's standard practice following litigation to only calculate a rate for those respondents that are a party to the appeal. See generally Dorbest Ltd. v. United States, 602 F. Supp. 2d 1287, 1293 (Ct. Int'l Trade 2009), rev'd on other grounds 604 F.3d 1363 (Fed. Cir. 2010) (noting that separate rate companies were not "entitled to the benefits of {Plaintiff}'s claim, because they were not parties to that action."). If Liang Chyuan had been the sole plaintiff-appellant, then consistent with Commerce's standard practice, it would be the only party that could receive a new rate as a result of this appeal. It is illogical for Commerce to deny Liang Chyuan its own rate merely because other non-selected respondents are also parties to this appeal.

Given that Liang Chyuan is entitled to its own rate, this Court should vacate the CIT's judgment and remand Commerce's use of the expected method with respect to Liang Chyuan.

**B. Commerce Should Have Solicited Further Information From Liang Chyuan or Pulled Forward Its Prior Rate From the Third Review**

There were, at a minimum, two other methods available to Commerce to ensure that its calculated rate reasonably reflected Liang Chyuan's potential dumping margin.  The availability of these other methods demonstrates that Commerce's use of the expected methodology was not supported by supported by substantial evidence or otherwise in accordance with law.

First, Commerce could have solicited additional information from Liang Chyuan to calculate an individual dumping margin.  Contrary to the arguments by the United States, Def.'s Br. at 25, calculating a rate for Liang Chyuan does not defeat the purposes of the respondent selection process but instead ensures that Liang Chyuan receives a rate that reasonably reflected its potential dumping margin.  Commerce was aware early in the review that the mandatory respondents would be unresponsive, and Commerce had broad authority to request additional information from Liang Chyuan concerning its alleged dumping practices especially given that Liang Chyuan volunteered to submit this information.  See Albemarle, 821 F.3d at 1358.  Commerce cannot now rely on the "absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making."  Id. at 1378 (citing Bestpak, 716 F.3d at 1378).

Second, Commerce wrongly concluded that it could not pull forward Liang Chyuan's 2.54 percent rate from the immediately prior third review.  See Final I&D

Mem. at 19, Appx0630.    Commerce's conclusion conflicts with its established practice of pulling forward prior rates when the expected method does not reasonably reflect the potential dumping margins of the non-selected respondents. The United States and Mid Continent fail in their attempts to distinguish this action from past instances when Commerce has followed this practice.    See Def.'s Br. at 48-50; Mid Continent's Br. at 40-44.    Both parties repeat Commerce's finding that the instant case is distinguishable from Commerce's decisions in its reviews of tapered roller bearings from China and stainless steel sinks from China (where Commerce pulled forward prior rates determined for the non-selected respondents) because in those cases Commerce found the mandatory companies were part of the China-wide entity.    See Mid Continent's Br. at 40; Def.'s Br. at 49.    This argument ignores that the China-wide entity rate is analogous to AFA rates because both types of rates are based on information not submitted by the mandatory respondents and are wholly divorced from any cooperating all-others rate respondents.

The United States' efforts to distinguish the facts of this case from Commerce's investigation of stainless-steel bar ("Stainless Steel Bar") from India and the CIT's holding in GODACO Seafood Joint Stock Co. v. United States, 539 F. Supp. 3d 1286, 1290 (Ct. Int'l Trade 2021), are equally unsuccessful because in both cases Commerce pulled forward rates where Commerce had concluded that the rates had remained consistent between reviews.    See Def's Br. at 46-47, 49.    In Albemarle,

27

the Court found that "use of data from a prior period may be reasonable . . . where there is evidence that the overall market and the dumping margins have not changed from period to period." 821 F.3d at 1357. The United States claims that Commerce's decision to pull forward a rate in Stainless Steel Bar is distinguishable because in that case Commerce determined that "circumstances outlined in <u>Albemarle</u> had been met." Def.'s Br. at 41. Similarly, the United States asserts that, unlike in <u>GODACO</u>, the history of the prior dumping rates confirm that Liang Chyuan's potential dumping margin was reflected by the mandatory respondents. <u>See</u> Def's Br. at 47. Here, similar to Stainless Steel Bar and <u>GODACO</u>, the considerations in <u>Albemarle</u> have been met because Liang Chyuan's willingness to cooperate demonstrates that its potential dumping margin was reasonably reflected by the 2.54 percent margin calculated for it in the prior review as opposed to the punitively high AFA rate assigned to the mandatory respondents. In other words, Liang Chyuan's rate likely remained consistent between the third and fourth review. This Court should reject Mid Continent's assertion that this case more strongly resembles <u>Mid Continent Steel & Wire, Inc. v. United States</u>, 321 F. Supp. 3d 1313 (Ct. Int'l Trade 2018). <u>See</u> Mid Continent's Br. at 42-44. There, unlike here where Liang Chyuan's dumping margin has likely not changed between two adjacent periods, the Court concluded that it was not reasonable to use rates from prior segments to calculate the non-selected respondent's rate because Plaintiff made no argument that "the overall

market and the dumping margins have not changed from period to period." <u>Mid Continent</u>, 321 F. Supp. 3d at 1323 (citation omitted). Like Stainless Steel Bar and <u>GODACO</u>, assigning Liang Chyuan's a rate from the immediately adjacent third review period would have been supported by substantial evidence because the record demonstrates that Liang Chyuan's potential dumping margin was consistent between the third and fourth reviews.

In sum, Commerce could have either solicited more information from Liang Chyuan or pulled forward its prior rate from the third review. Either method would have resulted in a rate that reasonably reflected Liang Chyuan's potential dumping margin. Instead, Commerce relied on the expected method, which resulted in a rate that did not reasonably reflect Liang Chyuan's potential dumping margin and the CIT should not have sustained Commerce's determination.

## CONCLUSION AND RELIEF SOUGHT

As PrimeSource has shown above and in its opening brief, the Court should reverse the judgment of the CIT sustaining Commerce's use of the expected method to calculate the non-selected respondents rate for Liang Chyuan. The Court should

remand with instructions that Commerce recalculate Liang Chyuan's rate by selecting a calculation methodology that reasonably reflects Liang Chyuan's potential dumping margin.

Respectfully submitted,

May 25, 2023

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel to PrimeSource Building Products, Inc.*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-2128 and 22-2129

**Short Case Caption:** PrimeSource Building Products, Inc. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6990 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/25/2023

Signature: /s/ Jeffrey S. Grimson

Name: Jeffrey S. Grimson